Jose C. DEHOYOS, Eva Perez–Dehoyos, Georgia Harrison, Charles White, Sheryl H. Franks, and Martel Shaw, Individually and on Behalf of Others Similarly Situated, Plaintiffs,

v.

ALLSTATE CORPORATION, Allstate Insurance Company, Allstate Texas Lloyd's, and Allstate Indemnity Company, Defendants.

No. CIV.A. SA01CA1010FB.

United States District Court,
W.D. Texas,
San Antonio Division.

Feb. 21, 2007.

Andrew Steven Friedman, Wendy J. Harrison, Bonnett, Fairbourn, Friedman & Balint, P.C., Gustave A. Hanson, Phoenix, AZ, Daniel J.T. Sciano, Richard E. Tinsman, Tinsman & Sciano, San Antonio, TX, Douglas Bowdoin, Beusse, Brownlee, Bowdoin & Wolter, Orlando, FL, Helen I. Zeldes, Lerach Coughlin Stoia & Robbins, LLP, John J. Stoia, Jr., Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA, J. Andrew Meyer, Kendra C. Mancusi, Terry A. Smiljanich, W. Christian Hoyer, Christa L. Collins, James, Hoyer, Newcomer & Smiljanich, Tampa, FL, Joe R. Whatley, Whatley Drake LLC, Birmingham, AL, Robert Q. Keith, Keith & Weber, P.C., Cypress Mill, TX, Robert R. Sparks, Ron Parry, Parry Deering Futscher & Sparks, Covington, KY, for Plaintiffs.

Jeffrey Lennard, Richard Fenton, Sonnenshein, Nath & Rosenthal, Richard C. Godfrey, Donna M. Welch, J. Robert Robertson, Kirkland & Ellis, LLP, M. Keith Moszkowicz, Chicago, IL, Kevin M. Sadler, Baker Botts, LLP, Austin, TX, Maryanne Lyons, Baker Botts L.L.P., Tony P. Rosenstein, Houston, TX, Rod Phelan, Baker & Botts, Roger D. Higgins, Thompson, Coe, Cousins & Irons, Dallas, TX, for Defendants.

## AMENDED[1] FINAL ORDER AND JUDGMENT APPROVING CLASS ACTION SETTLEMENT

BIERY, District Judge.

### SUMMARY

Before the Court is the issue of the disapproval or approval of the proposed settlement in this class action brought under federal civil rights laws and the Fair Housing Act which has been pending before this Court for over five years.

Plaintiffs sued the Allstate defendants ("Allstate") alleging deficiencies in Allstate's credit scoring procedure which plaintiffs say resulted in discriminatory action against approximately 5 million African–American and Hispanic customers throughout the United States. Allstate denies these allegations.

Prior to the fairness hearing on December 18, 2006, this matter has been reviewed at all levels of the federal court system. *Dehoyos v. Allstate Corp.*, Civ. A. No. SA–01–CA–1010–FB, 2002 WL 1491650 (W.D.Tex. Apr.5, 2002); *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir.2003); *Allstate v. DeHoyos*, 541 U.S. 1010, 124 S.Ct. 2074, 158 L.Ed.2d 621 (2004).

Both sides to the dispute have been represented by excellent lawyering, exemplifying the best of the Rule of Law and the American legal process. In addition to class counsel and defense counsel, other good lawyers advocated on behalf of the objectors including the Texas Civil Rights Project. Tellingly, Texas Civil Rights Project's counsel, after reviewing the history and effort of the case and the proposed remedy, expressed at the fairness hearing counsel's belief that the proposal is fair and reasonable, in a sense becoming somewhat of an amicus curie and an independent voice to the Court separate and apart from plaintiffs' and defense counsel.

Although no settlement can attain perfection precluding objections, after a thorough review, the Court finds the proposed settlement to be fair and reasonable for the reasons stated below and approves the same.

Plaintiffs and Allstate seek approval of this race discrimination class action suit based on credit scoring practices as fair, reasonable and adequate. Ten individual and group objectors mainly challenge the notice sent to class members, the proposed credit scoring system, the scope of the release and/or attorneys' fees. Objectors contend the settlement should not be approved or argue it should be modified. Plaintiffs and Allstate respond the settlement cannot be modified, but must be accepted or rejected. If the settlement is approved, plaintiffs' counsel seek $11,720,000 in attorneys' fees and costs. Several objectors challenge this award. The Melder objectors further contend they are entitled to an award of $2,493,327.20 for work they did in their case in Louisiana and, therefore, the attorneys' fees in this case would be reduced to $9,226.672.80. After careful consideration, this Court finds the proposed settlement is fair, reasonable and adequate and that the objections should be overruled. The Court also finds the proposed award of attorneys' fees is reasonable and should not be reduced.

### BACKGROUND

Before the Court is Plaintiffs' Motion for Final Approval of the Settlement and Entry of Final Judgment. (Docket no. 147). Six members of a proposed class of African–American and Hispanic customers brought this civil rights action against Allstate Insurance Company, Allstate Texas Lloyd's and Allstate Indemnity Company alleging that Allstate engaged in a racially discriminatory business practice in violation of 42 U.S.C. §§ 1981 and 1982 of the Civil Rights Act and the Fair Housing Act, 42 U.S.C. § 3601. Specifically, the plaintiffs allege Allstate used "credit scoring" as a form of unfair racial discrimination pursuant to which the proposed class members were charged higher rates for automobile and homeowners' insurance policies than similarly situated Caucasians.

Allstate moved to dismiss because: (1) plaintiffs' claims are barred by the McCaran-

---

1. This amended order is done not to change the substance of the Court's Final Order and Judgment Approving Class Action Settlement (docket no. 178), but to correct typographical errors contained in the original opinion.

Ferguson Act; (2) this Court should abstain from deciding the issues under the *Buford* abstention doctrine; and (3) the complaint fails to allege facts which, if proven, would establish that Allstate engaged in intentional discrimination. This Court held, and the Fifth Circuit Court of Appeals affirmed: (1) the McCaran–Ferguson Act does not preempt plaintiff's claims; (2) the *Buford* abstention doctrine does not prevent this Court from retaining jurisdiction and addressing plaintiffs' claims; and (3) plaintiffs had sufficiently alleged discriminatory intent. *Dehoyos v. Allstate Corp.,* Civ. A. No. SA–01–CA–1010FB, 2002 WL 1491650 (W.D.Tex. Apr.5, 2002), *aff'd,* 345 F.3d 290 (5th Cir. 2003). The United States Supreme Court denied Allstate's petition for writ of certiorari. *Allstate Corp. v. DeHoyos,* 541 U.S. 1010, 124 S.Ct. 2074, 158 L.Ed.2d 621 (2004).

Upon remand, the Court entered a Scheduling Order and the parties began to engage in discovery. Allstate produced a significant amount of documents to plaintiffs including rate books and policy manuals.

The Court held an initial status conference held on August 25, 2004. At that time, the parties announced they had begun formal settlement discussions. At the Court's direction, plaintiffs' and Allstate's counsel over the next eighteen months kept the Court informed of the status of their negotiations. The parties report that over fifty negotiating sessions were held, both in person and via telephone conference. As part of the negotiations, Allstate produced information regarding how it developed and implemented its credit scoring program. Counsel for plaintiffs retained experts who engaged in an extensive analysis of policyholder data and Allstate's credit scoring formulas.

The Court continued to hold conferences wherein counsel advised the Court of the status of the ongoing settlement negotiations. On May 19, 2006, a compromise and Settlement Agreement ("Settlement Agreement") was reached by the parties and their counsel. All parties and counsel have represented to the Court their unanimous opinion the proposed settlement is fair, adequate and reasonable. The joint motion for final approval of the settlement was briefed, supported by

affidavits, testimony and documents in the record, and was the subject of an extensive fairness hearing on December 18, 2006. Recognizing no settlement will please all the people all the time, and based on these submissions and the Court's findings of fact and conclusions of law regarding the fairness of the class action settlement set forth below, the settlement is approved.

### THE PROPOSED SETTLEMENT

As noted, the parties have reached a proposed settlement and have submitted the proposed Settlement Agreement for the consideration of this Court, together with plaintiffs' request for certification of the settlement class defined in the agreement. The class definition includes:

all individuals who are Black/African–American or of Hispanic or Latino origin who either (a) was charged a premium for a policy that was anything but the lowest available premium based in whole or in part on Credit Information; or (b) did not qualify for a policy issued by one Allstate insurer, and who received notice from Allstate in a new business or renewal mailing package, indicating that he or she did not qualify for lower rates or that he or she did not qualify for a policy based in whole or in part on Credit Information and advising him or her of certain rights under the Fair Credit Reporting Act.

(Order Preliminarily Approving Settlement, docket no. 110, p. 3). The Court previously approved a proposed plan for dissemination of notice to the settlement class regarding the litigation. *Id.* pp. 5–6.

Under the agreement, and subject to this Court's grant of final approval, the settlement includes:

* a new credit scoring formula which has undergone extensive testing from plaintiffs' experts;

* an appeals process for those people whose credit score has been impacted by an extraordinary circumstance;

* a credit education program designed to increase minority understanding of the use of credit and the management of their credit;

* an increase in minority marketing; and

* monetary relief ranging from $50 to $150.

Allstate denies any discrimination has occurred and contends its use of information from credit reports is a valid and statistically sound predictor of insurance losses. Allstate, nevertheless, has agreed to modify its practices.

### A. The New Settlement Credit Formula

The new settlement credit formula will be rolled out on a scheduled state-by-state basis because the proposed roll out is contingent on receiving required state regulatory approval. This new formula will remain in effect for at least two to three years from the date which it is approved for use by the appropriate state regulators, depending on various state requirements which are detailed at pages seven to ten of the Settlement Agreement. In a significant number of states, policyholders, including class members, will automatically be able to obtain a policy with a premium determined using the new settlement credit formula at their scheduled renewal. In certain states, the class members will be given an option of obtaining a policy from an Allstate company which is using the new settlement credit formula. In other states, the class members may request the opportunity to have their policy priced using the new settlement credit formula prior to renewal. Class members must return a request form to be eligible for certain options. The notice to class members will inform them they have the right to make this request. When such a request is made, Allstate will then send the class members more detailed information about the choices available.

### B. The Settlement Appeals Process

Pursuant to the Settlement Agreement, Allstate will implement an appeals process to allow customers to appeal their insurance credit scores based on nine "extraordinary circumstances." Specifically, a person whose credit history was negatively impacted by any of the following may be eligible to receive a revised premium based on a neutral credit score:

* divorce;

* death in the family;

* unemployment;

* medical expenses;

* care of an adult dependent;

* identity theft;

* long-term injury, illness or disability;

* care of a dependent; and/or

* domestic violence.

Under the terms of the agreement, when Allstate policyholders are notified they did not receive the best premium possible because of their credit score, and where their credit score resulted in a worse than neutral treatment, Allstate will inform them about the procedures to follow for the appeals process.

### C. The Education/Community Outreach Provisions of the Settlement Agreement

As part of the settlement, Allstate will make its new settlement credit scoring formula available to class members from the date the notice is first published through sixty days of the date of the fairness hearing. Allstate has also posted a narrative description of the credit attributes used in the new settlement credit scoring formula on the Allstate website for public viewing. Allstate is also funding a credit education program designed through Consumer Credit Counseling Services, a neutral third-party organization, which will be distributed to minorities through a number of community-based advocacy organizations. As part of the settlement, these organizations will share in $250,000 to implement the educational program in their communities within a one-year period.

### D. Multi–Cultural Marketing Under the Settlement Agreement

Also as part of the Settlement Agreement, Allstate will increase the percentage of its marketing budget directed to African–Americans and Hispanic/Latino communities. Specifically, Allstate has increased its national media expenditures directed to minorities for the 2005 fiscal year, and will increase its

national media expenditures directed to minorities for the 2006, 2007, and 2008 fiscal years to 15% (over these four fiscal years of its total national medial spending).

### E. Monetary Relief Under the Terms of the Settlement Agreement

Under the terms of the Settlement Agreement, Allstate will further make monetary payments to those class members who complete a claim form and qualify under a formula which compares the insurance score assigned to his or her Allstate policy in the past and the insurance score assigned under the new settlement credit formula. Class members whose insurance scores improve enough to qualify will receive from $50 to $150 depending on the amount of improvement and the length of time the class member has held the particular policy. A class member seeking monetary relief must submit a form indicating that he or she is a minority and that he or she has, or had, an Allstate policy. Allstate will then, under the terms of the Settlement Agreement, calculate whether monetary relief is appropriate and make payments accordingly.

### THE NOTICE PROGRAM

Allstate does not maintain information on the race of its policyholders. Because there is no readily identifiable record of the names and addresses of minority policyholders and given the size of the proposed class, the parties determined direct notice by mail was not feasible. Therefore, to provide notice to prospective class members, Garden City Group, Inc., a company which specializes in assisting counsel in providing notice to prospective class members, was retained. The administrator established and has overseen a toll-free number, post office box and website. Answers to common questions about the settlement can be obtained by calling 1–866–817–6514, or by writing to DeHoyos Settlement, P.O. Box 9000 # 6428, Merrick, N.Y. 11566–9000, or by visiting the website at *www.creditusesettlement.com.* The Court is not to be contacted.

The proposal for providing notice included publication in a variety of national magazines and newspapers, including those which target African–American and Hispanic and Latino readership. The notice was also advertised on the internet in both English and Spanish. The cost of the notice program, which is currently estimated by counsel to be approximately $2,100,000, will be paid by Allstate.

The notice form is attached as Exhibit 1 to the Settlement Agreement. The notice includes (i) a description of the class; (ii) a description of the settlement; (iii) an explanation of the rights of class members including the deadlines for filing a claim form; (iv) the names of counsel for the class; (v) the fairness hearing date (December 18, 2006, at 10 a.m.); (vi) a description of eligibility to appear at the hearing; (vii) a statement of the $11,720,000 maximum amount of attorneys' fees which is sought by class counsel; (viii) a statement of the deadline (November 6, 2006) for filing objections; and (ix) how to obtain further information by calling the toll free number, writing to the DeHoyos Settlement P.O. box or by visiting the website. As of December 4, 2006, there were a total of 13,781 calls to the helpline and 7,976 requests for notice packets. (Declaration of Jeanne C. Finegan, ¶ 36, attached to Defendant's Brief in Support of Proposed Class Action Settlement as Exhibit 8). By December 6, 2006, there had been 31,574 visits to the website and there were 6,732 requests made to the claims forms page. *Id.* ¶ 35.

### THE TIMETABLE OF THE PARTIES AND OBJECTORS

The Court entered an Order Preliminarily Approving [the] Settlement on June 2, 2006. (Docket no. 110). The fairness hearing was therein scheduled to be held on December 18, 2006 at 10 a.m. *Id.* Under the terms of the Settlement Agreement, Allstate began the class notice publication program (described in detail at Exhibit 13 of the Settlement Agreement) on or about July 2, 2006, and the last publication date was on or about September 4, 2006. (Addendum # 4 to the Settlement Agreement). Objections to the settlement were to be filed on or before November 6, 2006 (notice form attached as Exhibit 1 to the Settlement Agreement). However, objectors were allowed additional time (until noon on Friday, December 15,

2006) to file supporting materials, including all evidence they intended to present at the fairness hearing. (Order Setting Agenda for Fairness Hearing and Further Orders of the Court, docket no. 155).

The fairness hearing was held on December 18, 2006, as scheduled. The parties and counsel appeared, as did counsel for certain objectors. Out of time objections were filed on January 9, 2007 (docket nos. 174 & 175), and on January 17, 2007 (docket no. 176), following the fairness hearing. As set forth in the Order Preliminarily Approving Settlement, the following issues remain to be considered and determined by this Court following the hearing:

> (1) the merits of any objections to the Settlement; (2) whether to grant final approval of the Settlement Agreement pursuant to Rule 23(e) as fair, reasonable, adequate and in the best interests of the Class and to authorize all acts necessary to consummate and effectuate the terms and conditions of the Settlement Agreement; (3) whether the Court should certify the Class for settlement purposes only; (4) whether the Court should enter a Final Judgment approving the settlement and dismissing the Action with prejudice; (5) whether the fees and expenses submitted by Class Counsel should be approved; and (6) such other matters as the Court may deem necessary and appropriate.

(Docket no. 110, p. 5). Each issue shall be addressed separately below.

### CLASS CERTIFICATION

Prior to this Court's determination of the class certification issue, the parties reached the proposed settlement and Allstate agreed to class certification for settlement purposes only. Plaintiffs and Allstate jointly moved for an order from this Court conditionally certifying the settlement class, which was granted on June 2, 2006. (Order Preliminarily Approving Settlement, docket no. 110). Despite the conditional class certification, however, at least one circuit has held that "courts employing settlement classes must still make findings that the class complies with Rule 23(a) and the appropriate parts of Rule 23(b), and the failure to do so is 'a plain

error of law, and hence an abuse of discretion, requiring the certification be set aside.'" *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 800 (3d Cir.1995). Therefore, this Court will examine the class action certification prerequisites. *See Garza v. Sporting Goods Properties, Inc.*, No. CIV. A. SA-93-CA-108, 1996 WL 56247, at *3-6 (W.D.Tex. Feb.6, 1996) (discussing class certification prerequisites).

### A. Rule 23(a) Prerequisites

In deciding whether to certify a class, a district court is given wide discretion. *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 471-72 (5th Cir.1986). "A class may be certified if all four prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met and one or more of the provisions of Rule 23(b) is satisfied." *Garza*, 1996 WL 56247, at *3 (internal quotation omitted). Rule 23(a) provides:

> One or more members of a class [action] may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a). "Although these requirements apply to all federal class actions, the application is varied." *Garza*, 1996 WL 56247, at *3. For example, at least one court has approved a settlement and certified a settlement class under a more relaxed standard which allowed the class to be certified in the context of the settlement, but left doubt as to the certification for litigation purposes. *Id.* (citation omitted). Another did not allow the standard to be relaxed merely because the class was being certified in the context of a settlement. *Id.* (citation omitted).

■ Allstate agrees this class should be certified for purposes of settlement, but reserves its right to challenge class certification for purposes of litigation. (Defendant's

Brief in Support of Proposed Class Settlement, docket no. 152, p. 20 n. 14); *see In re Beef Indus. Antitrust Litig.*, 607 F.2d 167, 178 (5th Cir.1979), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981) (concluding it is proper and consistent for court to certify class for settlement purposes even though it might have had more difficulty reaching this same determination in different context). Although the United States Court of Appeals for the Fifth Circuit has indicated a class may be certified for settlement purposes when doubt exists as to certification for litigation, there is support for the proposition that the rule 23(a) requirements must be applied equally to settlement classes and litigation classes. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 216 (5th Cir.1981) (indicating that the evaluation of the fairness of settlement entails a consideration of "strength of plaintiff's case on the merits" including "risks of class [ ] certification"); *see also In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d at 800 (mandating that court reviewing class action settlement must make finding that class complies with rule 23). Accordingly, this Court shall apply the rule 23(a) requirements equally to this settlement class. *See Garza v. Sporting Goods Properties, Inc.*, No. CIV. A. SA–93–CA–108, 1996 WL 56247, at *3 (W.D.Tex. Feb.6, 1996) (taking approach rule 23(a) requirements are not different in settlement context than in litigation context and applying these requirements to class action settlement).

### 1. Numerosity

■ The numerosity requirement of rule 23(a) is satisfied because the proposed class involves approximately 4,760,000 Allstate policyholders and the policyholders are spread geographically across the United States. *See* (Decl. of Dr. John J. Donohue, III, docket no. 154, p. 5) (noting that Allstate has 13 million policyholders, 28% of whom are African–American and Hispanic); *see Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir.1999) (finding that class of 100 and 150 satisfies numerosity requirement); *Garza*, 1996 WL 56247, at *3 (concluding numerosity requirement was satisfied because proposed class involved owners of ap-proximately 8.5 million shotguns and owners were spread geographically across America). As set forth in rule 23(a)(1), the numerosity requirement is met when "joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). Given the potential class members and geographical dispersion of these individuals, the joinder of all members is indeed impractical.

### 2. Commonality

The commonality requirement of rule 23(a)(2) mandates there be at least one factual or legal issue which is common to all or substantially all of the class members. FED. R. CIV. P. 23(a)(2); *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir.1997); *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir.1986). Thus, "[t]he commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members." *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir.1993) (internal quotation omitted). "The threshold of 'commonality' is not high." *Jenkins*, 782 F.2d at 472. As long as class members are allegedly affected by a defendant's general policy and the general policy, here credit scoring, is the crux or focus of the litigation, the commonality requirement is satisfied. *Garza*, 1996 WL 56247, at *4–5 (citing *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 158 (S.D.Ohio 1992), *appeal dism'd without opinion*, 995 F.2d 1066 (6th Cir.1993)).

■ Plaintiffs allege Allstate discriminated against them because of their race and/or national origin in violation of 42 U.S.C. §§ 1981 and 1982 and the Fair Housing Act, through policies, practices and procedures implemented by Allstate. (Amended Complaint ¶¶ 3, 13–14, 71–78). The common factual and legal issues raised by the complaint which are common to all class members include:

* whether Allstate discriminated against class members by charging them higher premiums for their insurance policies than the premiums charged similarly situated Caucasians;

* whether Allstate's credit scoring formula has a disparate impact on class members;
* whether Allstate's intent in its alleged discriminatory policies and practices was racially motivated;
* whether Allstate maintained a corporate policy to sell its policies on a racially discriminatory basis by concealing material information from plaintiffs and class members, such as the fact that the policies were not sold under the same terms and conditions as those offered to similarly situated Caucasians;
* whether Allstate trained, directed or determined that its agents conceal or not disclose Allstate's alleged discriminatory practices in the sale and servicing of the policies;
* whether Allstate devised and deployed a scheme or common course of conduct which acted to deceive plaintiffs and class members and/or exact unreasonable, unconscionable and/or discriminatory premiums for its insurance policies by taking advantage of its position of superior knowledge and otherwise;
* whether Allstate systematically failed to disclose to plaintiffs and class members material information, such as the actual basis on which premiums would be calculated;
* whether plaintiffs and class members have sustained damages and the proper measure of those damages;
* whether the class members are entitled to specific performance, injunctive relief and other equitable relief against Allstate; and
* whether Allstate's conduct is actionable under the Civil Rights Act and the Fair Housing Act.

(Amended Complaint at ¶¶ 63, 71–88).

The alleged existence and operation of a company-wide policy and practice of unlawful discrimination presents the type of interrelated factual and legal issues which satisfy commonality. *See Rossini v. Ogilvy & Mather. Inc.*, 798 F.2d 590, 599 (2d Cir.1986) (holding that discriminatory intent was major issue of law and fact shared in common by individual and class plaintiffs); *San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 442 (W.D.Tex. 1999) (determining that "[a]s long as class members are allegedly affected by a defendant's general [discriminatory] policy, and the general policy is the crux or focus of the litigation, the commonality prerequisite is satisfied"); *Ingram v. Madison Square Garden Ctr., Inc.*, No. 76 Civ. 5870, 1978 WL 2, at *3 (S.D.N.Y. June 8, 1978) (concluding that basic question of whether defendants had company policy of discrimination is sufficient to satisfy commonality). Moreover, the fundamental factual and legal issues raised in this suit focus not on matters unique to the individual policyholder, but on Allstate's policy of using a particular credit scoring algorithm, which plaintiffs allege has a disparate impact on minorities. Stated another way, Allstate's conduct impacts all class members. Because the class is affected by this general policy, which is the focus of this litigation, the commonality requirement has been met. *See San Antonio Hispanic Police Officers' Org., Inc.*, 188 F.R.D. at 443 (noting commonality requirement is met where class is affected by general policy which is focus of litigation).

### 3. Typicality

"The typicality requirement does not focus as much on the relative strengths of the case of the named and unnamed plaintiffs as it does on the 'similarity of the legal and remedial theories behind their claims.'" *Garza v. Sporting Goods Properties, Inc.*, No. CIV. A. SA–93–CA–108, 1996 WL 56247, at *4 (W.D.Tex. Feb.6, 1996) (quoting *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir.1986)). The prerequisite in the settlement context requires "proof that the interests of the class representatives and the class are commonly held for purposes of receiving similar or overlapping benefits from a settlement." *Id.; see also* 4 NEWBERG ON CLASS ACTIONS § 11:28 (4th ed.2002). Typicality is satisfied when the named plaintiffs' claims for relief arise from the same common nucleus of operative facts as the claims of absent class members. *Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 625 (5th Cir.1999); *Forbush v. J.C. Penney Co.*,

994 F.2d 1101, 1106 (5th Cir.1993). Thus, rule 23(a)(3)'s typicality requirement "is satisfied when each class member's claim arises from the same [common] course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir.1993); *see also Jenkins*, 782 F.2d at 472 (stating that "[t]he 'typicality' requirement focuses less on the relative strengths of the named and unnamed plaintiffs' cases than on the similarity of the legal and remedial theories behind their claims"). Like the commonality requirement, the typicality requirement "is not demanding." *San Antonio Hispanic Police Officers' Org., Inc.*, 188 F.R.D. at 443. The test is simply whether the defendant discriminated "in the same general fashion against the class representatives and the other members of the class." *Robidoux*, 987 F.2d at 937 (citing *Rossini*, 798 F.2d at 598).

Plaintiffs do not assert claims unique to themselves. Their claims arise from the same factual and legal foundations as do the claims of other members of the class: the alleged discriminatory use of insurance credit scores. The named plaintiffs are all African–American or Hispanic persons who have or had an ownership interest in one or more of the policies issued, serviced or administered by Allstate, and each makes the same legal argument that Allstate's credit scoring algorithm has a disparate impact on them because of their race and/or national origin. (Amended Complaint ¶¶ 6–11, 32–58). Because Allstate's alleged discriminatory practices adversely affected the plaintiffs and the other proposed class members in the same general fashion, the plaintiffs' claims are typical of the claims of the entire class. Thus, the legal and remedial theories asserted by the class representatives are typical of the class itself.

### 4. Adequacy of Representation

Rule 23(a)(4) requires the class representatives and their counsel to "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). To meet this requirement, plaintiffs must show "[1] the zeal and competence of the representative[s']" counsel and [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees." *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir.2002) (citations omitted). As discussed below, these requirements are met here.

#### a. Qualifications of Counsel

Class counsel in this case are highly skilled, competent, and experienced class action attorneys, who have successfully litigated major deceptive trade practices class actions against Allstate and numerous other insurance companies, as well as substantial civil rights actions on behalf of allegedly victimized classes. (Declaration of Christa Collins, docket no. 149, ¶ 8). The law firms of James, Hoyer, Newcomer & Smiljanich, P.A. ("James, Hoyer"); Bonnet, Fairbourn, Friedman & Balint, PC ("Bonnet, Fairbourn"); and Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP ("Lerach, Coughlin"), have significant experience in class actions in general and insurance and racial discrimination cases in particular. For example Christa L. Collins, a partner with the James, Hoyer firm, is licensed in state and federal court, and has extensive experience and training in the field of civil rights and insurance coverage issues; likewise, J. Andrew Meyer, also a partner, is an experienced trial lawyer licensed in state and in federal courts. Andrew J. Friedman, a named shareholder in the Bonnet, Fairbourn firm, has successfully devoted his practice to major class action cases in state and federal courts; Wendy J. Harrison, a shareholder with firm, provides experience in prosecuting class actions and administering class action settlements. John J. Stoia, Jr., a named partner in the Lerach, Coughlin firm, brings inimitable experience concerning class actions and settlements. He has prosecuted numerous complex nationwide class actions and brought suit against insurance companies for a variety of alleged wrongful practices, including discrimination.

Moreover, plaintiffs' counsel have vigorously litigated this case for the past five years and successfully negotiated a powerful settlement for the class. *See Parker v.*

*Anderson,* 667 F.2d 1204 (5th Cir.1982) (reasoning "[i]t will follow generally that an attorney who secures and submits a fair and adequate settlement has represented the client class fairly and adequately"). There is no reason to believe plaintiffs' counsel would not continue to prosecute this case with their usual degree of diligence and vigor. In reviewing the curriculum vitaes of these firms and observing counsel's competence, skill, and expertise before this Court, the Court is satisfied class counsel has adequately represented the class.

**b. Class Representatives**

■ The Court also finds the class representatives have adequately represented the class. All of the named plaintiffs are members of the proposed class and are holders of Allstate insurance policies. As set forth in *Garza v. Sporting Goods Properties, Inc.,* No. CIV. A. SA–93–CA–108, 1996 WL 56247, at *4 (W.D.Tex. Feb.6, 1996), "[c]lass representatives satisfy the adequacy requirement unless they have an insufficient stake in the outcome or interest antagonistic to the unnamed members." (Internal quotation omitted). Moreover, as long as "all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 208 (5th Cir.1981). In this case, the interests of the plaintiffs are sufficiently aligned with those of the absentee class members, and they have vigorously pursued this litigation. Plaintiffs, through counsel, fought to obtain the best possible recovery to the point where defendants took the case to the United States Supreme Court before engaging in settlement negotiations.

Plaintiffs have further taken an active role in and controlled the litigation and also protected the interests of the proposed class members. (Declaration of Christa Collins, docket no. 149, ¶¶ 9–10). They have been in regular communication with class counsel to obtain updates and status reports regarding this action. *Id.* ¶ 9. Those who were able personally attended the initial pretrial hearing before the Court, *id.,* and the fairness hearing. Several conducted interviews with the media to have their story told. *Id.* Additionally, class counsel have consulted extensively with each of the named plaintiffs regarding the settlement and they each reviewed and approved of all settlement documents. *Id.* ¶ 10. Thus, the class representatives have met the primary standard for determining the adequacy of their representation. *See Gonzales v. Cassidy,* 474 F.2d 67, 75 (5th Cir.1973) (noting primary standard for determining adequacy of class representation is met when class representative through counsel vigorously and tenaciously protects interest of class).

Additionally, although this issue will be addressed in response to the objections in greater detail, there are no apparent conflicts among the proposed class members which undermine adequate representation. As African–American and Hispanic individuals, all class members share the same interest in determining whether Allstate in fact discriminated on the basis of race or national origin and, if so, in remedying this wrong. Their claims are essentially identical. As in *Marisol A. v. Giuliani,* plaintiffs seek relief which would benefit all members of the proposed class. *See* 126 F.3d 372, 378 (2d Cir.1997) (concluding all members of class shared same interest in obtaining broad-based relief which would improve quality of all beneficiaries of child welfare system).

**B. The Applicable Provision of Rule 23(b)**

■ As previously noted, in addition to complying with the prerequisites of rule 23(a), a putative class action must also satisfy at least one subsection of rule 23(b). These parties here seek certification under rule 23(b)(2), which requires the Court to find:

> the [defendant] has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

FED. R. CIV. P. 23(b)(2).

Racial discrimination cases seeking injunctive relief "are the 'paradigm' of [rule] 23(b)(2) class action cases." *Comer v. Cisne-*

*ros,* 37 F.3d 775, 796 (2d Cir.1994). This civil rights and Fair Housing Act suit, which seeks to address a history of alleged racial discrimination, is the type of case for which rule 23(b)(2) was designed. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (determining that "[c]ivil rights cases against parties charged with unlawful class-based discrimination are prime examples" of rule 23(b)(2) class actions). The advisory committee's note to rule 23(b)(2) states that "[i]llustrative are various actions ... where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration." FED. R. CIV. P. 23(b)(2) advisory committee's note. In fact, "Rule 23(b)(2) was promulgated ... essentially as a tool for facilitating civil rights [class] actions." 5 MOORE'S FEDERAL PRACTICE, § 23.43[1][a] (Matthew Bender 3d ed.1988). The United States Court of Appeals for the Fifth Circuit has long recognized the class action device is well-suited to eradicate corporate discrimination. *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 409 (5th Cir.1998) (determining that class action is appropriate mechanism for eradicating corporate discrimination); *see also Potts v. Flax,* 313 F.2d 284, 289 n. 5 (5th Cir.1963) (noting racial discrimination is "discrimination against a class as a class, and this is assuredly appropriate for class relief").

Certification under rule 23(b)(2) is appropriate in the present case because defendant "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). Plaintiffs allege Allstate sold its insurance in a racially discriminatory basis as to the African–American and Hispanic population, thereby acting on grounds generally applicable to the entire proposed class. *See Comer,* 37 F.3d at 796 (finding rule 23(b)(2) was satisfied "because the plaintiffs seek injunctive relief and they predicate the lawsuit on the defendants' acts and omissions with respect to" the class of minority residents of Buffalo).

Additionally, injunctive relief requiring Allstate to end its discriminatory practices is the appropriate and predominant form of relief sought and obtained by plaintiffs. *See Doe v. Bridgeport Police Dept.,* 198 F.R.D. 325, 333 (D.Conn.2001) (certifying rule 23(b)(2) class because declaratory relief was appropriate for entire class); *Bruce v. Christian,* 113 F.R.D. 554, 559 (S.D.N.Y.1986) (recognizing lawsuit seeking class-wide structural relief which would redound to benefit of each class member is "paradigmatic Rule 23(b)(2) class action"). Indeed, "[w]here racial discrimination is concerned, the [District] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

Rule 23(b)(2) also requires class members to have been harmed in essentially the same way by the defendant's acts, thereby making injunctive relief appropriate with respect to the class as a whole. FED. R. CIV. P. 23(b)(2). Where, however, the injunctive relief sought is accompanied by claims for monetary relief, as here, further analysis is required. Although rule 23(b)(2) does not address certification of money damage claims, the advisory committee implies money damages may accompany injunctive relief as long as the overall relief sought does not relate "exclusively or predominately to money damages." *Id.* advisory committee's notes, 1966 Amendment. The United States Court of Appeals for the Fifth Circuit has construed the advisory committee's notes to allow (b)(2) certification of claims for monetary damages, as long as such claims are "incidental" to the injunctive relief sought. *In re Monumental Life Ins. Co.,* 365 F.3d 408, 415 (5th Cir. 2004); *Allison,* 151 F.3d at 411. In this case, the monetary relief of $50 to $150 is incidental to the changes in the credit scoring formula, the marketing and educational programs and the appeals process.

Thus, the 23(b)(2) requirements are met here. The class members have been harmed in essentially the same way by the alleged discriminatory conduct and they seek injunc-

tive relief which requires Allstate to replace its credit scoring algorithm with the new settlement formula which plaintiffs believe materially reduces the alleged disparate impact on class members. Plaintiffs also seek other injunctive and equitable relief, including an education program, an increase in minority marketing, and an appeals process. Equitable restitution is also provided in the form of a monetary payment, based on an objective calculation and not dependent on class members' intangible, subjective differences. *Allison,* 151 F.3d at 415.

Other courts have held that restitution may be coupled with injunctive relief in a rule 23(b)(2) action. *See In re Monumental Life Ins. Co.,* 365 F.3d at 418 (determining "[e]quitable monetary relief is compatible with a rule 23(b)(2) class" when certifying class of minority policyholders who sought restitution in addition to injunctive relief); *Duprey v. Connecticut Dept. of Motor Vehicles,* 191 F.R.D. 329, 339 (D.Conn.2000) (certifying rule 23(b)(2) class where plaintiffs sought reimbursement of past payments wrongfully collected by defendant in addition to injunctive relief); *see also* 2 NEWBERG ON CLASS ACTIONS § 4:14 (4th ed.2002) (recognizing that "[w]hen monetary relief is properly sought as equitable restitution, such cases qualify as Rule 23(b)(2) classes, though such monetary relief is often as predominant as the injunctive and other equitable relief sought in such cases"). Such restitutionary relief is essential to the "make whole" objective of the equitable remedies available to the Courts in federal civil rights actions. *Id.* Here, restitution by Allstate is in the nature of a group remedy, consistent with the forms of relief intended for rule 23(b)(3) class actions. Additionally, the equitable relief sought in the form of reformation is designed to make the class whole once Allstate's alleged pattern and practice of discrimination is eliminated. Because the equitable relief sought for the class predominates, rule 23(b)(2) certification is appropriate.

■ When a class falls within the classic rule 23(b)(2) paradigm as it does here, no opt-out procedure is necessary to protect the interests of the class. *See Ayers v. Thompson,* 358 F.3d 356, 375 (5th Cir.2004) (recog-

nizing that a "member of a class certified under 23(b)(2) has no absolute right to opt-out of the class"); *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 412 (5th Cir.1998) (declaring that the "drafters of rule 23 found it unnecessary to provide (b)(1) and (b)(2) members with the absolute right to notice or to opt-out of the class"); *Kincade v. General Tire & Rubber Co.,* 635 F.2d 501, 506–07 (5th Cir.1981) (denying absolute right to opt-out of rule 23(b)(2) settlement class). No opt-out procedure is accorded because the intent behind rule 23(b)(2) is that suits primarily for injunctive relief are "inherently class actions and the decision generally will be applicable to a class of persons affected." 8 NEWBERG ON CLASS ACTIONS § 24:81 (4th ed.2002).

■ As discussed, the interests of the class members in this proposed settlement are cohesive and homogenous. Plaintiffs seek to redress a common injury properly addressed predominately by class-wide injunctive relief. The relief offered in the settlement is neither dependent on an adjudication of facts particular to any subset of the class nor does it require a remedy which differentiates materially among class members. As a result, an opt-out procedure is not required here. Objections to certification of a Federal Rule of Civil Procedure rule 23(b)(2) class aside, the Court concludes the class is properly certified.

### STANDARD OR REVIEW: FAIR, REASONABLE AND ADEQUATE

■ Having determined the class is properly certified, the Court must next address the proposed Settlement Agreement. As noted, rule 23 of the Federal Rules of Civil Procedure governs the settlement of class actions. FED. R. CIV. P. 23; *Pearson v. Ecological Sci. Corp.,* 522 F.2d 171, 176–77 (5th Cir.1975); *see also Garza v. Sporting Goods Properties, Inc.,* No. CIV. A. SA–93–CA–108, 1996 WL 56247, at *11 (W.D.Tex. Feb.6, 1996) (explaining operation of rule 23 in class action settlements). Before a settlement is approved, the Court must find the proposed settlement is "fair, reasonable and adequate." FED. R. CIV. P. 23(e)(1)(C); *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.

1977); *Garza,* 1996 WL 56247, at \*11. Approval of the settlement under this standard is not to be upset unless "the trial court clearly abused its discretion." *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 207 (5th Cir.1981). "The general rule applicable to the court's exercise of its discretion in deciding the fairness of a proposed class action is that the court must 'ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression.'" *Garza,* 1996 WL 56247, at \*11 (quoting *In re Shell Oil Refinery,* 155 F.R.D. 552, 559 (E.D.La.1993)). "In addition, the court acts 'as a fiduciary who must serve as a guardian of the rights of absent class members.'" *Id.* (quoting *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Morales v. Turman,* 569 F.Supp. 332, 337 (E.D.Tex.1983)).

■ "However, the court cannot modify the terms of the proposed settlement; rather, the Court must approve or disapprove of the proposed settlement as a whole." *Garza v. Sporting Goods Properties, Inc.,* No. CIV. A. SA–93–CA–108, 1996 WL 56247, at \*11 (W.D.Tex. Feb.6, 1996). In *Evans v. Jeff D.,* 475 U.S. 717, 726–27, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986), the United States Supreme Court described the scope of a district court's power to approve a proposed class action settlement:

> Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed. Although changed circumstances may justify a court-ordered modification of a consent decree over the objections of a party after the decree has been entered, and the District Court might have advised petitioners and respondents that it would not approve their proposal unless one or more of its provisions was deleted or modified, Rule 23(e) does not give the court the power, in advance of trial, to modify a proposed consent decree and order its acceptance over either party's objection. The options available to the District Court were essentially the same as those available to respondents: it could have accepted the proposed settlement; it could have rejected the proposal and postponed the trial to see if a different settlement could be achieved; or it could have decided to try the case.

(footnotes omitted). Thus, the Court's power to approve or reject settlements does not permit it to modify the terms of a negotiated settlement. *Id.; Mallory v. Eyrich,* 922 F.2d 1273, 1279 (6th Cir.1991). *But see San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio,* 188 F.R.D. 433, 454–58 (W.D.Tex.1999) (considering settlement agreement in light of collective bargaining agreement when determining whether to accept point system portion of proposed settlement).

■ As with other class actions, there is a strong presumption in favor of finding the Settlement Agreement fair. *Garza,* 1996 WL 56247, at \*11. The proposed settlement is not required to "achieve some hypothetical standard constructed by imagining every benefit that might someday be obtained in contested litigation." *Id.* (internal quotation omitted). Rather, compromise is the essence of settlement, and the Court may rely on the judgment of experienced counsel for the parties. *Id.*

### DISCUSSION

■ In assessing whether the settlement is fair, adequate and reasonable, the Fifth Circuit Court of Appeals has stated six key points or *Reed* factors which should be considered. These factors are:

(1) the existence of fraud or collusion behind the settlement;

(2) the probability of plaintiffs' success on the merits;

(3) the range of possible recovery;

(4) the complexity, expense and likely duration of the litigation;

(5) the stage of the proceedings and the amount of discovery completed; and

(6) the opinions of class counsel, class representatives, and absent class members.

*Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir.1983) (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982)); *see also Garza*, 1996 WL 56247, at *12–23 (considering *Reed* factors when assessing fairness of settlement). As noted by this Court in an order approving a previous class action settlement, the United States Court of Appeals for the Fifth Circuit has "admonished courts to be mindful of the 'overriding public interest in favor of settlement' in class action suits." *Garza v. Sporting Goods Properties, Inc.*, No. CIV. A. SA–93–CA–108, 1996 WL 56247, at *12 (W.D.Tex. Feb.6, 1996) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir.1977)). In this case, the Court concludes the *Reed* factors weigh in favor of approval.

## A. Consideration of the *Reed* Factors

### 1. The Existence of Fraud or Collusion Behind the Settlement

As noted, this Court has recognized that in considering the six factors, there is a strong presumption in favor of finding the settlement fair, adequate and reasonable. *San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 453 (W.D.Tex.1999); *see also Cotton*, 559 F.2d at 1331 (recognizing that "[p]articularly in class action suits, there is an overriding public interest in favor of settlement") (citing *United States v. Allegheny–Ludlum Indus., Inc.*, 517 F.2d 826 (5th Cir.1975)). Importantly, at least one treatise has held that courts may presume a proposed settlement is fair and reasonable when it is the result of arms' length negotiations. 4 NEWBERG ON CLASS ACTIONS § 11:41 (4th ed.2002). There is also a presumption of no fraud or collusion occurred between counsel, in the absence of any evidence to the contrary. *Id.* at § 11:51.

Here, there are no allegations or indications of fraud or collusion. *See Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir.1984) (determining that "[i]n the absence of fraud or collusion, the trial court should be hesitant to substitute its own judgment for that of counsel") (internal quotations and citations omitted). Additionally, a presumption of fairness is also indicated in light of this Court's recognition that counsel for both parties have "significant experience in litigating and negotiating settlement of class actions" including those "involving allegations of racial discrimination." (Order Preliminarily Approving Settlement, docket no. 110, p. 2). Moreover, as this Court found in its preliminary approval order, "the parties engaged in a lengthy, arms' length settlement process." *Id.* Over the course of twenty-three months, plaintiffs' and Allstate's counsel held over fifty negotiating sessions, both in person and via telephone conference. *Id.* Based on the undisputed record and experience with counsel, the Court determines the proposed settlement was the product of arms' length negotiations, free of fraud or collusion. Therefore, this factor weighs in favor of approving the settlement.

### 2. Probability of Plaintiffs' Success on the Merits

Once it has been determined whether the settlement is free of fraud or collusion, the most important factor in determining the fairness, adequacy, and reasonableness of the settlement is the likelihood of plaintiffs' success on the merits if the case were to proceed to trial. *San Antonio Hispanic Police Officers' Org., Inc.*, 188 F.R.D. at 459 (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir.1982)). In evaluating the likelihood of success, the Court must compare the terms of the settlement with the rewards the class would have been likely to receive following a successful trial. *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir.1983).

The DeHoyos plaintiffs, residents of Texas and Florida, bring this lawsuit on behalf of a nationwide class, alleging they were charged higher insurance premiums for less favorable property and casualty insurance policies based on their race violation of the Civil Rights Act, 42 U.S.C. §§ 1981 and 1982, and the Fair Housing Act, 42 U.S.C. § 3604. Specifically, plaintiffs allege Allstate intentionally discriminated against the class in the premiums it charged based on the use of credit information when pricing policies issued to African–Americans and Hispanics.

In this Circuit, section "1981 and 1982 [cases] have been confined to cases involving intentional race discrimination, not disparate impact claims." *Dehoyos v. Allstate Corp.*, 345 F.3d 290, 300 n. 1 (5th Cir.2003). Thus, to prevail on their claims under sections 1981 and 1982, the DeHoyos plaintiffs would have to show Allstate intentionally discriminated against the class in the premiums it charged based on credit information. *See Crawford v. Western Elec. Co.*, 614 F.2d 1300, 1309 (5th Cir.1980) (concluding a showing of intentional discrimination is required to prove discrimination claim under civil rights statutes). To prevail on their Fair Housing Act allegations, plaintiffs may challenge "the alleged disparate impact of a facially-neutral component in insurance pricing decisions." *Dehoyos*, 345 F.3d at 300 (Jones, J., concurring in part and dissenting in part).

Regarding plaintiffs' 42 U.S.C. section 1981 and 1982 allegations, there are factual and legal obstacles which adversely impact plaintiffs' ability to prevail on the merits of their claims. Importantly, the undisputed evidence shows Allstate has no knowledge of the race or ethnicity of its customers and does not track such data. As set forth in the uncontested affidavit of William R. Sparks, Personal Lines Manager in Allstate's Risk Management Department, a twenty-year employee, "Allstate does not collect or maintain information identifying the race, ethnicity or nationality of its current or former policyholders and Allstate does not otherwise know the race, ethnicity or nationality of its current or former policyholders." (Declaration Number 1 of William R. Sparks, ¶¶ 1 & 8, attached to Defendant's Brief in Support of Proposed Class Settlement as Exhibit 2). This presents a significant obstacle to plaintiffs' ability to show intentional discrimination.

Moreover, the undisputed evidence also shows Allstate's insurance rates are legally regulated on a state-by-state basis. Specifically, Allstate's rates are reviewed by state insurance departments to determine if they are excessive, inadequate or unfairly discriminatory. *See e.g.*, Tex. Ins. Code Ann. § 2251.155 (Vernon 2005) (mandating that the Insurance Commissioner "shall approve rate filing ... if the proposed rate is adequate, not excessive, and not unfairly discriminatory"); Fla. Stat. Ann. §§ 627.062(2)(b), 627.0651(2) (West 2003) (requiring Florida Department of Insurance to review all rate filings to determine whether they are excessive, inadequate, or unfairly discriminatory); 215 Ill. Comp. Stat. Ann. 5/460(c) (West 2006) (requiring Illinois State Insurance Director to disprove filed rates if they are inadequate, excessive or unfairly discriminatory); N.Y. Ins. Law §§ 2304–2305 (McKinney 2006) (setting forth standards for rate making and requiring rates be filed for approval with the insurance superintendent). These regulations also provide an obstacle to plaintiff's ability to show intentional discrimination.

Additionally, Allstate contends, without controverting argument, that insurance credit scoring was developed by a number of companies acting independently; it was based on continuing and recent developments in behavioral research; and it is a practice which has been regulated and expressly approved for use by most states. *See e.g.*, Tex. Ins. Code Ann. § 559.151 (Vernon 2005) (regulating and approving credit scoring in Texas); Fla. Stat. Ann. § 626.97411 (West 2004) (regulating and approving credit scoring in Florida).[2] It is improbable-and not even alleged in this case-that all of these entities conspired to intentionally discriminate on the basis of race or national origin. Accordingly, the approved and regulated use of credit scoring by a majority of the states in which Allstate does business presents an obstacle to plaintiffs' ability to prevail on the merits on their section 1981 and 1982 claims of discrimination.

Furthermore, there are also obstacles to plaintiffs' ability to prevail on their disparate

---

**2.** Allstate asserts without objection that thirty-one additional states have similar statutes or regulations authorizing the use of insurance scoring: Alabama, Alaska, Arkansas, California, Delaware, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Washington and West Virginia.

impact theory brought under the Fair Housing Act. In order to present a prima facie case under the Act, a plaintiff is required to demonstrate a substantial disparity in the application of the challenged practice. *United States v. West Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir.1971). If the plaintiff succeeds in establishing a prima facie case, the defendant then has the opportunity to show the practice in question is consistent with a "business necessity." *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 997–98, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) (discussing business necessity defense in employment law context); *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 989 (4th Cir. 1984) (stating the business necessity theory is employed to enforce fair housing and employment discrimination statutes). "Business necessity" is a term which connotes a policy or practice which bears a "manifest relationship" to a business purpose or is "significantly correlated" with a business objective. *Bernard v. Gulf Oil Corp.*, 841 F.2d 547, 563 (5th Cir.1988). It has also been defined as a showing that a "policy has a significant relationship to a legitimate business purpose." *EEOC v. J.M. Huber Corp.*, 927 F.2d 1322, 1328 (5th Cir.1991). After making a showing of a business necessity, the plaintiff then has to show a lesser disparate alternative existed (i.e., a practice which also accomplishes, with equal effectiveness, the defendant's legitimate interest in efficiency of operation while eliminating the disparate impact) and the defendant refused to adopt the proposed alternative practice. *See* 42 U.S.C. § 2000e–2(k)(1)(A)(ii) (Title VII of the Civil Rights Act); *Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir.1997) (recognizing that "[w]e apply Title VII discrimination analysis in examining Fair Housing Act ('FHA') discrimination claims").

Initially, plaintiffs face substantial challenges in establishing a prima facie case. They would first have to produce evidence that insurance credit scoring results have a disparate impact in the terms of the premiums charged to African–American and Hispanic policyholders. Presuming plaintiffs could prove disparate impact, Allstate has indicated it intends to raise the business necessity theory in this case. In support

thereof, it points to numerous studies which have established that credit scoring is an actuarially sound and powerful predictor of insurance losses. *See e.g.*, Tex. Dep't of Ins., Use of Credit Information by Insurers in Texas: The Multivariate Analysis (2005) (attached to Defendant's Brief in Support of Proposed Class Action Settlement as Exhibit 3); Tex. Dep't of Ins., Use of Credit Information by Insurers in Texas (2004) (attached to Defendant's Brief in Support of Proposed Class Action Settlement as Exhibit 4); A Statistical Analysis of the Relationship Between Credit History and Insurance Losses; Bureau of Business Research; Mccombs School of Business; University of Texas at Austin (2003) (attached to Defendant's Brief in Support of Proposed Class Action Settlement as Exhibit 5). Thus, even presuming, arguendo, insurance credit scoring has a disparate impact, Allstate presents evidence this practice, which a majority of insurers currently use to price personal lines insurance policies, is "significantly correlated" with insurance risk. Specifically, under Allstate's theory, "significantly" refers to statistical significance, and current authoritative studies establish that the correlation between credit scoring and risk of loss is highly statistically significant. Thus, Allstate makes a reasonable argument that insurance scoring is a business necessity.

The burden would then shift back to plaintiffs to prove an alternative was available which would have accomplished the same business purpose with equal effect, resulting in a lesser disparate impact. Plaintiffs would further have to prove Allstate refused to adopt this alternative. This is a difficult burden to meet. For example, in *Adams v. City of Chicago*, 469 F.3d 609, 613 (7th Cir. 2006), an employer stipulated its promotion test had a disparate impact and there was an equally effective alternative selection device with a lesser disparate impact. Summary judgment in favor of the employer was nevertheless affirmed because the plaintiffs failed to show the alternative was available at the time of the decision at issue, or that the defendant was given an opportunity to adopt the alternative and refused to do so. *Id.* at

613–14, 616. In this case, Allstate contends: it is aware of no equally effective mechanism of insurance scoring; no such scoring mechanism was available at the time this case was filed; and Allstate has never been presented with any such alternative which it has refused to adopt. *See id.* at 614. (noting that "most critical" to the analysis is "the statutory scheme [which] requires plaintiff to demonstrate a viable alternative and give the [defendant] an opportunity to adopt it").

Plaintiffs face yet another obstacle to prevailing on the merits if the class is certified outside the settlement context. "Because 'the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action,' this factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir.2004) (internal citation omitted). Allstate contends insurance scoring results in lower premiums for its policyholders than if insurance scoring were not used. Presuming Allstate can produce evidence this is true, minority policyholders would be among those who benefit from insurance scoring, thereby making certification extraordinarily difficult. *See Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir.2000) (determining that "[a] class cannot be certified when … it consists of members who benefit from the same acts alleged to be harmful to other members of the class"); *see also Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189, 1190 (11th Cir.2003) (recognizing fundamental conflict which will extinguish a party's claim to class certification "exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class," and "no circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class"); *Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir.1988) (denying class certification of class of all landowners in vicinity of airport because, while plaintiffs alleged airport decreased value of their land, other landowners tremendously benefitted from proximity to airport); *see also Amchem*

*Prods., Inc. v. Windsor*, 521 U.S. 591, 624, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (decertifying class because some class members suffered no injuries while others were harmed to great degree).

Furthermore, as discussed above, there is an interplay between plaintiffs' challenge to Allstate's rates under the Federal Civil Rights laws and the state laws which specifically govern these rates. Because the laws of numerous states may be relevant to individual class member claims, plaintiffs would apparently face a further significant challenge to certifying the class outside the settlement context. *See Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir.1996) (decertifying class and stating "in a multi-state class action, variations in state law may swamp any common issues and defeat predominance" and undermine superiority); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 618 (3d Cir.1996) (decertifying class because legal and factual differences in plaintiffs' claims "when exponentially magnified by choices of law considerations, eclipse any common issues in this case"); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir.1996) (granting mandamus in multi-state products liability action in part because "[t]he district [court] … failed to consider how the law of negligence differs from jurisdiction to jurisdiction."); *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1018 (D.C.Cir.1986) (ordering District Court to consider how variations in state law affect inquiry into whether there is predominance of common questions of fact). Given these factual and legal obstacles to plaintiffs' ability to prevail on the merits, this factor weighs in favor of approving the settlement.

### 3. The Range of Possible Recovery

The next factor the Court must consider is whether the range of possible recovery or the benefit of the settlement to plaintiffs outweighs the risks of proceeding through litigation. The undisputed record reveals the settlement will not only provide significant benefits to members of the plaintiffs' class, but to policyholders throughout the country as well. As a result, plaintiffs' counsel have concluded the settlement is in the best inter-

ests of the class because of: (1) the substantial and immediate benefits provided to class members, including implementation of a new credit scoring formula; (2) the risks and length of trial in the class action; and (3) the likelihood of appeals and subsequent proceedings if this case proceeds on the litigation track.

As noted above, in place of the current insurance scoring formula, which plaintiffs allege discriminates against African–American and Hispanic policyholders, Allstate has agreed to implement the settlement scoring formula which it will use to underwrite and/or price personal lines insurance policies. Plaintiffs' counsel report their statistical experts have engaged in an extensive disparate impact analysis of policyholder data produced by Allstate. With the assistance of their experts, plaintiffs' counsel believe the implementation of the settlement scoring formula will provide material benefit to class members. As part of the implementation, policyholders in certain states, including class members, will automatically be able to obtain a policy with a premium determined using the settlement scoring formula. In other states, class members may request the opportunity to have their policy priced using the settlement scoring formula prior to renewal.

As previously stated, in addition to implementing the settlement scoring formula, Allstate has agreed to employ an appeals program to allow customers, including class members, to appeal the use of their insurance credit scores based on certain defined "extraordinary circumstances." Further, Allstate has agreed to fund a credit education program designed by the National Urban League and National Counsel of La Raza, two leading national minority advocacy organizations, to increase minority understanding of the use of credit and techniques for managing their credit histories. At the request of plaintiffs, Allstate has also agreed to increase and maintain the percentage of its marketing budget directed to African–American and Hispanic/Latino communities. Finally, in addition to the equitable relief described above, Allstate has agreed to make monetary payments to those class members who complete a claim form and qualify under a formula which compares the insurance scoring group assigned to his or her Allstate policy in the past and the insurance scoring group assigned under the settlement scoring formula. The Court determines these substantial and immediate benefits from the settlement outweigh the risk of an uncertain, potentially protracted and costly litigation. This factor therefore weighs in favor of approving the settlement.

### 4. The Complexity, Expense and Likely Duration of the Litigation

In evaluating the merits of a class action settlement, this Court has recognized it is important to be mindful of "the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *San Antonio Hispanic Officers' Org., Inc. v. City of San Antonio,* 188 F.R.D. 433, 458 (W.D.Tex.1999) (citing *In re Shell Oil Refinery,* 155 F.R.D. 552, 560 (E.D.La.1993)). Consequently, "[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush." *Id.* (internal quotations and citations omitted). Here, the litigation has proceeded over a period of five years and has included appeals to the United States Court of Appeals for the Fifth Circuit and the United States Supreme Court. As noted, Allstate filed a motion to dismiss at the outset of this case which was denied; this Court's denial was affirmed by the United States Court of Appeals for the Fifth Circuit, with one opinion concurring in part and dissenting in part; and Allstate's petition for writ of certiorari was subsequently denied by the United States Supreme Court. This initial motion was litigated for three years and is indicative of the complexity, expense, and likely duration of continued litigation. Specifically, as counsel for the parties have concluded, the probability of further protracted litigation, including appeals, would be a certainty in the absence of a settlement. Additional litigation would likely include: (1) contested class certification proceedings; (2) an appeal under Federal Rule of Procedure 23(f); (3) dispositive motions; (4) expert depositions leading to *Daubert* challenges; (5)

extensive pretrial filings; (6) a lengthy trial; (7) post-trial proceedings in this District Court; and (8) further appeals. Having considered the complexity, expense, and likely duration of the litigation, the Court concludes this factor weighs in favor of approving the proposed settlement.

### 5. The Stage of the Proceedings and the Amount of Discovery Repeated

██ In order to determine whether the parties have sufficient information to evaluate the terms of the settlement, the Court should look to more than simply the amount of formal discovery which has been completed. *Cotton v. Hinton,* 559 F.2d 1326, 1332–33 (5th Cir.1977). The Court should consider all information which has been available to the parties. *Garza v. Sporting Goods Properties, Inc.,* No. CIV. A. SA–93–CA–108, 1996 WL 56247, at *13 (W.D.Tex. Feb.6, 1996) (noting Court should look to information including factual and legal issues identified and developed from prior proceedings and litigation).

As part of negotiations conducted over the course of twenty-three months, Allstate produced tens of thousands of documents, including rate books and policy manuals. Allstate also reportedly produced voluminous electronic data, including the highly sensitive data used to develop its credit scoring formula. Plaintiffs retained statistical experts who engaged in extensive discrimination impact analysis of policyholder data and Allstate's credit scoring formula. In light of this discovery and plaintiffs' statistical analysis, plaintiffs' counsel determined the proposed settlement is fair, adequate and reasonable and, more importantly, to plaintiffs' ultimate benefit. The Court determines the stage of the proceedings and the amount of discovery completed have provided the information necessary to permit the parties and the Court to make an informed judgment on the merits of the settlement. This factor therefore weighs in favor of accepting the proposed settlement.

### 6. The Opinions of Class Counsel, Class Representatives and Absent Class Members

As discussed, after twenty-three months of arduous negotiations and careful consideration, counsel and the class representatives have concluded the proposed settlement is in the best interests of the class and is an overall excellent result. The endorsement of class counsel is entitled to deference, especially in light of class counsel's significant experience in complex civil litigation and their lengthy opportunity to evaluate the merits of the claims. *Lelsz v. Kavanagh,* 783 F.Supp. 286, 297 (N.D.Tex.1991), *aff'd,* 983 F.2d 1061 (5th Cir.), *cert. denied,* 510 U.S. 906, 114 S.Ct. 287, 126 L.Ed.2d 236 (1993); *McNary v. American Sav. & Loan Ass'n,* 76 F.R.D. 644, 648–49 (N.D.Tex.1977). Here, counsel for both parties have engaged in numerous class action lawsuits and possess a substantial amount of experience and expertise. This Court previously found "counsel for all [p]arties have significant experience in litigating and negotiating settlements of class actions" and "cases involving allegations of racial discrimination." (Order Preliminarily Approving Settlement, docket no. 110, p. 2). "In reviewing the opinions of counsel, the Court is to bear in mind that counsel for each side possess the unique ability to 'assess the potential risks and rewards of litigation, and a presumption of correctness is said to attach to a class settlement reached in arms' length negotiations between experienced, capable counsel after meaningful discovery.'" *San Antonio Hispanic Police Officers' Org., Inc.,* 188 F.R.D. at 461 (quoting *Lelsz,* 783 F.Supp. at 297); *see also Cotton,* 559 F.2d at 1330 (concluding that "[c]ompromise is the essence of a settlement," and determining the Court may rely on "the judgment of experienced counsel for the parties").

In addition to the opinions of class counsel and the class representatives, the Court should also consider the opinions of absent class members. In this case, ten individual and group objections have been filed. Jeanne C. Finegan, APR, is the Senior Vice President of the Garden City Group which oversaw the notice program in this case and has done so in class actions for more than twenty years. (Declaration of Jeanne C. Finegan, ¶¶ 1 & 3, attached to Defendant's Brief in Support of Proposed Class Action

Settlement as Exhibit 8). Her undisputed conclusion based on the market research analysis is that the publication notice plan in this case reached 80% of all adults age eighteen and over; 87.04% of the African–American target group; 70.35 to 73.38% of the Hispanic/Latino target group; and 77.65% of the non-Caucasian target group. *Id.* ¶ 24. In light of the undisputed reach of the nationwide notice, the minimal level of opposition from absent class members weighs in favor of approving the settlement. *See Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1152 (8th Cir.1999) (approving settlement where objectors represented fewer than 4% of class); *DeBoer v. Mellon Mortgage Co.,* 64 F.3d 1171, 1178 (8th Cir.1995) (determining that "[t]he fact that only a handful of class members objected to the settlement similarly weighs in its favor"); *Bell Atl. Corp. v. Bolger,* 2 F.3d 1304, 1313–14 & n. 15 (3d. Cir. 1993) (recognizing class silence can be considered consent to settlement); *Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118–19 (3d Cir.1990) (holding that objections by even 10% of class "strongly favors settlement"); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 462 (2d Cir.1974) (noting silence of majority of class may be attributed to agreement to proposed settlement); *In re Cardizem CD Antitrust Litig.,* 218 F.R.D. 508, 527 (E.D.Mich.2003) (noting small number of objections received may be viewed as indicative of adequacy of settlement); *In re Holocaust Victim Assets Litig.,* Case No. CV–96–4849, 2000 WL 33241660, at *2, 2000 U.S. Dist. LEXIS 20817, at *7–8 (E.D.N.Y. Nov. 22, 2000) (recognizing "overwhelming majority of the Settlement Class members-more than 99 percent-did not submit any comment regarding the Proposed Plan and presumably had no objection"); *aff'd,* 413 F.3d 183 (2d Cir. 2005); *Lazy Oil Co. v. Witco Corp.,* 95 F.Supp.2d 290, 332 (W.D.Pa.1997) (concluding silence in class action settlement context can be construed as assent); *see also TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 458, 462 (2d Cir.1982) (approving settlement despite objections of approximately 56% of class); *Parker v. Anderson,* 667 F.2d 1204, 1207, 1207 (5th Cir. Unit A 1982) (approving approval of class action settlement over objections of all but one of eleven

named plaintiffs); *Cotton v. Hinton,* 559 F.2d 1326, 1333 (5th Cir.1977) (approving settlement over objections of counsel purporting to represent almost 50% of class); *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 803–04 (3d Cir.1974) (approving class settlement even though more than 20% of class objected); *Taifa v. Bayh,* 846 F.Supp. 723, 728 (N.D.Ind.1994) (approving class settlement despite objections from more than 10% of class). Given the wide reach of the notice versus the small number of objections, the Court finds the opinions of class counsel, the class representatives, and the absent class members weigh in favor of approving the settlement. Objections aside, having considered the relevant factors, the Court finds the Settlement Agreement to be fair, reasonable and adequate.

### *OBJECTIONS TO THE PROPOSED SETTLEMENT*

■ The Court must next decide whether the objections provide a compelling reason to reject the settlement. "Once the court has given preliminary approval, an agreement is presumptively reasonable, and an individual who objects has a heavy burden of demonstrating that the settlement is unreasonable." *Whitford v. First Nationwide Bank,* 147 F.R.D. 135, 138–39 (W.D.Ky.1992). General objections without factual or legal substantiation do not carry weight. 4 NEWBERG ON CLASS ACTIONS § 11:58 (4th ed.2002); *see also* FED. PRAC. & PROC. § 1797.1 (providing that in class action settlement dispute "[o]nly clearly presented objections ... will be considered"). In the notice, the Court was clear in requiring objectors to submit with their objections to be filed on November 6, 2006, any evidence or other written materials they wanted the Court to consider in support of their objections. *See* (Order Setting Agenda for Fairness Hearing and Further Orders of the Court, docket no. 155, p. 2) (setting forth requirements for objectors and presentation of evidence pursuant to the notice and the Settlement Agreement). Then, on its own initiative, the Court granted an extension of the deadline to the Friday before the Monday fairness hearing for objectors to submit such affidavits or other written materials.

*Id.* Despite this specific invitation and direction from the Court, there have been no affidavits filed which challenge any of the settlement benefits or the substance of the settlement benefits. Also, no affidavits challenging the effectiveness of the notice or the reasonableness of the attorneys' fees which plaintiffs' counsel are seeking have been filed. The only affidavit filed is the affidavit of the Melder group seeking to be awarded a portion of the attorneys' fees sought by class counsel. Thus, there is no outside evidence to refute or contradict any of the information provided in support of the Settlement Agreement. "To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 464 (2d Cir.1974); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir.2001) (discarding objections to notice which were based on speculation). With this in mind, the Court will consider the objections.

## A. Certification of a Rule 23(b)(2) Class

As set forth above, the parties stipulated to the certification of a class for settlement purposes pursuant to rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, and the Court preliminarily approved this certification. (Order Preliminarily Approving Settlement, docket no. 110, p. 4). Certain objectors argue the certification of a settlement class under rule 23(b)(2) is inappropriate because the equitable relief provided by the settlement is "without value." As previously discussed, the undisputed record reflects the settlement provides significant and tangible equitable relief otherwise not available to the class members: a reformulated insurance scoring formula, marketing and educational programs, an appeals process, and a possible restitutionary award of between $50 and $150. Thus, members of the class have "no absolute right to opt out of the class, even where monetary relief has been sought and is made available." *Penson v. Terminal Transp. Co.*, 634 F.2d 989, 994 (5th Cir.1981).

Certain objectors also contend that, because monetary relief is provided in this settlement, certification under Federal Rule of Civil Procedure 23(b)(2) is inappropriate and instead certification under rule 23(b)(3) is required. However, a class can be certified under rule 23(b)(2) where monetary relief is awarded so long as this relief is incidental to, and does not predominate over, the non-monetary relief provided to the class. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 413 (5th Cir.1998); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 257 (5th Cir.1974). In this case, the record reflects the majority of the relief is equitable in nature and the ability to receive a monetary component is only the application of the new settlement algorithm to the person's prior credit information, if he or she makes a claim. Thus, the non-monetary relief afforded under the Settlement Agreement predominates over the sole element of the monetary relief, demonstrating that the monetary relief is incidental to the overall settlement benefits awarded to the class.

The objectors also argue the injunctive relief has so little value that the monetary portion of the settlement overshadows that relief and requires the Court to review this case under Federal Rule of Civil Procedure 23(b)(3). However, as previously discussed, the undisputed evidence shows the injunctive relief provided by the settlement has significant value to the class. Moreover, as discussed below, the undisputed evidence also shows the monetary relief in this case is restitutionary and merely incidental to the injunctive relief. Monetary relief is equitable and properly sought under Federal Rule of Civil Procedure 23(b)(2). *See* 2 NEWBERG ON CLASS ACTIONS § 4.14 (4th ed.2002) (noting that "[w]hen monetary relief is properly sought as equitable restitution, such cases qualify as Rule 23(b)(2) cases, though such monetary relief is often as predominant as the injunctive and other equitable relief sought in such cases"). Restitution is essential to the "make whole" objective of the equitable remedies available to courts in federal civil rights actions. Indeed, courts routinely allow certification of rule 23(b)(2) classes seeking back pay and other forms of "make whole" equitable relief. *See Allison*, 151 F.3d at 428 (concluding rule 23(b)(2) class action plaintiffs can seek money damages "so long as money damages are not

[the] exclusive or predominant relief sought"); *see also In re Monumental Life Ins. Co.*, 365 F.3d 408, 415 (5th Cir.2004) (explaining that rule 23(b)(2) certification is inappropriate where proper relief relates exclusively to monetary damages).

The Settlement Agreement requires Allstate to pay restitution from $50 to $150 to eligible class members whose credit scores dramatically improved under the new settlement scoring formula. (Settlement Agreement at 11–13). These payments are an effort to reimburse class members for some of the overpayments they paid in insurance premiums due to Allstate's prior credit scoring algorithm. *Id.* Therefore, these small monetary payments constitute "incidental damages," which are permissible under Federal Rule of Civil Procedure 23(b)(2). *See Allison,* 151 F.3d at 425 (declaring that "[i]ncidental damages flow directly from liability to class as a whole on claims forming basis of injunctive or declaratory relief"). Additionally, this settlement concerns the civil-rights-type of incidental relief as outlined in the *Allison* case. 151 F.2d at 425.

Objectors also argue the settlement is unfair because class members do not have the right to opt-out of the class. Despite these objections, the United States Court of Appeals for the Fifth Circuit has held that "a member of a Rule 23(b)(2) class action has no absolute right to opt out of the class, even where monetary relief has been sought and is made available." *Penson v. Terminal Transp. Co.*, 634 F.2d 989, 994 (5th Cir.1981) (citing *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1220 (5th Cir.1978); *United States v. United States Steel Corp.*, 520 F.2d 1043, 1057 (5th Cir.1975)). A rule 23(b)(2) class, such as this case, has "a greater decree of 'cohesiveness or unity in the class' than in 23(b)(3) actions, which minimizes the need for ... a right to opt out of the class." *Id.* at 993–94. "This cohesiveness is claimed to result from both the group nature of the harm alleged and the broad character of the relief sought." *Id.* at 994. Therefore, an automatic right to opt-out is not created merely because a class action settlement includes some form of monetary relief. *Id.*

The same analysis applies here. The alleged harm suffered by all class members arose from Allstate's alleged use of a discriminatory credit scoring formula in calculating insurance premiums. Regardless of the state in which class members reside, the nature of their alleged harm is the same, and the nature of their damages is not significantly different. Any variation in the amount of harm suffered by one particular class member over another is resolved by the fact that the settlement allows greater monetary recovery for those who suffered more severe monetary damages based on an objective calculation. Furthermore, the undisputed evidence shows all class members will benefit from the broad, class-wide relief for which the settlement provides. Every class member will have the assurance that, should he or she renew or reapply for insurance through Allstate, he or she will have the benefit of his or her premiums being based on a non-discriminatory credit scoring formula as achieved by the settlement. Additionally, equitable relief-including the education program, an increase in minority marketing, and the appeals process-will also be available on a class-wide basis. The record therefore shows the settlement process will not only provide future benefits to these class members, but will provide benefits to non-class members as well. This type of settlement has been approved by the United States Court of Appeals for the Fifth Circuit. *See Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 429 (5th Cir.1998) (stating that "[w]hen the relief sought is injunctive relief, the benefits ... would inure not only to [the] known class, but also to a future class of indefinite size") (internal citations omitted). Because class members suffered the same harm, and because the relief achieved in the settlement is broad class-wide relief, this Court determines the inclusion of an opt-out provision was not necessary. For these reasons, the objection that the settlement must be certified under rule 23(b)(3), instead of rule 23(b)(2), is overruled.

## B. The Notice

Several objectors criticize the notice program. These objectors first contend the pro-

gram is inadequate because notice was not mailed to individual class members, but was instead published in newspapers, magazines, and other media targeted at reaching individual class members. They also argue the notice should be mailed to all of Allstate's current policyholders, regardless of whether they may be class members. Further, the objectors contend the information provided in the notice is insufficient because it does not allow individuals to determine if they are class members or to ascertain the value of the settlement relief. Based on the undisputed record, the Court finds these objections lack merit.

█ Individual notice is not required when there is no reasonable way to sufficiently identify the class members. *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534, 539 (N.D.Ga.1992). And, contrary to the objectors' suggestion, "[r]eceipt of actual notice by all class members is required neither by Rule 23 nor the Constitution." *Id.* For example, in *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 203 (D.Me.2003), the Court found "individual notice was not possible" and notice by print, broadcast and/or electronic means was completely permissible, where the case involved millions of potential class members who could not be identified. Allstate is "the nation's largest publicly held personal lines insurer," and "provides insurance products to more than 17 million households." (The Allstate Corporation at a Glance, htt p://www.allstate.com/about/pa gerender.asp?page=allstate_at_aglance.htm (last visited Feb. 11, 2007)). However, class membership is limited to policyholders who are Black or African–American and/or of Hispanic or Latino origin. *See* (Amended Complaint, ¶¶ 3, 13–14, 71–88). As discussed above, Allstate does not collect or maintain information identifying the race, ethnicity, or nationality of its current or former policyholders nor does it otherwise know this information. (Declaration Number 1 of William R. Sparks, ¶ 8, attached to Defendant's Brief in Support of Proposed Class Settlement as Exhibit 2). Because the class is comprised of African–American and Hispanic policyholders, Allstate cannot identify the class members from its records. Thus, the objectors

have not shown that serving notice by mail to individual class members is possible or required. While sending notice by mail is preferred when all or most of the class members can be identified, where class members cannot be identified, as here, notice by publication is sufficient. *Pigford v. Veneman*, 355 F.Supp.2d 148, 162 (D.D.C.2005) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)); *see also Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 57 (1st Cir.2004) (recognizing newspaper notices met requirements of due process). Moreover, the United States Court of Appeals for the Fifth Circuit has held that "the type of notice to which a member of a class is entitled depends upon the information available to the parties about that person." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1098 (5th Cir.1977); *see also Fontana v. Elrod*, 826 F.2d 729, 732 (7th Cir.1987) (concluding that "[w]hile the notice must be adequate, it is not necessary that each member of the class actually receive the notice"). Because the undisputed record shows Allstate does not collect or maintain information regarding its policyholders' race or national origin, the parties cannot distinguish the class members from Allstate's other policyholders and, therefore, individual notice is not required.

As to the contention the notice should be mailed to all of Allstate's current policyholders, Allstate has millions of policyholders, the majority of whom are not class members. Allstate contends such an overly broad notice program would result in massive customer confusion and disruption. Moreover, those objecting to the notice program have provided no authority to support their suggestion that notice to non-class members should be required. In fact, several courts have rejected the type of over-inclusive notice program advocated by these objectors. *See In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 169 (2d Cir.1987) (rejecting argument that individual mail notice should have been provided to all 2.4 million Vietnam Veterans because "far fewer than that number were exposed to Agent Orange" and thus notice of this sort would have been "considerably overbroad"); *Carlough v. Amchem Prods., Inc.*,

158 F.R.D. 314, 327 (E.D.Pa.1993) (noting "[f]ar fewer of those persons whose names would be generated are indeed members of the class" and concluding "there would be no easy method of knowing which persons on these lists were likely to be exposed to asbestos and which persons were not"); *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534, 539–46 (N.D.Ga.1992) (finding that sending notice to larger group "would most likely confuse the recipients and encourage claims by non-class members"). Additionally, mailed notice of this type of information would not reach former customers.

▮ To issue mailed notice to all of Allstate's policyholders, as some objectors suggest is appropriate, Allstate would have to send notices to more than 17 million people. The objectors have not shown such a task would not be unduly burdensome or unnecessary. Furthermore, the DeHoyos plaintiffs did not bring this case on behalf of every Allstate policyholder, but only on behalf of a discrete group of similarly situated customers–28% of Allstate's 17 million policyholders. *See In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1099 (5th Cir.1977) (rejecting proposed list of individuals to receive class notice, including both class members and non-class members, as being over-inclusive and as helpful as a "telephone book"). Moreover, there is authority to suggest that sending individual direct notice to millions of policyholders who are not class members would likely result in unneeded confusion on the part of the non-class member recipients. *See Macarz v. Transworld Sys., Inc.*, 201 F.R.D. 54, 64 (D.Conn.2001) (allowing notice by publication because, where list also included non-class members, "sending notice to the admittedly over-inclusive group here would 'most likely confuse the recipients and encourage [responses] by non-class members'") (quoting *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. at 546); *Skelton v. General Motors Corp.*, Nos. 79 C 1243, 80 C 2151, 1987 WL 6281, at *3 n. 3 (N.D.Ill. Feb.5, 1987) (declining to mail notice to an over-inclusive list because it "could mislead many thousands of ineligible consumers into thinking that they qualify to recover in this action").

Additionally, publication notice has been utilized widely in actions brought under Federal Rule of Civil Procedure 23(b)(2), including discrimination cases such as this. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 316, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (recognizing "this Court has not hesitated to approve of resort to publication ... where it is not reasonably possible or practicable to give more adequate warning"); *see also Handschu v. Special Servs. Div.*, 787 F.2d 828, 833 (2d Cir.1986) (upholding notice by publication in rule 23(b)(2) class actions involving allegations of discrimination); *Franks v. Kroger Co.*, 649 F.2d 1216, 1222–23 (6th Cir.1981) (allowing publication notice in Federal Rule of Civil Procedure rule 23(b)(2) discrimination class actions); *Marcus v. State Dept. of Revenue*, 209 F.Supp.2d 1179, 1181 (D.Kan.2002) (approving publication notice in discrimination case brought under rule 23(b)(2)).

Regarding sufficiency, the undisputed evidence shows the notice program in this case was developed and implemented by a nationally recognized expert in class action notice programs. (Declaration of Jeanne C. Finegan, ¶¶ 5, 12, attached to Defendant's Brief in Support of Proposed Class Action Settlement as Exhibit 8). This program was vigorous and specifically structured to reach the African–American and Hispanic class members. *Id.* ¶ 12. Additionally, the program was based on a scientific methodology which is used throughout the advertising industry and which has been routinely embraced routinely by the Courts. *Id.* Specifically, in order to reach the identified targets directly and efficiently, the notice program utilized a multi-layered approach which included national magazines; magazines specifically appropriate to the targeted audiences; and newspapers in both English and Spanish. *Id.* ¶ 19. For example, the notice appeared in twenty leading national publications including: *Parade, USA Weekend, Time, People* and *O (The Oprah Magazine)*, as well as leading minority-targeted publications like: *People en Español, Vista, Latina, Black Enterprise, Ebony, Essence, Jet, The Vibe* and *Source.* (Declaration of Jeanne C. Finegan, ¶¶ 20–23, attached to Defendant's Brief in Support of Proposed Class Action Settlement

as Exhibit 8). The notice was published in the largest Spanish language newspapers in the top twelve Hispanic markets including: *La Prensita* in San Antonio, *La Opinion* in Los Angeles, and *El Diario La Presensa* in New York City. *Id.* ¶ 21. Also, the notice program "was massive, generating over 640 million opportunities to see this message" and did an excellent job at reaching the target group. *Id.* ¶¶ 12–37. Accordingly, the claim that notice by publication was insufficient is not supported by the record. In fact, an argument can be made the objectors' knowledge of the settlement and their submission of objections according to the terms of the notice illustrates the effectiveness of the notice program used in this case. *See In re Kendavis Holding Co.*, 249 F.3d 383, 387 (5th Cir.2001) (determining that one "usually has adequate notice that his rights could be jeopardized and should take steps to protect his rights" when one knows of legal proceeding); *Walsh v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 964 (3d Cir.1983) (noting that objector's "vigorous objection to the settlement, and that of the other objectors, demonstrates that the notice selected was adequate").

 The undisputed evidence also shows the notice provided sufficient information to allow individuals to determine whether or not they are class members and to evaluate the benefits of the settlement. A class settlement notice need only properly identify the plaintiff class and generally describe the terms of the settlement so as to alert members "with adverse viewpoints to investigate and to come forward and be heard." *In re Cement & Concrete Antitrust Litig.*, 817 F.2d 1435, 1440 (9th Cir.1987); *see also In re Southern Fla. Waste Disposal Antitrust Litig.*, 896 F.2d 493, 495 (11th Cir. 1990) (holding that notice is adequate if it identifies the potential class and informs its members of the proposed settlement); *Burns v. Elrod*, 757 F.2d 151, 154–55 (7th Cir.1985) (determining settlement is sufficient if class members are informed of their rights under agreement). In addition, the notice is "not required to provide a complete source of settlement information." *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1125 n. 1 (9th Cir.1977); *see also Weinberger v. Kendrick*, 698 F.2d 61, 70–71 (2d Cir.1982) (recognizing

notice "can practicably contain only a limited amount of information" and it may properly be limited to "very general descriptions of the proposed settlement"). The notice in this case described who is a class member: (1) the individual must be a current or former African–American or Hispanic Allstate policyholder; and (2) the policyholder must have been adversely impacted by credit information. Allstate maintains, without controverting evidence from the objectors, that when credit information has an adverse effect on an Allstate policy, Allstate sends the policyholder a notice of adverse action pursuant to the Fair Credit Reporting Act. Thus, African–American and Hispanic policyholders fall within the class parameters and are able to identify themselves based on the adverse action notice they received relating to the effect of their credit information on their Allstate insurance policy.

Nonetheless, without citing to any legal authority, certain objectors contend the class definition contained in the notice does not make the class readily identifiable. However, simply because the objectors cannot identify each member of the class does not make the class unidentifiable. *Hnot v. Willis Group Holdings Ltd.*, 228 F.R.D. 476, 481–82 (S.D.N.Y.2005) (determining that "[t]he class that plaintiffs seek to certify must be readily identifiable so that *the court* can determine who is in the class, and thus, who is bound by the ruling") (emphasis added) (citations omitted).

Some objectors also state the class definition is insufficient because the class members themselves will not know if they are members of the class, but this is speculation. In fact, some of the objectors themselves demonstrate the class definition is understandable. For example, objector Burns states he "is a member of the class defined because he and his wife are African–American individuals and believed that they were charged a premium by Allstate for a policy that was not the lowest available premium." (Objections, docket no. 139, p. 1).

 "An identifiable class exists if its members can be ascertained by reference to objective criteria." *Fears v. Wilhelmina*

*Model Agency, Inc.,* No. 02 Civ. 4911, 2003 WL 21659373, at *2 (S.D.N.Y. July 15, 2003); *see also Stoffels v. SBC Commc'ns,* 238 F.R.D. 446, 450–52 (finding class to be sufficiently definite where members could be identified by looking to records or other objective criteria). Here, the class is unidentifiable for purposes of giving notice because the parties do not yet have information about the race and/or national origin of the potential class members. Once the potential class members report this information, the class is identifiable because its members can be ascertained by referring to objective criteria. *Id.* Stated another way, the class members must self-report their race and/or national origin because this information is not in Allstate's possession. Then, as plaintiffs argue without challenge from the objectors, the class members who satisfy the class definition requirement of being "either (a) Black and/or African–American or (b) of Hispanic or Latino origin," can be cross referenced with Allstate's records to determine if they satisfy the remainder of the class definition (e.g., whether their credit information resulted in Allstate charging them a higher premium).

Furthermore, as discussed above, if potential class members have a question about whether they are members of the class, they can call or write the Settlement Administrator, or class counsel, or visit the website. Class members who are in doubt as to their legal status-for example, if they do not remember receiving a notice from Allstate indicating that their rates were impacted by their credit-are then instructed to file a request form. Additionally, the website contains a "Frequently Asked Questions" section, which includes the following Q & A:

Q. I do not recall whether or not I received a notice from Allstate, included in a new business or renewal mailing package, indicating that I did not qualify for lower rates or that I did not qualify for a policy based in whole or in part on Credit Information and advising me of certain rights under the Fair Credit Reporting Act; what should I do?

A. You should complete a Request Form and return it to us. If the information you provide on the Request Form identifies you as a Class member, by completing the Request Form you will also be eligible for a monetary payment and, if you are a current Allstate customer, you will receive important information about how to obtain a policy that is priced using the new insurance scoring algorithm, or formula. (If you are a class member, to be eligible for these settlement benefits you must submit a Request Form). You can obtain a Request Form by clicking here or by contacting us at 1–866–817–6514 or in writing to us at DeHoyos Settlement, P.O. Box 9000 # 6428, Merrick, N.Y. 11566–9000. Completed Request Forms must be returned to us by mail at DeHoyos Settlement, P.O. Box 9000 # 6428, Merrick N.Y. 11566–9000 and postmarked no later than February 18, 2007.

(DeHoyos Settlement Website, *www. creditusesettlement.com/faq/php3* (last visited Feb. 11, 2007)). Once the potential class members submit the request forms, and self-report their race and/or national origin, Allstate can determine from its records if those individuals satisfy the remainder of the class definition and are in fact class members. Therefore, it is not necessary for each class member to know whether he or she satisfied the class definition because each factor can be determined by reference to objective criteria. Because the class is identifiable, the objections to its definition, therefore, lack merit.

Finally, the objectors' state that policyholders will not know if they are class members because Allstate failed to give them the adverse action notices. The objectors base this argument on a multi-district litigation previously filed against Allstate in Tennessee ("Allstate MDL"). *In re Allstate Ins. Co. Underwriting,* MDL Docket No. 3:02–md–1457, 2005 WL 3753105 (M.D.Tenn. July 8, 2005) (attached to as Exhibit 11 to the Motion for Reconsideration and Motion to Modify Order Preliminarily Approving Class Ac-

tion Settlement, docket no. 112).[3] However, the individuals alleged to have not received notice in the Allstate MDL included non-applicant adults living in the household of someone else who applied for insurance and individuals who dropped their applications after receiving an initial quote. *Id.* at 8. They are not class members here because they are not or were not policyholders, a requirement to become a member of the class in this case. The other individuals alleged to have not received adverse action notices in the Allstate MDL included a small group of consumers in Tennessee. *Id.* at 7. As one of the experts from the Allstate MDL opined: "[T]he first settlement benefit is the class notice itself, which serves as a '*surrogate*' *adverse action notice,* advising class members that they were disadvantaged by past use of their credit reports without their knowledge. The notice also informs class members that their credit information was obtained by Allstate-perhaps illegally-and that it was used to set their insurance premiums." *Id.* (emphasis added and citations omitted). Another expert explained the class notice provided in the Allstate MDL educated millions of consumers that "insurers used credit information in setting premiums." *Id.* Accordingly, the objectors' concern that class members in this case did not receive notice based on the Allstate MDL in Tennessee is not supported by the record.

 Certain objectors also challenge the content of the notice. Federal Rule of Civil Procedure 23(e) prescribes the content of notices issued in the context of class action settlements. FED. R. CIV. P. 23(e). The notice must inform class members of the nature of the pending litigation; of the settlement's general terms; that complete information is available from court files; and that any class member may appear and be heard at a fairness hearing. *Id.; In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 177 F.R.D. 216, 230 (D.N.J.1997). The notice in this case did meet these requirements. *See Fowler v. Birmingham News Co.,* 608 F.2d 1055, 1059 (5th Cir.1979) (recognizing Dis-

trict Court has great discretion in determining kind of notice to employ in alerting class members to proposed settlement and settlement hearing subject to "broad reasonableness standards imposed by due process"). The notice details each specific element of settlement relief. (Exhibits 1A and 1B to Settlement Agreement). Further, it makes clear the notice "only summarizes the proposed settlement" and it directs class members to the class action administrator to obtain a copy of the Settlement Agreement for complete details. *Id.* Class members are further instructed they can obtain the Settlement Agreement from the settlement administrator by phone, mail or through the settlement website. *Id.*

"Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *In re Cement & Concrete Antitrust Litig.,* 817 F.2d 1435, 1440 (9th Cir.1987). "Those who wanted to probe more deeply could, as the notice plainly told them, examine the settlement stipulation and the papers and documents filed in this action." *Weinberger v. Kendrick,* 698 F.2d 61, 71 (2d Cir.1982) (internal quotation omitted).

In claiming fault with the notice, some objectors contend the notice is too confusing for "the minimally sophisticated lay person" to understand, yet in the next breath they challenge the notice because it does not include complicated and potentially confusing information about the actual algorithms used by Allstate; the basis for the attorneys' fees, such as the hours worked, the hourly rates and any lodestar factors; and the estimated value, or a mechanism for estimating the value, of the settlement relief. One objector complains the notice is inadequate because it does not contain a description of the factual basis for the complaint. Others assert the notice should include personalized information, such as each class member's previous credit score and the rates he or she should

---

**3.** The plaintiffs in a state court case against Allstate filed in Illinois originally objected to the settlement in this case, but then withdrew their objections. (Docket nos. 112 & 165). However, at the fairness hearing, the remaining DeHoyos objectors stated their wish to incorporate those objections into this matter.

have been charged for the insurance by Allstate.

None of this information is required in a class notice. While no rigid standards govern the contents of class notice, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950), as a practical matter, the notice cannot include all information which might be of concern to absentee class members. *See In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104 (5th Cir.1977) (determining "an overly detailed notice would not only be unduly expensive, but would also confuse class members and impermissibly encumber their rights to benefit form the action") (citations omitted); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 223–24 (5th Cir. 1981) (noting class notice was not required to include information which would make it so detailed that it would confuse class members or class members' estimated recovery where amounts were too unreliable) (citations omitted); *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534, 553 (N.D.Ga.1992) (concluding "[a] notice that is confusing to class members is not the best practicable under the circumstances") (citing *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104 (5th Cir.1977); *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791 (10th Cir. 1970)).

██ Notably, rule 23(e) does not require that the legal notice contain a precise valuation of the settlement relief. FED. R. CIV. P. 23(e). Moreover, courts have not required that the value to the class be set forth in monetary terms in the notice. *See DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1178 (8th Cir.1995) (recognizing Court "need not resolve all of the underlying disputes ... and the value of the settlement need not be determined with absolute precision" in the notice because the purpose of a settlement is to avoid delay and expense of trial); *Weinberger*, 698 F.2d at 70 n. 11 (noting "any estimate as to class losses-much less individual losses-would have been highly speculative and more likely to hinder informed decision-making by class members than advance it"); *O'Keefe v. Mercedes–Benz USA, LLC*, 214 F.R.D. 266, 302 (E.D.Pa.2003) (determining that an exact figure is not required by Court to evaluate and approve settlement's non-monetary benefits); *Fickinger v. C.I. Planning Corp.*, 646 F.Supp. 622, 630 (E.D.Pa. 1986) (concluding that to attempt to establish as a matter of legal certainty the value of a claim in the notice "would defeat the purpose of disposing of a case by settlement rather than trial"); *see also Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374 (9th Cir.1993) (noting that where recovery is uncertain, it is appropriate to omit such information from notice).

Rule 23 only requires notice of the proposed settlement and any options available to class members, such as an opportunity to object. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1289 (9th Cir.1992); *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.1975). "Subject to these requirements, however, the district court has virtually complete discretion as to the manner of giving notice to class members." *Handschu v. Special Servs. Div.*, 787 F.2d 828, 833 (2d Cir.1986) *Handschu*, 787 F.2d at 833 (citing FED. R. CIV. P. 23(e)). In exercising this discretion, "[n]umerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved 'very general description[s] of the proposed settlement.'" *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir.1982) (citing *Grunin*, 513 F.2d at 122); *see also Handschu*, 787 F.2d at 833 (recognizing notice "may describe [the settlement] in general terms"); *Sanders v. United States Dept. of Hous. & Urban Dev.*, 872 F.Supp. 216, 218 (W.D.Pa.1994) (finding class notice sufficient where it summarized settlement and did not "risk confusion by describing in detail the complicated and lengthy provisions" and explained how to object or comment on settlement).

██ Moreover, a simple summary of the proposed settlement is particularly appropriate in a rule 23(b)(2) case such as this. As the United States Court of Appeals for the Third Circuit explained, "the form of notice settlement of a Rule ... 23(b)(2) class action need only be such as to bring the proposed settlement to the attention of representative class members who may alert the court to

inadequacies in representation, or conflicts of interest among subclasses, which might bear upon the fairness of the settlement." *Walsh v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 963 (3d Cir.1983). This is because the interests in a "[r]ule 23(b)(2) class action for declaratory and injunctive relief, [are] related primarily, if not exclusively, to adequacy of representation, since a judgment in the action would establish the obligations of [defendant] and the Plan to the entire class." *Id.*

At the fairness hearing, counsel for certain objectors stated that the fact that the "response [to the notice] is in fact rather low" indicates that the notice has not been adequately distributed to the class. (Fairness hearing, testimony of David Treat, pp. 55–56). However, these objectors present no evidence to support this claim. In fact, the undisputed record reflects that, by a conservative measure, the notice reached not only the proposed class, but many others as well. As set forth in the declaration of Ms. Finegan:

> Based on our analysis from MRI research, this Notice program was so robust that the publication plan reached an estimated 80% of ALL adults 18 and over. More specifically, our analysis of the media performance for the African–American target shows that the Notice Program reached an estimated 87.04% of the African–American target with an average Frequency of 4.69. With respect to the Hispanic/Latino target, by a very conservative measure, our analysis of the media performance shows that the Notice Program reached an estimated 70.35% to 73.38% of the Hispanic/Latino target with an average Frequency of 3.57. In addition, the Notice Program reached an estimated 77.65% of the non-white target group with an average Frequency of 4.02

(Declaration of Jeanne C. Finegan, ¶ 24, attached to Defendant's Brief in Support of Proposed Class Action Settlement as Exhibit 8).

As written, the notice in this case was four pages long and contained, in a question and answer format, the following information:

* a description of the lawsuit and the proposed settlement and release;

* a description of the class members;

* an explanation of the rights of the class members;

* instructions as to how to object to the proposed settlement and deadlines for filing objections;

* instructions for submitting a claim;

* information about plaintiffs' counsel, their attorneys' fees, and the incentive awards sought for the named plaintiffs;

* information about the Court's fairness hearing; and

* instructions regarding how to obtain a copy of the complete Settlement Agreement or other information via the website, the toll-free telephone number or in writing.

The Court finds the notice satisfied rule 23 of the Federal Rules of Civil Procedure.

■ Due process is even further satisfied here because the parties supplemented the notice's summarized information with other information made easily available to the class outside of the notice. For example, in *In re Exxon Valdez*, an objector group argued the class notice was deficient because it "failed to disclose all relevant data showing the derivation of Matrix Shares of each claims category," which they claimed was needed to evaluate the settlement. No. A89–0095–CV, 1996 WL 384623, at *4 (D.Alaska June 11, 1996). The Court rejected this objection, reasoning there was no reason to complicate and unduly lengthen the notice when this type of detailed information was available to class members by calling a toll-free telephone number or writing to the address provided in the notice. *Id; see also In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir.2001) (finding notice was sufficient where, although it could have been clearer on how to object, notice provided the class members with phone number and address for obtaining further information); *Weinberger*, 698 F.2d at 71 (finding notice was sufficient because "[t]hose who wanted to probe more deeply [into the Settlement Agreement] could, as the notice plainly told them, examine the settlement stipulation and the papers and

documents filed in this action") (internal quotation omitted); *Gold Strike Stamp Co. v. Christensen,* 436 F.2d 791, 798–99 (10th Cir. 1970) (finding notice may satisfy due process requirements even where it is not comprehensive, provided there was a means to obtain further information); *Valerio v. Boise Cascade Corp.,* 80 F.R.D. 626, 636–37 (D.C.Cal.1978) (determining notice satisfied due process where it stated an address and phone number for class members to obtain more information and documents were available for inspection). As discussed above, the notice provided in this case informed class members they could obtain additional information about the case or the settlement, and copies of the documents, including the proposed settlement and class counsel's application for attorneys' fees, by writing, calling a toll-free telephone number or visiting a specific website. Thus, by providing class members an opportunity to have their questions answered or obtain further information or documents, the notice further satisfied due process. Finally, the announcement is consistent with the illustrative notices promulgated by the Federal Judicial Center at the request of the Subcommittee on Class Actions of the U.S. Judicial Branch's Advisory Committee on the Federal Rules of Civil Procedure. (The Federal Judicial Center Website, *http://www.fjc.gov* (last visited Feb. 11, 2007)). Accordingly, the Court finds the notice to be sufficient under the applicable provisions of federal law. Objections to the sufficiency of the notice are therefore overruled.

## C. The Relief Provided by the Settlement Agreement

### 1. The Settlement Credit Scoring Formula

Several objectors contend the settlement algorithm constitutes illusory relief because Allstate developed and implemented it as part of its ordinary business practices and not as a result of this settlement. The un-

controverted record, however, shows the settlement provides significant equitable relief not otherwise available to class members and the new credit scoring formula was the product of settlement negotiations. As explained in Declaration Number 1 of William R. Sparks, Personal Lines Manager in the Risk Management Department at Allstate, Allstate's changes in business practices were a direct result of this lawsuit. (Declaration Number 1 of William R., ¶¶ 5–7, attached to Defendant's Brief in Support of Proposed Class Settlement as Exhibit 2). As set forth by Mr. Sparks, Allstate developed the settlement credit scoring formula as a result of settlement negotiations with plaintiffs and class counsel. *Id.* ¶ 5–6. Further, it was class counsel and their experts who identified the particular variables within Allstate's then-existing formulas which were allegedly exerting a disparate impact on Allstate's minority policyholders. *Id.* ¶ 6. And, as Allstate acknowledges in Mr. Sparks' declaration, it does not collect any racially identifying information from its policyholders and has done no disparate impact testing of its own. *Id.* ¶¶ 7–8. Thus, Allstate would not have identified the variables within its then-existing formulas which were unfairly impacting its minority customers and would not have modified those formulas in the manner provided for in the settlement without the present case.

The record reveals that in 2000, Allstate introduced an insurance scoring model, also referred to as an insurance scoring algorithm, as one of its many rating variables used to price automobile and homeowners insurance policies. (Declaration Number 2 of William R. Sparks, ¶ 2, attached to Defendant's Brief in Support of Class Action Settlement as Exhibit 12). This insurance scoring model was a proprietary model which Allstate developed using internal data and information from credit reports. *Id.*[4] The insurance scoring model was designed to predict the likelihood of insurance losses and it utilized ap-

---

4. When state law required a public disclosure of insurance scoring models, Allstate maintains it developed a non-proprietary version of its insurance scoring model to file in those states. Therefore, Allstate contends, the objectors' argument that "Allstate has already publicly disclosed the insurance scoring model that plaintiffs challenged in this case is not correct." The objectors filed no response in opposition to this argument. The undisputed record thus shows that, until this settlement, Allstate had not publicly disclosed its proprietary scoring model.

proximately 30 variables from more than 300 credit report variables compiled and maintained by the consumer reporting agency TransUnion. *Id.* at ¶ 3.

After developing its insurance scoring model in 2000, Allstate continued to evaluate the predictive power of credit report information as well as other rating variables to determine whether modified and/or different uses of credit report information could increase the power of an insurance scoring model to predict insurance losses. *Id.* at ¶ 4. In June of 2004, the DeHoyos plaintiffs and Allstate initiated settlement negotiations. *Id.* at ¶ 5. One component of a settlement proposal presented by the DeHoyos plaintiffs was the development of a new insurance scoring model. *Id.* The DeHoyos plaintiffs contended a new insurance scoring model could be developed which would have a less discriminatory effect on minority policyholders than Allstate's existing insurance scoring model. *Id.*

In conjunction with plaintiffs' settlement proposal regarding changes to the existing insurance scoring model, and Allstate's ongoing evaluation of credit information, Allstate developed a new insurance scoring model. *Id.* at ¶ 6. Allstate developed the new insurance scoring model excluding and/or modifying certain credit report variables that the DeHoyos plaintiffs had specifically identified. *Id.* The parties agreed on the new insurance scoring model in the fourth quarter of 2004. *Id.* Based on that agreement, Allstate began to make this new insurance scoring model available to some of its customers, including class members on a state-by-state and line-by-line basis, as reflected in the Settlement Agreement. Therefore, as established by the undisputed record, the new credit scoring formula was a product of this settlement.

Certain objectors argue that the fact that the settlement was implemented in a number of states before the parties executed the formal Settlement Agreement minimizes the value of the relief to the class. However, the record does not indicate, and the objectors do not argue, this earlier implementation harmed class members. If anything, class members are beginning to see the benefits of a more racially neutral algorithm now, as opposed to having to wait for the settlement approval process to come to a conclusion. Earlier implementation of the new scoring model can only have benefitted class members, some of whom were provided with the opportunity to obtain an insurance policy priced using the settlement insurance scoring model prior to when such pricing would have been available had Allstate waited until the Settlement Agreement became effective to implement process. The critical fact is that the Settlement Agreement was a product of the parties' negotiations and resulted from plaintiffs' initiation of the present case. Without more, the Court declines to find that the fact that the settlement credit scoring formula is being used in some states now, as opposed to after the Settlement Agreement becomes effective, diminishes its value to the class.

Several objectors contend the settlement credit scoring formula has no value to the class. However, class counsel and their experts have determined the modifications contained in the settlement credit scoring formula materially reduce the disparate impact on minorities resulting from Allstate's use of credit scoring. Not a single objector takes issue with this conclusion and no objector has attempted to bring forth evidence to rebut plaintiffs' contention the settlement algorithm materially reduces this disparate impact.

Indeed, plaintiffs' expert, Dr. John J. Donohue III, economist and professor of law at Yale Law School, explained how Allstate's agreement to use the settlement algorithm brings significant value to the class. (Declaration of Dr. John J. Donohue III, docket no. 154, ¶¶ 2, 5–9). He concluded the new formula will have a significant economic impact, given the overall societal benefit of reducing discrimination and the large numbers of minority policyholders who stand to benefit from the settlement credit scoring formula. *Id.* ¶¶ 5–9. Professor Donohue also concluded that the algorithm change provided by the settlement will further overall fairness and the goals of the Civil Rights Act and the Fair Housing Act by providing "economic benefits to a class of individuals that is generally less affluent than the population at large" by

ensuring that minorities pay the same insurance rates as non-minorities for the same level of risk and by promoting home ownership by minorities. *Id.* ¶ 9.

The objectors overlook the fact that Allstate's agreement to implement the settlement algorithm also brings class members more than a one-time benefit. Class members stand to benefit from Allstate's less discriminatory use of credit each time they renew a policy, and this benefit will inure to class members for at least two years after Allstate has begun using the settlement credit scoring formula. In addition, any new minority customers who purchase automobile or homeowners' policies will benefit from Allstate's use of the less discriminatory settlement algorithm, regardless of whether they are members of the class.

Several objectors claim that the requirement that Allstate make its settlement credit scoring formula available for review is meaningless. However, this overlooks the tenacious opposition with which insurance companies have traditionally met calls for more transparency in their use of credit information. (Declaration of Christa Collins, docket 149, ¶ 4). In fact, as noted above at page 60 and fn3, Allstate had never voluntarily disclosed its credit scoring algorithms prior to this settlement. Thus, there was presumably no avenue for independent observers to verify that Allstate was using the same scoring algorithm for its business as the credit scoring algorithm it disclosed in select states pursuant to state law. With the mandatory transparency called for by the Settlement Agreement, consumers can be reliably informed about what aspects of their credit history and performance will impact their Allstate credit insurance score.

Pursuant to the Settlement Agreement, Allstate has agreed that the settlement credit scoring formula "will remain in effect for a period of at least two (2) years from the date the Settlement Algorithm is approved for use and rolled out on a state-by-state, company-by-company and line-by-line basis, and will remain in effect for a period of at least three (3) years for companies and lines identified in Schedule 1 as 'automatic re-order only.'" Certain objectors contend Allstate should be required to keep the settlement algorithm in effect for up to ten years, rather than the two to three years after implementation as required by the Settlement Agreement. This objection ignores the significant benefits the class will realize for the period of time Allstate has agreed to keep the settlement credit scoring formula in place. Moreover, the two to three year period represents a balance the parties struck in negotiations between plaintiffs' desire to see the settlement algorithm remain in place for a longer period of time versus the regulatory and business realities Allstate faces in obligating itself to use a specific algorithm over a longer period of time. (Fairness hearing, testimony of Jeffrey Lennard, p. 83).

Finally, certain objectors suggest the settlement algorithm was not the result of good-faith negotiations between the parties. As discussed above, there is no reason to believe this settlement is the product of fraud or collusion. In fact, "Allstate [initially] fought this case at every turn." (Plaintiffs' Memorandum in Support of Final Approval of Settlement Agreement and Certification of the Class for Settlement Purposes Only, docket no. 148, p. 33). It was only after Allstate's request to appeal to the United States Supreme Court failed that Allstate came to the negotiating table. Indeed, this was not a quick settlement; it was negotiated at arms' length by adversarial parties over a span of nearly two years. (Declaration of Christa Collins, docket 149, ¶ 5); *see In re Motorsports Merch. Antitrust Litig.*, 112 F.Supp.2d 1329, 1338 (N.D.Ga.2000) (approving agreement because "[t]his was not a quick settlement, and there is no suggestion of collusion"). As set forth previously, objectors have presented no evidence or indication of any fraud, collusion or any other wrongdoing by the parties in reaching this settlement, and the Court perceives none. *See Ingram v. Coca–Cola Co.*, 200 F.R.D. 685, 693 (N.D.Ga.2001) (approving settlement because there was "no doubt that this case had been adversarial, featuring a high level of contention between the parties"); *Warren v. City of Tampa*, 693 F.Supp. 1051, 1055 (M.D.Fla. 1988) (approving settlement because record showed no evidence of collusion, but to the

contrary showed that the parties "negotiated the terms of [the] settlement for an extended period of time"). The most the objectors point to is their belief that the relief is valueless. However, as discussed herein, the Court does not find this to be true. In any event, the objectors' suggestion the proposed settlement was anything but properly negotiated is not supported by the record. These objections are therefore overruled.

## 2. The Credit Education Program

Certain objectors assert the credit education program is an attempt to offer a service which is already free and readily obtainable to class members. Others contend the materials are already generally available. The record reveals, however, the credit education program offered through this settlement is a comprehensive nationwide program specifically targeted to class members. It is not currently available, but will be funded by Allstate, and developed and implemented by two leading minority advocacy groups. As established at the fairness hearing, the credit education program will be instituted by the National Council of La Raza ("NCLR"), the largest Hispanic civil rights and advocacy group, and the National Urban League, the nation's oldest and largest community based African–American advocacy organization. (Fairness hearing, Court's Exhibit 1, submitted by plaintiffs). Both the NCLR and the National Urban League will develop comprehensive educational programs specifically tailored to their respective constituencies. For example, the NCLR program will involve formative research, using science-based approaches to shape community mobilization and social marketing efforts aimed at promoting consumer behavior change. *Id.* NCLR also will identify the opportunities and challenges which Hispanic and Latino consumers face in credit markets. NCLR will then oversee and manage the dissemination of this brochure, distributing English and Spanish language versions, to Hispanic consumers who undergo financial or housing counseling or education through NCLR network. *Id.* The brochure will also be available on NCLR's website, which receives approximately 1.5 million visitors each month and distributed at the LatinExpo during the NCLR annual conference and which is visited by approximately 20,000 individuals. *Id.* Finally, the brochure will be posted to the NCLR's *Lideres* website. *Id.* The Urban League has a similar program under development.

## 3. The Appeals Process

Certain objectors argue the appeals process Allstate has agreed to implement is illusory, vague and worthless. At least one objector contends it provides nothing more than what Allstate is already required to do by law. Another objector contends the Settlement Agreement does not define who qualifies for the appeals process and, furthermore, it fails to provide a defined benefit for class members who qualify. Initially, the Court notes there is no evidence to show why an appeals program made available to current policyholders who have experienced an exceptional circumstance which negatively impacts their credit history is vague or worthless. Dr. Donohue found in his report that the appeals process generates significant economic benefit to class members and even greater economic benefit to policyholders in general, all of whom will be eligible to take advantage of the appeals process. (Declaration of Dr. John J. Donohue III, docket no. 154, ¶ 10). He explains the "extraordinary circumstances" defined in the appeals process capture significant life-changing events which are common in the United States population and frequently result in a negative impact on credit scores. *Id.* ¶ 16. He further concludes certain of these hardships have a significant impact on minority communities. *Id.* From this, Dr. Donohue concludes the appeals process has significant value, particularly "given the large number of Allstate policyholders, the projected number of policyholders that will be eligible to participate in the appeals process, and the projected number of those policyholders that are minorities." *Id.* ¶ 17. From all indications, the opportunity for a customer to receive a premium discount based on a successful appeal is of value to this customer.

Moreover, the settlement provides a definition as to who qualifies under the appeals process. (Settlement Agreement at 13).

The Settlement Agreement specifically states the appeals process is designed to help class members who have endured certain specific events, classified as "extraordinary circumstances," which are delineated in the Settlement Agreement. *Id.* "Extraordinary circumstances" is defined as "divorce, death in the family, unemployment, medical expense, care of an adult dependent, identity theft, long-term injury, illness or disability, care of a dependent and/or domestic violence." *Id.* Moreover, the settlement further mandates all policyholders who receive less than the best available rate due to derogatory credit information, and thus who are entitled to an adverse action notice under the Fair Credit Reporting Act, will receive notice of their right to appeal Allstate's decision on the basis of these defined extraordinary circumstances. The notice policyholders will receive contains a detailed account of what information Allstate's policyholders must provide in order to successfully pursue an appeal of Allstate's decision based upon credit information. (Settlement Agreement, ¶ 3.D.3). In addition, Allstate has agreed to provide a toll-free telephone number dedicated to assisting customers in this appeals process.

The objectors further state that the appeals process is vague because it does not give an acceptance rate or a range of possible dollar amount reductions. Allstate argues, without controverting proof from the objectors, that by its nature the appeals process contemplated by the Settlement Agreement is not susceptible to acceptance rate predictions because whether policyholders have experienced an extraordinary circumstance is unique to each policyholder and not capable of prediction. Furthermore, even if a policyholder experiences an extraordinary circumstance, whether the exceptional circumstance negatively impacts the policyholder's credit history is an individualized inquiry from which an acceptance rate for all eligible customers cannot be extrapolated or predicated. However, it is certain the appeals process provides a guaranteed right of appeal and a safety valve to those negatively impacted by the exceptional circumstances. This benefit is not available to Allstate policyholders absent this settlement.

Similarly, the exact amount of premium reductions to be received by successful participants in the appeals process is likewise not amenable to calculation. Allstate argues, without challenge from the objectors, that this calculation will depend on the specific rating rules in effect for the state, line and issuing company which supplied the policy to the policyholder. Nonetheless, under the terms of the Settlement Agreement, each policyholder with a successful appeal will receive a specifically quantifiable premium reduction, calculated pursuant to the terms of Allstate's applicable rating rules on file with the state departments of insurance of each applicable state.

Stated another way, the objectors' claim that the premium discount under the appeals process is undefined is without merit. Through the appeals process, any policyholder whose "Credit Information is worse than neutral" is eligible for a premium discount. (Settlement Agreement at 13). A policyholder who submits an "Extraordinary Circumstances Appeal Form" and otherwise meets the criteria for the appeals process will then receive a premium calculated as though this policyholder had a "neutral Credit Information." *Id.* While it is not possible to predict in advance what specific premium discount any particular policyholder may receive by virtue of this process, the amount of the discount will be calculated using an objective, agreed-upon system and not left to Allstate's capricious discretion as the objectors imply.

Certain objectors contend the appeals process has no value because certain states already have laws requiring an appeals process. At the time the parties negotiated the appeals process only ten states had enacted a statute or regulation requiring a substantially more limited appeals process. *See* Amended Reg. 5–1–6 promulgated under Colo. Rev. Stat. § 10–1–109 (2002); Delaware Reg. 906 (2003); S.B. 40–A, 2003 Spec. Sess. (Fla.2003); S.B. 14, 78th leg., Reg. Sess (Tex.2003); S.B. 1284, 2003 Gen. Assem., Reg. Sess. (Va.2003); S.B. 13, 23d Leg., Reg. Sess (2003); H.B. 1448, 2003 Leg., Reg. Sess. (La.2003); H.B.2071, 2003/2004 Sess. (Kan. 2003); S.B. 560, 46th Leg., Reg. Sess. (N.M.

2005); S.B. 311, 2005 Leg., Reg. Sess. (Mont. 2005); Bulletin No. 04–05 Issued by Dept. of Business and Insurance (N.J.2004). There is plainly value in a nationwide appeals process for those class members who reside in the vast majority of states which do not currently have such a process.

Equally important, the undisputed evidence shows the proposed Allstate appeals process is far more comprehensive than any of the state mandated appeals processes. In the states which mandate appeals, most require a very limited appeals process. For example, Florida allows policyholders to appeal rates when their credit information has been adversely affected by the dissolution of marriage or by the credit information of a former spouse. S.B. 40–A ¶ 4(e), 2003 Spec. Sess. (Fla.2003). Colorado's appeals process is similarly limited. *See* Amended Reg. 5–1–16 promulgated under COLO. REV. STAT. § 10–1–109 (allowing appeal when credit information has been adversely affected by factors, such as dissolution of marriage, which insurer is prohibited from considering). The other states add additional grounds for appeal, but no state law requires all of the grounds for appeal available through the appeals program agreed to in this settlement. The Texas Insurance Code, for instance, requires insurers using credit information only to "provide reasonable exceptions ... for a consumer whose credit information has been directly influenced by: (1) catastrophic illness or injury; (2) death of a spouse, child or parent; (3) temporary loss of employment; (4) divorce; or (5) identify theft." TEX. INS. CODE ANN. § 559.103(a) (Vernon 2006).[5] In fact, the Court found no state which allows a consumer to appeal an insurer's credit scoring decision because the consumer experienced adverse credit events due to domestic violence or as a result of his or her caring for a dependent adult or grandchild, which the

settlement appeals process allows here. Thus, the settlement provides class members with significant value by: (a) increasing the number of reasons they may use for purposes of appeal in states currently mandating an appeals process and (b) creating an appeals process-where none previously existed-for the vast majority of class members residing in states without a mandatory appeals process.

Furthermore, most of these state laws do not require insurers to notify their policyholders who are eligible of the right to appeal. *See* S.B. 40–A ¶ 4(e), 2003 Spec. Sess. (Fla 2003) (requiring insurer to provide an appeal at request of an applicant, but not requiring insurer to notify applicant of his or her right to appeal). In contrast, Allstate has agreed to notify consumers of their right to appeal when they are notified they did not receive the best available rates. (Settlement Agreement, Ex. 11) (requiring Allstate to send letters to all policyholders eligible for appeal describing and facilitating the appeals process). In addition, Allstate has agreed to provide the toll-free telephone number dedicated to assist policyholders in this appeals process. *Id.* ¶ 3.D.3. The objections regarding the appeals process are overruled.

### 4. The Proposed Marketing Plan

Certain objectors contend Allstate's commitment to significantly increase and maintain its marketing directed toward minority consumers does not constitute fair consideration because it will only benefit Allstate. However, plaintiffs allege Allstate's use of credit report information to price insurance policies was done to discourage the sale of its insurance policies to minority customers. (Amended Complaint, ¶ 15). While Allstate vigorously rejects this contention, agreeing to significantly increase and maintain marketing toward minority customers squarely

---

**5.** Louisiana requires insurers to provide an appeals process solely for medical crises, a spouse's death, identity theft, catastrophic event, or the personal guaranty of a business loan. LA. REV. STAT. ANN. § 22:1486 (2004). Minnesota requires insurers to develop underwriting exceptions for "catastrophic injury or illness, temporary loss of employment, or the death of an immediate family member." MINN. STAT. ANN. § 72A.20 (2006). In New Jersey, insurers are required by a regulatory

bulletin to provide exceptions for adverse credit impacts due to "extraordinary life events, including a catastrophic illness or injury, the death of a spouse, child or parent, temporary loss of employment, divorce, or identity theft." *[http://www.state.nj.us/jobi/bulletins/blt04 05.pdf]*. In Virginia, certain insurers may "provide reasonable exceptions" when credit history is affected by catastrophic illness or death of a spouse or household member. VA. CODE ANN. § 38.2–2234 (2006).

addresses plaintiffs' allegations. In addition, this objection ignores the fact any minority customer who chooses to buy a policy as a result of such marketing efforts will stand to benefit directly from the other settlement terms.

Several objectors state that Allstate's agreement to dedicate at least 15% of its national media spending on multicultural marketing is a one-sided bargain with no corresponding benefit to the class. However, plaintiffs maintain, without dispute from these objectors, that insurance companies have traditionally "been reluctant to market to minority communities and have, in some instances, taken steps to discourage minority marketing." (Memorandum of Class Counsel in Response to Objections to Proposed Class Action Settlement and Certification of the Class, docket no. 151, p. 20). It is thus undisputed that the purpose of this aspect of the settlement is thus to ensure that Allstate continues to, and improves upon, its outreach into minority communities in an effort to serve this segment of the population which has historically been underserved by insurance companies. That Allstate may also enjoy benefits from its multicultural marketing efforts mandated by the Settlement Agreement does not diminish the value of those efforts for the class and minorities generally. Accordingly, these objections are overruled.

### 5. Monetary Payments

Certain objectors contend the $50 to $150 monetary payments the class members will receive from the Settlement Agreement are so low as to be without value. They also argue the settlement is unfair because it does not take into consideration that policyholders who maintained insurance policies for longer periods of time were damaged more than other class members. These objectors propose the settlement should offer larger payments for class members who were customers for longer time periods.

 Settlement, by its very nature, involves compromise by both sides on the relief afforded to the class after hard fought negotiations over contested issues of fact and law. "[I]nherent in a compromise is a yielding of absolutes and an abandoning of highest

hopes." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977) (internal quotation omitted). "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir.1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir.2000). In other words, a settlement is not "a wish-list of class members that the Defendants must fulfill." *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 169 (S.D.Ohio 1992), *appeal dism'd without opinion*, 995 F.2d 1066 (6th Cir.1993).

In this case, the Court finds the monetary payments are reasonable and provide value to the class. Class members can recover between $50 and $150 per qualifying policy. (Settlement Agreement, Ex. 10). Moreover, the potential for monetary payments available to class members will differ depending on whether a class member was insured for one policy period or more than one policy period, with greater payments awarded to qualifying policyholders insured for longer than one policy period. The fact that a class member insured for more than three policy periods might be able to litigate his or her claim, and if he or she prevailed, establish greater damages than a class member insured for fewer policy periods, does not necessarily render unreasonable the monetary relief afforded under the Settlement Agreement.

Moreover, these particular objections overlook the fact that the primary goal of the settlement is to provide injunctive relief, not to provide individually calculated damages. Under the terms of the Settlement Agreement, Allstate will use an objective formula to calculate the monetary relief, which will compare the class member's prior insurance score with their new insurance score calculated under the new settlement scoring formula. (Settlement Agreement at 11–13). As noted, class members whose insurance scores improve enough to qualify will receive monetary relief between $50 and $150, depending on the amount of improvement and the length of time the class member held the

particular policy. (Settlement Agreement at 11–13; Settlement Agreement Exhibit 10, "Monetary Payment Process" at 3–5). As such, this objective formula accounts for the fact that class members who have been policyholders for longer periods of time or who may have been overcharged more than others should receive higher restitutionary payments. Although the restitutionary payments may not exactly equal any particular class member's alleged damages, this does not mean this component of the settlement has little value. In fact, it can reasonably be concluded the settlement payments, called for by the Settlement Agreement, augment the value of the of the practice changes Allstate has agreed to implement.

At least one objector also contends the monetary award is not beneficial to former policyholders. This is incorrect. The awards outlined in the settlement are available to all policyholders, both current or former, who fall within the class definition. (Settlement Agreement at 1, 11–13). Moreover, past policyholders who apply for insurance with Allstate after the implementation of the settlement algorithm will benefit from their premiums being calculated by the less discriminatory formula and the appeals process.

At least one objector contends the settlement lacks value because it does not provide assistance for class members who want to challenge Allstate's determination of monetary payments. This also is not correct. The proposed settlement includes a dispute resolution process regarding the monetary payments. (Settlement Agreement at 13–14). The class action website further explains that if a class member disputes his or her monetary payment, class counsel will attempt to resolve the dispute informally and "[i]n the event that the dispute cannot be resolved, Class Counsel will continue to represent [the class member] at no additional expense . . . as part of their continuing duties to the class and to present [the class member's] dispute for resolution in writing . . . ." (DeHoyos Settlement Website, *http://www. creditusesettlement.com/faq/php3.* (last visited Feb. 12, 2007)). The objection is overruled.

### D. The Anti–Injunction Act

 Certain objectors contend the injunction in the settlement violates the Anti–Injunction Act. The Anti–Injunction Act is generally recognized to permit a district court to enjoin state court proceedings on three bases: (1) expressly authorized by a federal statute; (2) necessary to assert jurisdiction; or (3) necessary to protect or effectuate a prior judgment by a federal court. 28 U.S.C. § 2283; *Chick Kam Choo v. Exxon Corp.,* 486 U.S. 140, 146, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988). The jurisdictional exception allows a federal district court the ability to grant an injunction to stay proceedings in a state court where necessary in aid of the Court's jurisdiction. The United States Supreme Court in *Atlantic Coast Line R.R. v. Brotherhood of Locomotive Eng'rs,* 398 U.S. 281, 295, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970), explained that preventing a state court from interfering with a federal court's disposition of a case may be necessary to avoid a serious impairment on the federal court's flexibility and authority to decide the case. Moreover, district courts are authorized to issue injunctions under the jurisdictional exception where settlement is imminent or pending. *See Carlough v. Amchem Prods., Inc.,* 10 F.3d 189, 203–04 (3d Cir. 1993) (finding district court's preliminary injunction enjoining absent members of purported federal class in an asbestos related tort action from prosecuting state claims was necessary in aid of its jurisdiction because the prospect of settlement was imminent after years of pre-trial negotiations in complex and far-reaching matter); *Battle v. Liberty Nat'l Life Ins. Co.,* 660 F.Supp. 1449, 1455 (N.D.Ala.1987), *aff'd,* 877 F.2d 877 (11th Cir. 1989) (permanently enjoining class members from prosecuting state court action where state court action would directly interfere with district court's ability to supervise and dispose of federal action involving multiple parties and complex antitrust issues and would remove federal court's flexibility in reaching a just solution, protecting settling defendants and avoiding conflicting results). In this case, this Court found the issuance of a preliminary injunction was necessary and appropriate in aid of the Court's jurisdiction

over the action and to protect and effectuate the Court's review of the settlement. (Order Preliminarily Approving Settlement, docket no. 110, ¶ 20). Having considered the objection, the Court finds the issuance of the preliminary injunction falls within the jurisdictional exception to the Anti–Injunction Act. The objection is overruled.

### E. The Release

 Several objectors contend the release agreed upon by the parties is impermissibly broad. The United States Court of Appeals for the Fifth Circuit has noted that "[t]he weight of authority establishes that . . . a court may release not only those claims alleged in the complaint and before the court, but also claims which 'could have been alleged by reason of or in connection with any matter or fact set forth or referred to in' the complaint." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir.1981) (quoting *Patterson v. Stovall*, 528 F.2d 108, 110 n. 2 (7th Cir.1976)). "[T]he very nature of a general release is that the parties desire to settle all matters forever . . . [and a] general release . . . not only settles enumerated specific differences, but claims of every kind or character, known or unknown." *Zandford v. Prudential–Bache Sec., Inc.*, 112 F.3d 723, 727 (4th Cir.1997) (quoting *Virginia Impression Prods. Co. v. SCM Corp.*, 448 F.2d 262, 265 (4th Cir.1971)); *see also Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106 (2d Cir.2005) (recognizing "[b]road class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country"). Where, as here, a "release provides that 'any and all claims,' 'past, present, or future' are to be extinguished," a court is required to enforce its provisions both as to known and unknown claims . . . [because a] contrary result would not contribute significantly to the public policy of encouraging the settlement of differences and compromise of disputes in which the execution and exchange of releases is the common and legally accepted means of consummation." *Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1312 (5th Cir.1983); *see also Wal–Mart Stores, Inc.*, 396 F.3d at 106 (concluding that "[c]lass action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability"); *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366–67 (3d Cir.2001) (determining that refusing to grant broad settlement release would undermine multi-district class settlements because defendants would be concerned their exposure to liability would be too great). As class counsel noted at the fairness hearing:

> The release is tailored specifically to release claims for which this lawsuit has provided full relief. . . . [O]nly class members' clams are being released. There isn't any risk that the claims on behalf of other minorities are somehow being discharged by this case. The release only applies to class members. Those are identified as African–American and Hispanic individuals. No other individual's claims are affected by [the] release and the release itself is tailored to address claims related to credit scoring that are fully addressed by the benefits in this settlement.

(Fairness hearing, testimony of Christa Collins, pp. 106–07). Here, the release also specifically provides that "nothing herein is intended to or shall be construed as a release of any [c]laims arising after the Effective Date." (Settlement Agreement, at 25). Therefore, any claims arising out of the new credit scoring formula are not precluded.

In *United States v. Allegheny–Ludlum Indus. Inc.*, 517 F.2d 826, 853 (5th Cir.1975), the United States Court of Appeals for the Fifth Circuit explained that settlements of class action discrimination claims can release a broad spectrum of claims based upon the same set of facts. *See also Wal–Mart Stores, Inc.*, 396 F.3d at 109 (recognizing settlement can release claims arising from same factual predicate); *Newby v. Enron Corp.*, 394 F.3d 296, 305 n. 15 (5th Cir.2004) (concluding settlement may release "defendants from class memberships subsequently asserting claims relying on a legal theory different from that [relief] relied on in the class action complaint but relying on the same set of facts"); *see also In re VMS Sec. Litig.*, No. 89 C 9448, 1993 WL 105423, at *2 (N.D.Ill. Apr.6, 1993) (finding class actions generally contain broad releases because

they "are essential to encourage settlement of class litigation") (citing *TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 460 (2d Cir.1982); *Richard's Lumber & Supply Co. v. United States Gypsum Co.,* 545 F.2d 18, 20–21 (7th Cir.1976), *cert. denied,* 430 U.S. 915, 97 S.Ct. 1326, 51 L.Ed.2d 593 (1977)).

The release at issue here is narrow and was designed to cover only those claims arising from the facts at issue in this case. First, the release is limited to this factual scenario: Allstate's "use of credit reports, credit information, and/or insurance scores in any form and in any manner whatsoever to underwrite, price or rate insurance policies" arising prior to the effective date of the settlement. (Settlement Agreement, at 23). As such, class members retain their right to pursue claims against Allstate for matters unrelated to its use of credit information to underwrite, price or rate insurance policies. For example, class members are free to pursue a claim relating to an insured loss. Second, even with respect to Allstate's use of credit information to underwrite, price, or rate insurance policies, class members have retained the right to pursue claims against Allstate for any alleged wrongdoings occurring after the settlement's effective date. Third, the release specifically maintains the "Class Members' rights to participate in any relief obtained or made available by any administrative or regulatory body through a public action or proceeding ... even if such relief is related to Allstate's use of credit information to underwrite, price, or rate insurance policies." *Id.* at 25. This would therefore allow class members to participate in investigations undertaken by an insurance commissioner or regulatory agency. Finally, the release does not "extinguish or otherwise compromise in any way ... any Class Member's claims or remedies for any violation of the Fair Credit Reporting Act." *Id.*

Additionally, the undisputed evidence shows the release has been executed voluntarily and with adequate knowledge, as class counsel have evaluated the relative merits of each party's case and entered into the settlement with a full and fair view of the case's strengths and weaknesses. (Declaration of Christa Collins, docket 149, ¶ 6). Again, the class representatives were actively involved in this litigation, including settlement negotiations. *Id.* ¶¶ 9–10, (Settlement Agreement at 2). As with class counsel, the record therefore shows the class representatives' views about the propriety of the settlement are based upon a strong foundation of knowledge concerning the strengths and weaknesses of the case.

■ Certain objectors imply that a release in a federal case is limited to releasing only federal claims. However, "federal class action settlements containing a release of state law claims are both common and presumptively valid." *Association for Disabled Am., Inc. v. Amoco Oil Co.,* 211 F.R.D. 457, 471 (S.D.Fla.2002) (citing *Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 376–77, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996); *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 221 (5th Cir.1981)). In fact, federal courts have consistently held that class action settlements can release state claims arising from the same subject matter. *See e.g., Tropp v. Western–Southern Life Ins. Co.,* 381 F.3d 591, 596 (7th Cir.2004) (determining nationwide class settlement of claims of consumer fraud in insurance billing practices barred subsequent action); *Williams v. General Elec. Capital Auto Lease, Inc.,* 159 F.3d 266 (7th Cir.1998) (barring subsequent action in Florida because of previous nationwide class settlement in Illinois); *Feuerman v. Sears, Roebuck & Co.,* No. 96 Civ. 0120, 1996 WL 648966 (S.D.N.Y. Nov.6, 1996) (recognizing New York plaintiff's claims were barred by previous nationwide class settlement in California). As explained by the Court in *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*:

> Variations from state-to-state in the form of state law claims would always prevent a nationwide settlement, thereby defeating the efficiencies of the class action settlement mechanism. Such a position is plainly against the public policy favoring class action settlements and courts frequently and routinely approve nationwide class settlements, including consumer class actions involving state law claims.

No. MDL 1559, 4:03–MD–015, 2004 WL 3671053, at *15 (W.D.Mo. April 20, 2004). Accordingly, the release in this case may properly include those claims based upon state law.

Finally, this Court rejects any suggestion that it should sever certain state claims from the release, or create subclasses to pursue other claims after approval of the Settlement Agreement. Severing these claims would not be beneficial to the class because it may jeopardize the settlement. *See In re Baldwin–United Corp.*, 607 F.Supp. 1312, 1325 (S.D.N.Y.1985) (concluding "[n]ot only is the dismissal of all of plaintiffs' pendent and federal claims a term in the stipulations among the settling parties, but the Court is authorized to approve releases of all of the state and federal claims if it determines that the settlements on the totality of the facts are fair, adequate and reasonable") (citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d at 221). Accordingly, the Court concludes the release, which discharges only those claims related to the previous algorithm, is narrowly tailored to accomplish the goals of this settlement. The objections concerning the broadness of the release are therefore overruled.

**F. The Predicate of the Request Forms**

A few objectors complain that class members are being required to file claim forms to receive their monetary benefit. For example, objector Marivel Garcia argues the request form required to apply for monetary relief is designed to limit the "take rate" by asking former policyholders to identify policy information. (Objection to Proposed Class Action Settlement and Notice of Intent to Appear, docket no. 131, pp. 7–8). At the fairness hearing, class counsel described how "this requirement is driven by two practical considerations which left the parties with no option." (Fairness hearing, testimony of Christa Collins, p. 24). She explained:

> Number one, the Fair Credit Reporting Act requires that consumers give their consent to have their credit pulled. Credit has to be pulled to allow the rescoring to take place. So we simply couldn't set up a mechanism that would cause a violation of

the Fair Credit Report [Act]. And in addition to that, Allstate doesn't collect racial data on its policyholders. So, there was no means other than self-identification to determine who the class members were and their minority status.

*Id.* Thus, one purpose of the policy information in the request form is to help Allstate identify the class members in its records. The undisputed record shows that, because many of Allstate's customers share the same or similar names, it is not unusual to find multiple, and different, policy records associated with a single name. (Declaration Number 2 of William R. Sparks, ¶ 2, attached to Defendant's Brief in Support of Proposed Class Settlement as Exhibit 12). By way of example, Allstate has thirty-three different policyholders in its records named Marivel Garcia. *Id.* As a result, additional data, such as policy information, may be needed to identify specific class members.

Other objectors expressed concern the claim form offers no concrete way to ascertain the true origin/ethnicity of filers. It is not clear how these objectors would have the parties determine the "true" race or national origin of the claim filers. As indicated herein, appearance alone is neither appropriate nor an accurate indicator. Self reporting, which is required here, is therefore the best option for identifying class members in this case. Moreover, the undisputed evidence shows the likelihood of identifying class members in Allstate's records increases if Allstate knows the type of insurance such as automobile or homeowners, and improves significantly if a policy number is provided. *Id.* Therefore, while Allstate may be able to identify a class member in its records by name, the request form is designed to maximize class member identification where name alone does not suffice by requesting class members to provide policy information.

 Certain objectors also argue that obtaining policy information to properly identify class members and facilitate settlement relief is too arduous and is aimed at suppressing class member participation in the settlement. However, on the other hand, they state that allowing class members to simply self-identify as African–American or

Hispanic or Latino will allow for fraudulent claims. While these objectors offer no alternative to this self-identification, their positions appear to be diametrically opposed. In this regard, an objection that the settlement fails to protect against fraudulent filers, or that the agreement fails to provide a method to verify the information provided by the filers, is not a basis on which to reject the settlement. Such objections do not seek to protect class members, but rather attempt to protect Allstate from paying invalid claims. "The reason the court is called on to review a settlement is to protect the rights of the many absent class members who were not involved in the negotiations leading to settlement." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 225 (5th Cir.1981) (citation omitted). "A defendant who negotiates a settlement, however, does not need the court to act in a fiduciary role to protect its interests." *Id.* Therefore, this type of an objection does not support a finding that the settlement is unfair, unreasonable or inadequate.

Certain objectors also contend the request form process is designed to limit monetary payments. As set forth above, however, the undisputed record reveals the request form process is necessary to confirm class membership and obtain the necessary information from Allstate records in order to: (1) provide the important information to current policyholders about how they will have the opportunity to obtain a policy priced using the settlement scoring formula; and (2) determine the amount of the monetary payment, if any, for which a class member may qualify. Without this information, Allstate cannot dispense these settlement benefits, including monetary payments, to eligible class members. Moreover, the request form requires class members to authorize Allstate to obtain their credit report information pursuant to federal law. *See* 15 U.S.C. § 1681(b) (requir-

ing "consumer reporting agencies [to] adopt reasonable procedures . . . which are fair and equitable to the consumer"). The request forms are thus a necessary prerequisite to the payment of any monetary relief, and the objectors have not shown they are in any way an attempt to limit monetary payments.

A few objectors also contend that because class members have only a short time to return request forms-a mere sixty days-this short time period seems calculated to suppress redemption rates. Nonetheless, the undisputed record reveals that request forms have been available from, and class members have been submitting these request forms since, July of 2006, when the first publication notice was issued. (Declaration of Jeanne C. Finegan, ¶ 24, attached to Defendant's Brief in Support of Proposed Class Action Settlement as Exhibit 8).[6] The undisputed record also reveals that the request forms are not due to be returned until February 17, 2007.[7] Therefore, class members will have almost seven months to return the request forms.

Additionally, some objectors contend the claim form procedure was designed in a complex way with the goal of limiting the relief available. However, class members were advised of the claim form process when they received the class notice. The notice specifically states: "If you do not submit a request form, you will not be eligible for a monetary payment and you will not receive important information about, and therefore, may not qualify for, a policy that uses the new insurance scoring algorithm to determine your premium." (Class Notice at 2). The notice also included an address, phone number, and website which class members could use if they had questions about the contents of the notice. *Id.* at 5. Additionally, the claim form contains this exact language-in bold capitalized letters-on two separate pages. (Claim Form, Settlement Agreement, Exhibit 9 at

---

6. Allstate began the class notice publication program (described in detail at Exhibit 13 of the Settlement Agreement) on or about July 2, 2006, and the last publication date was on or about September 4, 2006. (Addendum # 4 to the Settlement Agreement).

7. As set forth in the order preliminarily approving the settlement, the notice provides that

"Class Members wishing to obtain important information about how they can obtain an Allstate policy priced using the Settlement Algorithm and/or to be eligible for monetary payment must return Request Forms, as described in the Notice, no later than 60 days after [the December 18, 2006] fairness hearing." (Docket no. 110, p. 6).

1,2). It again provides the phone number, address, and website information. *Id.* Thus, the specific language of the notice, the Settlement Agreement, and the claim form, evidence that both parties worked diligently to efficiently communicate the claim procedure to class members. The objections to the request forms for information related to obtaining monetary payments are therefore overruled.

## G. Intra–Class Conflicts and Adequate Representation

Certain objectors imply the class representatives should be disqualified based on alleged due process violations. The United States Supreme Court set forth the standard for determining a violation of due process in *Hansberry v. Lee*, finding that "this Court is justified in saying that there has been a failure of due process only in those cases where it cannot be said that the procedure adopted, fairly insures the protection of the interests of absent parties who are to be bound by it." 311 U.S. 32, 42, 61 S.Ct. 115, 85 L.Ed. 22 (1940). "It is axiomatic that a putative representative cannot adequately protect the class if the representative's interests are antagonistic to or in conflict with the objectives of those being represented ... [b]ut only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." 7A Wright & Miller, Federal Practice and Procedure § 1768 (2000) (emphasis added). "Beyond that straightforward proposition, defining the level of antagonism or conflict that should preclude class certification is a more difficult proposition." *Id.* Numerous conflicting situations which do not pertain to the class claims directly have been held not to bar a finding of adequate representation. 1 Newberg on Class Actions § 3.25 (4th ed.2002). Here, the representatives' interests are not antagonistic to or in conflict with the objectives of the members. Nor is there an indication the procedure adopted does not insure the protection of absent class members. The Court thus declines to find a due process violation.

The objectors also argue the Settlement Agreement will only benefit current policyholders, thus creating a conflict between present and former customers. Although the settlement credit scoring formula and appeals process guaranteed by the settlement will provide a benefit to current and future policyholders, other aspects of the settlement provide benefits to former policyholders. For example, Allstate has agreed to make monetary payments to class members who qualify under a formula which compares the insurance score group assigned to them in the past and the insurance score group assigned under the settlement. As discussed, qualifying class members will receive between $50 and $150 depending on the amount of improvement in their insurance score group and the length of time they held the particular policy. Former policyholders are equally able to apply for a portion of the monetary distribution. In addition, Allstate's agreement to fund credit education will benefit all class members, whether or not they are current policyholders, as well as other non-class members. Moreover, the objection fails to account for the fact that a former policyholder who decides to apply for a new policy with Allstate will benefit from all aspects of the equitable relief provided.

In this same light, at least one objector contends there exists a conflict between current and former policyholders because former policyholders will not benefit from the practice changes. However, all class members have the opportunity to benefit from the injunctive relief as well as the claims process. Both current and former policyholders have the opportunity at renewal of their policies to either continue with or return to Allstate. If a policyholder returns to Allstate, he or she will have the benefit of the new settlement scoring formula and the appeals process. He or she can also participate in the credit education program. Most importantly, all class members share the same societal interest in remedying racial discrimination. As set forth previously, the plaintiffs' claims in this class action are essentially one and the same and the fact that the ultimate remedial interests of the individual class members might differ in their particulars is no bar to certification. *See Ceaser v. Pataki*, No. 98 CIV. 8532(LMM), 2000 WL 1154318, at *7 (S.D.N.Y. Aug.14,

2000) (finding no conflict where institutional reform benefits similarly injured class members in discrimination case); *Walsh v. Northrop Grumman Corp.*, 162 F.R.D. 440, 447 (E.D.N.Y.1995) (determining proper inquiry is whether class members suffered similar injuries from challenged discriminatory conduct); *Gill v. Monroe County Dept. of Soc. Servs.*, 79 F.R.D. 316, 327 (W.D.N.Y.1978) (concluding different remedial interests do not amount to disabling conflict in class action); *see also Adames v. Mitsubishi Bank, Ltd.*, 133 F.R.D. 82, 91 (E.D.N.Y.1989) (recognizing superficial conflicts among class members are no bar to adequate representation). The relief the named representatives seek is the same relief which would benefit all members of the proposed class. *See Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir.1997) (approving settlement where all class members shared same interest in obtaining broad-based relief which would dramatically improve quality of all services to beneficiaries of child welfare system). To the extent some members will choose not to benefit from the available relief, this does not create an impermissible conflict. *See UAW v. General Motors Corp.*, No. 05-CV-73991-DT, 2006 WL 891151, at *28 (E.D.Mich. Mar.31, 2006) (recognizing that "[t]here is no rule that settlements benefit all class members equally ... as long as the settlement terms are rationally based on legitimate considerations") (internal quotations omitted). Accordingly, the objections based on interclass conflicts and adequacy of representation are thus overruled.

### H. Chilling Effect of an Appeal Bond and Attorney Disclosures

■ A few objectors contend the Settlement Agreement has a chilling effect upon objectors because the proposed final order contains a provision for an appeal bond and because the objectors' counsel are required to disclose their prior involvement in class actions. Regarding this first argument, the objectors fail to explain why the requirement of a bond is *per se* objectionable. As a general rule, requiring a bond is a common procedural device to protect the parties' interests. *See Hamlin v. Charter Twp. of Flint*, 181 F.R.D. 348, 353 (E.D.Mich.1998)

(finding that the "bond requirement serves a substantial function in balancing the parties' interest"). An appeal bond is not uncommon in these circumstances given the delay and costs which may be incurred by the class by an appeal. *Id.* at 351; *see also In re Heritage Bond Litig.*, No. MDL 02-ML-1475 DT, 2005 WL 2401111, at *3 (C.D.Cal. Sept.12, 2005) (recognizing "[f]ederal courts have required an appeal bond from appellants ... as a condition of maintaining objector appeals of class action settlements or attorneys' fee awards") (citing *In re Cardizem CD Antitrust Litig.*, 391 F.3d 812, 814 (6th Cir.2004); *Sckolnick v. Harlow*, 820 F.2d 13, 15 (1st Cir.1987); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361, 2003 WL 22417252, at *1 (D.Me. Oct.7, 2003)); *see also Allapattah Servs., Inc. v. Exxon Corp.*, No. 91-0986-CIV, 2006 WL 1132371, at *18 (S.D.Fla. Apr.7, 2006) (imposing appeal bond on class member appealing settlement on behalf of entire class when impact of appeal would be "highly detrimental" as it would stay "both the entry of final judgment on all claims ... and payment to all Class members"). The objections to the appeal bond are overruled.

As noted, some objectors also contend a chilling effect is created by the requirement that their attorneys disclose their prior involvement in class actions. Although they contend such a requirement is not fair, adequate or reasonable, they nonetheless state, and the record reflects, that counsel have already provided the information requested. They have therefore adhered to the disclosure requirement. This ability to comply demonstrates the requirement did not, in fact, chill such objections. Finally, attorney disclosures serve the purpose of providing basic information to both the parties and the Court regarding the lawyers' experience and background. The objectors provide no authority indicating why it is unfair to provide this Court and counsel with full knowledge about the record and experience of the objectors' counsel. Additionally, class counsel are required to provide this same information. Accordingly, the objections regarding any chilling effect the settlement may have are overruled.

## I. *Cy Pres* Award

 At least one objector contends that because there are class members which will not receive any direct monetary benefit from the settlement, a *cy pres* award is appropriate. A *cy pres* distribution is appropriate only where there is a settlement fund which is not fully distributed to the class. *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm.*, 84 F.3d 451, 455 (D.C.Cir.1996) (commenting that "[i]n class actions, some courts have applied the equitable doctrine of cy pres to undistributed damage or settlement funds."); 2 NEWBERG ON CLASS ACTIONS § 4.26 (4th ed.2002) (recognizing *cy pres* doctrine traditionally applies where settlement agreement is silent concerning distribution of unclaimed funds). In this case, there is no settlement fund. As discussed above, Allstate will make monetary payments to all qualifying class members who timely return request forms. Accordingly, there is no cap on the total amount of monetary payments to the class. The objectors have thus not shown there will be excess funds which could be distributed through a *cy pres* award. Consequently, this objection is overruled.

## J. The Settlement Document

Several objectors refer to the settlement document itself, stating that portions are over complicated and "could be explained in a much clearer, more concise, and more didactic way." However, the Court cannot fashion, and the objectors do not propose, a clearer explanation of the terms of this detailed settlement. Although the objectors criticize the number of exhibits and mathematical evidence as confusing to class members, this case deals with complicated issues which required over two years of negotiation to resolve.

The objectors also argue the settlement is confusing because it references documents "3.B.5; 3.B.6; 3.B.7; 3.B.8 below," when the agreement does not contain those provisions. (Settlement Agreement at 9–10). These particular documents explain the manner in which class members may be able to obtain a policy with a premium determined using the settlement credit scoring formula. (Settle-

ment Agreement at 9). Class counsel have admitted this is a typographical error and the information regarding implementation of the settlement credit scoring formula is properly set forth in the settlement in sections 3.A.5; 3.A.6; 3.A.7; 3.A.8. (Memorandum of Class Counsel in Response to Objections to Proposed Class Action Settlement and Certification of Class, docket no. 151, at 35).

The Court declines to find the inclusion of this minor clerical error renders this composite settlement less than fair, adequate or reasonable. A class member who takes time to read the settlement will presumably understand the process. For those class members who do not take the time to read the settlement in its entirety, the notice contained information as to how class members can receive information regarding how to obtain a policy using the settlement scoring formula. (Class Notice at 2). Furthermore, the notice contained the toll free phone number, through which relevant information is provided to class members seven days per week, twenty-four hours per day. (Class Notice at 5). The prospective class members have utilized this tool as evidenced by the 13,447 phone calls received by the help line as of November 17, 2006. (Memorandum of Class Counsel in Response to Objections to Proposed Class Action Settlement and Certification of Class, docket no. 150, p. 36). The notice also contained the website address which provided similar information and guidance. (Class Notice at 5). Given the inclusion of information in the Settlement Agreement and the supporting documentation, and the help available to prospective class members, the error does not prove to be so confusing as to be fatal to the Settlement Agreement. The objection is overruled.

## K. The Melder Objectors

The Melder objectors allege the settlement is unfair because the relief is insufficient to address their Louisiana state law claims. The Melder matter is a putative class action filed by nine African–American named plaintiffs who seek to certify a class of Louisiana residents only. The Melder objectors argue their claims against Allstate are identical to those raised in this DeHoyos case, with the

exception that the Melder plaintiffs also seeks damages of between $1.3 billion and $3.5 billion under Louisiana state law. They contend this Court should disapprove the settlement so they can pursue their claims in Louisiana. At the fairness hearing, it was determined that anyone in the Melder action who was or is an Allstate insured, and who meets the other requisites for class certification here, would have those claims released.[8] (Fairness hearing, testimony of Jeffrey Lennard, p. 51). As discussed below, it is not likely the Melder plaintiffs will prevail on their state law claims and the Court thus declines to disapprove the Settlement Agreement on the grounds raised in their objections.

In their action in Louisiana, the Melder group challenges the legality of the rates which Allstate charges for automobile and homeowners' insurance and which are approved by the Louisiana Insurance Rating Commission ("LIRC") based on Allstate's use of credit information. The case was originally filed in Louisiana state court alleging only state law discrimination causes of action. Allstate removed the case to federal court and the Melder group filed a motion to remand, which was denied by the District Court. The Melder plaintiffs appealed the decision to the United States Court of Appeals for the Fifth Circuit. This Appellate Court remanded the case to the federal District Court in Louisiana, finding that, because these rates were approved by the LIRC, the Melder plaintiffs were required to exhaust administrative remedies in Louisiana before filing suit. *Melder v. Allstate,* 404 F.3d 328, 332 (5th Cir.2005). Following remand, the Melder plaintiffs appealed Allstate's rates to the LIRC, directly challenging the legality of these rates under state anti-discrimination statutes. The LIRC held a hearing, took evidence from the Melder plaintiffs and ultimately found that Allstate's rates were in full compliance with Louisiana law. (Transcript of Testimony at 249, *Melder v. LIRC,* Docket No. L–05–04 LIRC (August 17, 2005)) (attached as Exhibit 13 to Defendant's Brief in Support of Proposed

Class Settlement, docket no. 152). This decision by the LIRC repudiates the Melder objectors' contention their Louisiana state law claims are worth between $1.5 billion and $3.5 billion. Thus, according to the record, the LIRC has affirmatively placed no value on the Melder group's claims of discrimination brought under the state's statutes.

The Melder objectors contend the LIRC dismissed their claims on "jurisdictional" grounds. The record does not support this contention. The LIRC declined to address certain claims the Melder objections asserted against State Farm, another defendant in the case, not Allstate. Transcript of Testimony at 139–40, 249–50, *Melder v. LIRC,* Docket No. L–05–04 LIRC (Aug. 17, 2005) (noting that State Farm is also a defendant in the Melder action, but that these claims against State Farm did not relate to State Farm's insurance rates in any way).

Moreover, the $1.5 billion to $3.5 billion valuation which the Melder objectors ascribe to their state law claims is based on their contention they are entitled to a $10,000 statutory penalty for each violation of Louisiana's anti-discrimination laws. This $10,000 penalty is found in LA. REV. STAT. ANN. § 22:652.4 (2004). The statute prohibits insurers from refusing to issue or failing to renew insurance "solely because of the race of the applicant or the economic conditions of the area in which the property sought to be insured is located, unless such refusal to issue or failure to renew is based on sound actuarial principles or is related to actual experience." *Id.* § 22:652.4(A). There is a private right of action under this statute against insurers, but private litigants can only recover "actual damages suffered by the injured party and reasonable attorney's fees." *Id.* § 22:652.4(D). The $10,000 penalty can only be asserted by the Insurance Commissioner. *Id.* § 22:652.4(C). In any event, because the LIRC has rejected the Melder plaintiffs' claim that Allstate's rates violate Louisiana law, including section 652.4, there should be no basis for a $10,000 penalty, even if one is allowed. Additionally, be-

---

**8.** This excludes suits brought by regulatory agencies in Louisiana, which can pursue whatever remedies they may have. The Settlement Agreement also does not bar further action by state or federal authorities in any jurisdiction.

cause the credit reports from which Allstate derives its insurance scores do not contain any information identifying race or ethnicity, the Melder objectors cannot make out a prima facie case under section 22:652.4(A) because that statute requires that the refusal to issue or renew be based "solely on the race" of the customer. LA. REV. STAT. ANN. § 22:652.4(A) (2004). Finally, on its face, the Louisiana statute upon which the Melder plaintiffs rely does not apply to the claims which are being addressed here. The statute applies only to the failure or refusal to insure or renew. *Id.* § 22:652.4(A). As discussed by class counsel at the fairness hearing, "this case is based on prices in credit scoring, not the refusal to insure based on outright refusals to insure or renew." (Fairness hearing, testimony of Christa Collins, p. 109). Therefore, even if the LIRC had not rejected the Melder plaintiffs' claims of discrimination under state law, and even if the $10,000 penalty does apply to a private right of action, the statute is not applicable to the Melder group's claims.

The Melder plaintiffs also have not shown they can make out a prima facie case under their other theories alleged under state law. For example, the Melder plaintiffs' claim under Article 1, Section 12 of the Louisiana Constitution is unsupportable because the provision applies only to discrimination in access to public areas, accommodations or facilities, none of which are at issue in this case. LA. CONST. art. 1, § 12. The Melder plaintiffs' claim under section 51 of the Louisiana statutes appears equally unavailing because these laws are limited to discriminatory practices in connection with public accommodations. LA. REV. STAT. ANN. §§ 51:2232, 51:2247, 51:2255 (2003). Lastly, a strong argument can be made that the Melder plaintiffs' claims under the Louisiana Fair Trade Practices Act, LA. REV. STAT. ANN. §§ 22:1214, et seq., fail because the statute does not grant a private cause of action. *See Riley v. Transamerica Ins. Group Premier Ins. Co.,* 923 F.Supp. 882, 888 (E.D.La.1996) (dismissing home resident's claim against insurer and adjuster for violation of Louisiana Unfair Trade Practices Act for failure to state cause of action), *aff'd without opinion,* 117 F.3d 1416 (1997);

*see also Klein v. American Life & Cas. Co.,* 858 So.2d 527, 533 (La.Ct.App.) (Louisiana law does not provide private cause of action for unfair financial planning practices), *writ denied,* 857 So.2d 499 (La.2003); *Clausen v. Fidelity & Deposit Co.,* 660 So.2d 83, 86 (La.Ct.App.1995) (Louisiana statute does not for provide private cause of action based on unfair trade practices), *writ denied,* 666 So.2d 320 (La.1996).

As set forth above, the Melder objectors contend the release provided for in the proposed DeHoyos settlement is overbroad and will impair the Louisiana state law claims they have raised in a Louisiana-only class action pending in the Eastern District of Louisiana. These objectors seek rejection of the proposed DeHoyos nationwide settlement based on an assertion that Louisiana class members are entitled to monetary damages not available to the rest of the DeHoyos class. However, as discussed, the LIRC has denied there was any discrimination by Allstate, and the statutes relied upon in the *Melder* case do not convey a private right of action for statutory damages, but rather only a fine from the Insurance Commissioner. Moreover, the state law claims of certain minority Allstate customers residing in Louisiana appear not to be precluded by approval of the DeHoyos proposed settlement. While at times the Melder objectors protest that the DeHoyos settlement precludes all of their claims, Melder Objections, docket no. 129, p. 3, at other times they suggest their claims also include "failure to insure or to renew" claims which do not fall within the DeHoyos class definition. *Id.* p. 4. To the extent any of the minority Allstate customers residing in Louisiana were denied insurance by Allstate, their claims are not precluded by the DeHoyos settlement. Specifically, minorities who were completely denied coverage from Allstate on the basis of their credit do not fall within the definition class and would thus not be precluded from pursuing those claims by the present settlement. (Class Definition at page 4 of the Proposed Settlement Agreement) (class definition includes African–Americans and Hispanic individuals who are or were insured by Allstate and who did not

receive the lowest rate available rate because of their credit history).

To support the viability of their Louisiana state law discrimination claims, the Melder plaintiffs rely upon a letter to the Court written by executive counsel on behalf of the Louisiana Commissioner of Insurance. The letter, dated three days before the fairness hearing, provides in relevant part:

Louisiana Commissioner of Insurance James J. Donelon has requested that I provide Your Honor with a written explanation of Commissioner Donelon's concerns regarding those Louisiana claimants who may be involved in the ... *DeHoyos* class action litigation....

Commissioner Donelon's concern is whether or not Louisiana claimants in a federal court matter entitled *Melder, et al v. Allstate,* pending in the U.S. District Court, Eastern District of Louisiana, may have a cause of action that is different from the cause of action that forms the basis of the *DeHoyos* class action that would merit separate and distinct treatment and/or severance. Our simple request is that Your Honor, as part of the Fairness Hearing, conduct an examination into whether or not the underlying cause of action by the Louisiana claimants in *Melder* justifies these Louisiana claimants being afforded different relief in the *DeHoyos* class action, which may include additional financial compensation. The provisions of the Louisiana Insurance Code that comprise the cause of action for the Louisiana policyholders in *Melder* are found at LSA R.S. 22:652.4, and 22:1484.

Commissioner Donelon originally expressed his concern in this matter in a letter dated December 8, 2006, addressed to ... Regional Counsel for Allstate, and ... retained counsel for Allstate Insurance Company here in Louisiana. Exhibit A. By letter dated December 12, 2006, [Regional Counsel for Allstate] provided Commissioner Donelon with a written response along with an attached transcript of testimony taken at a hearing conducted before the Louisiana Insurance Rating Commissioner on August 17, 2005. Exhibit B, in globo. All of these referenced documents

are provided to Your Honor for completeness of the record....

Once again, the concern on the part of Commissioner Donelon is whether or not the simultaneous extinguishment, without different compensation, of the cause of action of these Louisiana policy holders may be contrary to traditional due process requirements if in fact the cause of action in *Melder* is different from the cause of action in *DeHoyos* such that the Louisiana claimants should be entitled to different and/or separate relief and/or severance.

We trust that this letter sets forth the concern that Commissioner Donelon has for those Louisiana claimants who are involved in both the DeHoyos and the Melder class actions. We rely on your Honor to address and protect our concerns at the fairness hearing on December [1]8 2006....

(Attachment to Melder Objections, docket no. 129). At the fairness hearing, counsel for the Melder plaintiffs interpreted this letter as a conclusion by the Louisiana Insurance Commissioner that the Melder plaintiffs were entitled to the relief they seek under Louisiana law and, therefore, their objections to the DeHoyos settlement should be sustained. Specifically, counsel stated:

The Louisiana Commissioner of Insurance did file in this matter a letter and I think that the scope of the letter in what is in it is important. The letter was not first filed here but was instead issued to Allstate counsel and the letter from the commissioner himself indicated the concerns that he had and *that he believed that there was in this case available to the Melder clients claims for damages of $10,000 per occurrence....* We've seen and it's in the record now the response of [Allstate's] counsel in the southern part of the United States, and [Allstate counsel's] response and the reasons for her response were included with what was then the very carefully considered and written response of executive counsel to the commissioner of insurance where he reflects on the letterhead of the commissioner, the response of Allstate *and then his position that if there's not an additional compensation or consideration*

*given to the Louisiana claimants, the extinguishment of the claims by virtue of the settlement here has essentially denied the Louisiana claimants their degree of due process to which they're entitled. His letter then we submit to you, is a very careful legal consideration of the merits of our claim there is a strong, legitimate claim for $10,000 under either scenario, penalties or general damages, and that he had in hand the arguments of Allstate that we heard earlier, that our claim for this very large potential award cannot succeed. He believes that it can. We believe that it can. . . .*

(Fairness hearing, testimony of Tom Thornhill, pp. 95–98) (emphasis added).

While the Louisiana Insurance Commissioner did repeatedly express his concern for the Melder plaintiffs, he did not conclude the Melder plaintiffs' claims had merit or that their objections should be sustained. Instead, after giving Allstate an opportunity to respond to his concerns, he left it up to this Court "to address and protect" the rights of the Melder plaintiffs. (Letter from executive counsel on behalf of the Louisiana Commissioner of Insurance, attachment to Melder Objections, docket no. 129) (stating "[w]e rely on your Honor to address and protect our concerns at the fairness hearing on December [1]8 2006").

As noted, the Melder plaintiffs presented their Louisiana state claims to the Louisiana Insurance Rating Commission ("LIRC"), and the LIRC found Allstate's rates, based in part on insurance scores, as well as Allstate's insurance scoring algorithm, were compliant with Louisiana law. Furthermore, as discussed, the Louisiana statutes identified by the Melder plaintiffs are inapplicable to the claims being settled in this case. Section 22:652.4(A) states: "No insurer shall refuse to issue or fail to renew any policy or contract of property and casualty insurance to a person or business, solely because of the race of the applicant or the economic condition of the area in which the property sought to be insured is located, unless such refusal to issue or failure to renew is based on sound actuarial principles or is related to actual experience." LA. REV. STAT. ANN.

§ 22:652.4(A) (2004). This DeHoyos case involves charging allegedly unfairly discriminatory premiums and not an alleged refusal by Allstate to issue or renew a policy based solely on race. The class definition provides that African–American or Hispanic individuals are class members if "their credit information resulted in Allstate charging them a higher premium." (Settlement Agreement, p. 4).

Moreover, it is undisputed the credit reports from which Allstate derives its insurance scores do not contain any information identifying race or ethnicity. Allstate filed its insurance scoring algorithm with the Louisiana Department of Insurance. Section 22:1484 regulates the use of credit information and prohibits, among other things, the "[u]se [of] an insurance score that is calculated using income, gender, address, zip code, *ethnic group*, religion, marital status, or *nationality* of the consumer as a factor." LA. REV. STAT. ANN. § 22:1484(1) (2004) (emphasis added). The LIRC reviewed Allstate's insurance scoring algorithm, found it was not unfairly discriminatory, complies with section 22:1484 and, specifically, does not use any characteristics prohibited under the statute. (Transcript of Testimony before LIRC, pp. 157–58, 207–08). Specifically, the LIRC stated: "We have reviewed [Allstate's] filings . . . and we did not find anything-we did not see anything that I would term as being unfairly discriminatory or in any way using characteristics that were not allowed according to the statute on the use of credit . . . ." *Id.* at 156–57. In any event, as discussed and notwithstanding this analysis, the Melder plaintiffs are not entitled to the $10,000 fine under section 22:652.4(B) because private litigants can only recover actual damages and attorney's fees under this statute. Section 22:652.4(D) of the Louisiana statutes provides:

Any person discriminated against in violation of this Section shall have a personal right of action against the insurer and may file suit against the insurer in a court of competent jurisdiction. Upon a finding of discrimination on the part of the insurer, the insurer shall be responsible for actual

damages suffered by the injured party and reasonable attorney's fees.

LA. REV. STAT. ANN. § 22.652.4(D) (2004). As a result of the inapplicability of these statutes, there is no basis to support the Melder plaintiffs' contention they are entitled to additional benefits beyond the relief afforded under this settlement. Moreover, if this settlement is approved, it will provide significant and valuable settlement benefits to class members, including the Louisiana class members. The Melder objections are overruled.

### ATTORNEYS' FEES AND EXPENSES

▆▆▆▆ An agreed upon award of attorneys' fees and expenses is proper in a class action settlement, so long as the amount of the fee is reasonable under the circumstances. See FED. R. CIV. P. 23(h) (providing that "[i]n an action certified as a class action, the court may award reasonable attorney fees and nontaxable costs authorized by . . . agreement of the parties . . . ."). In fact, courts have encouraged litigants to resolve fee issues by agreement, if possible. Lobatz v. U.S. W. Cellular, Inc., 222 F.3d 1142, 1149–50 (9th Cir.2000) (affirming reasonable award of fees and expenses to be paid separate from class action settlement where defendant agreed not to oppose request up to negotiated amount); Hanlon v. Chrysler Corp., 150 F.3d 1011, 1029 (9th Cir.1998) (upholding district court's award of attorneys' fees where Court had approved attorneys' fees and costs of $5.2 million which were negotiated after final settlement was achieved); Malchman v. Davis, 761 F.2d 893, 905 n. 5 (2d Cir.1985) (recognizing "[a]n agreement 'not to oppose' an application for fees up to a point is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged"), cert. denied, 475 U.S. 1143, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986), abrogated on other grounds sub nom Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); M. Berenson Co. v. Faneuil Hall Marketplace, Inc., 671 F.Supp. 819, 829 (D.Mass.1987) (concluding that "[w]hether a defendant is required by statute or agrees as part of the settlement of a class action to pay the plaintiffs' attorneys' fees,

ideally the parties will settle the amount of the fee between themselves"). As the United States Supreme Court has explained, "[a] request for attorney's fees should not result in a second major litigation." Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). "Ideally, of course," the Court continued, "litigants will settle the amount of a fee." Id. The United States Court of Appeals for the Fifth Circuit has also "encourage[d] counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees." Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 720 (5th Cir.1974). Accordingly, courts are authorized to award attorneys' fees and expenses where all parties have agreed to the amount, subject to court approval, particularly where the amount is in addition and separate from the defendant's settlement with the class. See Local 56, United Food & Commercial Workers Union v. Campbell Soup Co., 954 F.Supp. 1000, 1005 (D.N.J. 1997) (granting class counsel the maximum amount of fees agreed to by the defendant under the settlement agreement where "class members . . . retain all that the settlement provides [and] they do not lose any of the negotiated benefits on account of an attorneys' fee and costs award that equals the 'cap' on such an award set forth in the settlement").

▆▆▆▆ As noted, Allstate, their counsel and class counsel have agreed to award class counsel a lump sum of attorneys' fees and expenses, subject to Court approval. This award of attorneys' fees and expenses is separate and apart from the class settlement-which is not a monetary common fund-and will not in any way diminish the class settlement. Were the Court to reduce the award of class counsel's fees, this would not confer a greater benefit upon the class, but rather would only benefit Allstate. Compare Garza v. Sporting Goods Properties, Inc., No. Civ. A. SA–03–CA–108, 1996 WL 56247, at *26 (W.D.Tex. Feb.6, 1996) (noting that court is responsible for applying heightened judicial scrutiny to fee request and is not bound by amount of fee award requested by counsel in common fund case) with McBean v. City of

*New York,* 233 F.R.D. 377, 392 (S.D.N.Y. 2006) (recognizing that court need not review an application for attorneys' fees with heightened level of scrutiny where, as here, parties have contracted for an award of fees which will not be paid from common fund). Furthermore, attorneys' fees were not negotiated or discussed until after the agreement was reached between the parties on all other terms of the settlement. *See Hanlon,* 150 F.3d at 1029 (noting with approval that "class counsel and [defendant] did not negotiate or discuss attorneys' fees until after the final settlement"). These factors indicate a presumption of reasonableness in the request for an award. *See In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.,* MDL No. 901, 1992 WL 226321, at *4 (C.D.Cal. June 10, 1992) (stating that Court should be reluctant to disturb award where class counsel negotiated fee with sophisticated defense counsel who were familiar with case, risks, amount and value of class counsel's time, and nature of result obtained for class), *appeal dismissed for class member's lack of standing,* 33 F.3d 29 (9th Cir.1994), *superseding* 19 F.3d 470 (9th Cir.).

## A. Attorneys' Fees

In *Longden v. Sunderman,* the United States Court of Appeals for the Fifth Circuit reiterated that "this circuit utilizes the 'lodestar method' to calculate attorneys' fees." 979 F.2d 1095, 1099 (5th Cir.1992) (citing *Copper Liquor, Inc. v. Adolph Coors Co.,* 684 F.2d 1087, 1092 (5th Cir.1982)). The lodestar is computed by multiplying the number of hours reasonably expended by the prevailing hourly rate in the community for similar work. *Id.* The Court then adjusts the lodestar upward or downward depending on the respective weight of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir. 1974), which are:

(1) the time and labor required;

(2) the novelty and difficulty of the questions;

(3) the skill required to perform the legal services properly;

(4) the preclusion of other employment by the attorneys;

(5) the customary fee;

(6) whether the fee is fixed or contingent;

(7) time limitation imposed by the client or the circumstances;

(8) the amount involved and the results obtained;

(9) the experience, reputation and ability of the attorneys;

(10) the undesirability of the case;

(11) the length and nature of the attorney-client relationship; and

(12) awards in similar cases.

*Id.* at 1099–1100 & n. 10. The adjustment of the lodestar according to a *Johnson* factor may be made only if "that factor is not already taken into account by the lodestar." *In re Fender,* 12 F.3d 480, 487 (5th Cir.), *cert. denied,* 511 U.S. 1143, 114 S.Ct. 2165, 128 L.Ed.2d 888 (1994); *see also Shipes v. Trinity Indus.,* 987 F.2d 311, 320 (5th Cir.) (noting that after lodestar has been determined District Court may adjust lodestar up or down for relevant *Johnson* factors not already included in lodestar being careful not to double count *Johnson* factors), *cert. denied,* 510 U.S. 991, 114 S.Ct. 548, 126 L.Ed.2d 450 (1993).[9]

"The district court must explain how each of the *Johnson* factors affects its award, regardless of their specific factual significance; and 'while the subsidiary fact findings are reversible only if clearly erroneous ... review of the total fee is [governed] by the precept that its amount lies in the trial judge's discretion, and is to be recalculated *only* if that discretion is abused."' *Longden,* 979 F.2d at 1099–1100 (quoting *Copper Liquor, Inc.,* 684 F.2d at 1092, 1094) (emphasis in original). In addition, it is permissible to adjust a lodestar by *Johnson* factors considered within the original lodestar calculation if the case is rare and exceptional and if "supported by both specific evidence on the rec-

9. Four of the *Johnson* factors have been "presumed" to be fully reflected in the lodestar calculation. These factors are (1) the novelty and complexity of the issues; (2) the special skill and experience of counsel; (3) the quality of representation; and (4) the results obtained from the litigation. *Shipes,* 987 F.2d at 320.

ord and detailed findings by the lower courts." *Shipes,* 987 F.2d at 320. In this case, the Court is presented with applications for attorneys' fees and expenses from class counsel totaling $11,720,000.

The request by class counsel for attorneys' fees and expenses was set forth in the notice and was met with opposition by absent class members through letters of objection and by objectors appearing at the fairness hearing. Class counsel filed an application and brief in support of their request for attorneys' fees on June 30, 2006, and a supplement on October 27, 2006, prior to the fairness hearing. Concurring with class counsel that the fees being requested were within the range of fees permitted in a class action was Charles Silver, Esquire, a professor of law at the University of Texas at Austin and a recognized authority on class actions, attorneys' fees, and professional responsibility. (Report of Charles Silver, pp. 1–2, attached to plaintiffs' Notice of Filing Supplement to plaintiffs' Application for Attorneys' Fees and Costs, docket no. 119). Especially in light of the results achieved, Professor Silver found the attorneys' fees and costs requested to be reasonable. *Id.* at pp. 5–24.

In making its determination of the amount of attorneys' fees to be awarded, the Court must first determine the lodestar. The first step in this calculation is to determine the "compensable hours" from the attorneys' records, including only hours reasonably expended. *Shipes v. Trinity Indus.,* 987 F.2d 311, 319 (5th Cir.), *cert. denied,* 510 U.S. 991, 114 S.Ct. 548, 126 L.Ed.2d 450 (1993). The burden is on the fee applicant to establish "entitlement to an award and document the appropriate hours expended and hourly rates." *Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319, 324 (5th Cir.), *cert. denied,* 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 113 (1995). Customarily, courts require the fee applicant to provide contemporaneous time or billing records or other documentation which is sufficient for the Court to examine the application and discern any noncompensable hours. *Id.* If the documentation provided is vague or incomplete, the Court may reduce the number of hours claimed by the applicant. *Id.* However, as long as the evidence produced provides the Court with the necessary information to ascertain the total number of hours reasonably expended, the failure to provide contemporaneous billing records will not, *per se,* preclude an award of attorneys' fees. *Id.* at 325.

Once this task is complete, the Court must then "select an appropriate hourly rate based on prevailing community standards for attorneys of similar experience in similar cases." *Shipes,* 987 F.2d at 319. The determination of the reasonable number of hours expended and the reasonable rate to be applied are questions of fact, and the District Court's findings are reviewed for clear error. *Kellstrom,* 50 F.3d at 324. These two numbers are multiplied to produce the lodestar. *See Riley v. City of Jackson,* 99 F.3d 757, 760 (5th Cir.1996) (noting the "lodestar is computed by multiplying the reasonable number of hours by a reasonable hourly rate"). In "civil rights and other injunctive relief class actions, courts often use a lodestar calculation because there is no way to gauge the net value of the settlement or any percentage thereof." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1029 (9th Cir.1998).

The hourly rates requested for attorneys and other timekeepers appear in exhibits to Plaintiffs' Application for (i) Attorneys' Fees and Costs and (ii) Incentive Awards to Class Representatives and Memorandum of Points and Authorities in Support Thereof (docket no. 113) and Notice of Filing Supplements to Plaintiffs' Application for Attorneys' Fees and Costs (docket no. 119). The rates range from a high of $550 per hour for senior partners to a low of $145 per hour for paralegals. The average hourly rate-calculated by dividing the lodestar basis ($6,605,604.50) by the total number of hours expended prior to the filing of the supplement (15,652.05) is approximately $422. After applying the requested multiplier of 1.68, the effective hourly rate rises to $709.

### 1. Class Counsel's Hourly Rates

In determining the reasonableness of hourly rates, courts consider the experience, reputation and ability of the attorney, and the skill required by the attorneys. *Shipes,* 987 F.2d at 320. Here, class counsel

are experienced and skilled practitioners in civil rights and class action fields. *See Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974) (recognizing "[a]n attorney specializing in civil rights cases may enjoy a higher rate for his expertise than others, providing his ability corresponds with his experience"). Moreover, the high quality of class counsel's work is not unique to these litigation proceedings. James, Hoyer, Newcomer & Smiljanich, P.A. has been involved in more than 80 class action lawsuits on a nationwide basis over the past 13 years. Bonnett, Fairbourn, Friedman & Balint, P.C. has successfully handled more than 100 class action settlements over the last 20 years. And, Lerach Coughlin Stoia Geller Rudman & Robbins LLP has successfully prosecuted thousands of class action lawsuits. Additionally, as set forth in Professor Silver's report, class counsel's rates reflect the competitive market hourly rates for national cases involving complex and class action litigation, as well as the reputation, experience and success of the lawyers and firms involved. (Report of Charles Silver, pp. 15–20, attached to plaintiffs' Notice of Filing Supplement to plaintiffs' Application for Attorneys' Fees and Costs, docket no. 119). Considering the complex nature of this case and class counsel's experience, reputation and skill, this Court finds class counsel's rates are reasonable. *Id.* Thus, based on the application and supplement, and testimony of class counsel and the attorneys' fees expert, the Court finds the appropriate rate for senior and lead counsel in this case is between $550 and $500 per hour. The Court also finds the hourly rates of between $475 and $350 per hour for other counsel and associate attorneys reasonable, as are the rates of between $200 and $130 for legal assistants, paralegals, investigators and non-secretarial support staff. These reasonable rates are based on years of experience, successful track records, and fees prevailing in the market for legal services. (Report of Charles Silver, pp. 15–20, attached to plaintiffs' Notice of Filing Supplement to plaintiffs' Application for Attorneys' Fees and Costs, docket no. 119).

## 2. The Hours Expended by Class Counsel

The Court has also reviewed the billing/time records submitted by each firm. The fee applicants have the burden of proving the number of hours expended in prevailing in this case are reasonable. *Von Clark v. Butler,* 916 F.2d 255, 259 (5th Cir.1990). The burden is not shifted merely because the opposing party does not show the hours to be unreasonable, or that the opposing party fails to make specific objections to the claimed hours. *Id.* The Court is required to determine not only that the total hours claimed by class counsel are reasonable, but the hours were reasonably expended. *Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319, 325 (5th Cir.1995). A court may reduce or delete hours when the documentation provided in support is "too vague to permit meaningful review." *Id.* at 326. When applications provide the Court with little else than words such as "pleadings," "documents," or "correspondence," without stating in greater detail what job was done, the applicants take a chance the Court will reject some of the time spent. *Id.*

Over the past five years, class counsel spent a total of 15,652.05 hours on this case as of June 30, 2006. The Court finds this to be reasonable. As discussed in the undisputed report of Professor Silver, class counsel lacked incentives to use resources needlessly given the cost of investing money in lawsuits and the gamble taken over an uncertain result. (Report of Charles Silver, pp. 24–26, attached to plaintiffs' Notice of Filing Supplement to plaintiffs' Application for Attorneys' Fees and Costs, docket no. 119). Moreover, class counsel were opposed by Sonnenschein, Nath & Rosenthal, Kirkland & Ellis, and Baker Botts-three law firms with exceptional reputations for work in defending class actions. Nevertheless, class counsel were able to persuade both this Court and the United States Court of Appeals for the Fifth Circuit that, contrary to Allstate's claims, federal anti-discrimination laws were not pre-empted by state insurance laws under the McCarran–Ferguson Act, and to negotiate a settlement with Allstate for significant relief. In fact, Allstate's petition for

writ of certiorari was denied by the United States Supreme Court.

Additionally, from the outset class counsel demonstrated skill and quality of work by undertaking a concerted effort to obtain the maximum recovery possible for the class. Class counsel expended numerous hours engaging in complex statistical analysis and analyzing complex insurance underwriting and pricing algorithms. Obtaining the type of socially beneficial and wide-spread injunctive relief class counsel were able to obtain here was also a difficult and lengthy task. Additionally, as noted, class counsel gave a maximum effort as evidenced by their vigorous opposition to Allstate's motion to dismiss at the District Court, Appellate Court and Supreme Court level. The quality of class counsel's work on this case was excellent and is ultimately reflected in the result which was obtained with a formidable opponent. This Court therefore finds the total amount of hours expended to successfully and diligently prosecute this action to this settlement is fair and reasonable for the services provided.

### 3. Adjustment of the Lodestar using the *Johnson* Factors

The second step in establishing attorneys' fees is to consider whether the lodestar should be adjusted due to the circumstances of the case. *Rutherford v. Harris County,* 197 F.3d 173, 192 (5th Cir.1999). "Views conflict as to which of the twelve *Johnson* factors are subsumed within the calculation of the lodestar." *Garza v. Sporting Goods Properties, Inc.,* No. Civ. A. SA–03–CA–108, 1996 WL 56247, at *30 (W.D.Tex. Feb.6, 1996). In *Brantley v. Surles,* 804 F.2d 321, 325 (5th Cir.1986), the Fifth Circuit Court of Appeals explained that the first *Johnson* factor, the time and labor required, and the fifth factor, the customary fee, were included in the lodestar calculation. As to the remaining ten factors, the Court states they would "rise or fall in importance according to the facts of each case." *Id.* In a later opinion, *Shipes v. Trinity Indus.,* 987 F.2d 311, 320 (5th Cir.), *cert. denied,* 510 U.S. 991, 114 S.Ct. 548, 126 L.Ed.2d 450 (1993), the Court found four of the *Johnson* factors fully reflected in the lodestar. These factors were: (1) the novel-

ty and complexity of the issues; (2) the special skill and experience of counsel; (3) the quality of representation; and (4) the results obtained from the litigation. However, at least one court has found the "quality of representation" factors subsumed within the lodestar were: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the customary fee; (5) the amount involved and the results obtained; (6) the experience, reputation and ability of the attorneys; and (7) awards in similar cases. *Garza,* 1996 WL 56247, at *30 (quoting *Purdy v. Security Savs. & Loan Ass'n,* 727 F.Supp. 1266, 1274 (E.D.Wis.1989)). Use of these factors has not been foreclosed in making an upward adjustment of the lodestar if the case is rare and exceptional and "supported by both specific evidence on the record and detailed findings by the lower courts." *Shipes,* 987 F.2d at 320. In assessing the use of a multiplier/enhancer in this case, only the factors which favor an adjustment in the lodestar will be considered.

### a. Time and Labor Required

Although the time and labor required in this case is presented in the calculation of the lodestar, there is evidence the amount of time expended was reduced significantly by the experience of counsel. *See Garza v. Sporting Goods Properties, Inc.,* No. Civ. A. SA–03–CA–108, 1996 WL 56247, at *30 (W.D.Tex. Feb.6, 1996) (considering reduction of time and labor required due to experience of counsel). Andrew Friedman, who graduated from law school in 1978, has been involved in a large number of class actions which generated large financial recoveries, including several cases with recoveries exceeding $500 million. Along with John J. Stoia, Jr., he was a member of the trial team which obtained a multi-billion dollar jury verdict against Charles Keating and other defendants who were found responsible for the failure of the Lincoln Savings and Loan. (Report of Charles Silver, p. 11, attached to plaintiffs' Notice of Filing Supplement to plaintiffs' Application for Attorneys' Fees and Costs, docket no. 119). Christa Collins graduated from law school in 1983 and spent

the first sixteen years of her practice engaged in defense work on behalf of insurance companies and major corporations. During those years, she litigated and tried· many cases involving a wide variety of issues, including civil rights, insurance coverage issues, and products liability. Starting in 1999, Ms. Collins initiated and prosecuted more than fifteen class action cases involving racial discrimination in the sale of life insurance to African–Americans· and other minorities. The defendants were such companies as Metropolitan Life Insurance Company, American General Life Insurance, United Life Insurance Company, and Life of Georgia. These cases have recovered more than $400 million in benefits for policyholders. She has also handled many other class action cases against insurance companies and lending institutions involving racial discrimination, as well as Federal Credit Reporting Act compliance. *Id.* John J. Stoia, Jr. started his practice in 1987 at the Security and Exchange Commission, and is now a named partner in one of the most successful class action firms in the country: Lerach Coughlin Stoia Geller Rudman & Robbins, LLP. Like Mr. Friedman, he worked on the trial team which handled the prosecution of civil claims against Charles Keating and others, and which obtained enormous verdicts and recoveries. He has brought suit against insurance companies many times and for a variety of allegedly objectionable practices. He also served as lead counsel in the case styled *McNeil v. American Gen. Life Ins. & Accident Co.,* the first major settlement involving discrimination claims, a case which had a $234 million recovery. The time spent in these previous cases presumably reduced by a substantial amount the amount of time for the prosecution of this class action because counsel already had experience with discovery and research in similar cases. *Id.* Whereas the argument has been made in other cases that the hourly rate of counsel will encompass such expertise, the Court finds the years of prior experience was not a part of the reasonable rate for class counsel and finds their expertise exceptional. *Garza,* 1996 WL 56247, at *30 (noting other cases have held that hourly rate encompassed expertise of class counsel and nonetheless finding this expertise was not a part of reasonable rate for class counsel in complex class action settlement).

Moreover, class counsel's work is not finished. As previously discussed, the proposed settlement includes a dispute resolution process regarding the monetary payments. (Settlement Agreement at 13–14). In this regard, if a class member disputes his or her monetary payment, class counsel will attempt to resolve the dispute informally, if the dispute cannot be resolved, class counsel will continue to represent the class member at no additional expense as part of their continuing duties to the class and to present the class member's dispute for resolution to Allstate in writing. (DeHoyos Settlement Website, *http://www.creditusesettlement.com/faq/php3.* (last visited Feb. 12, 2007)). The time and labor factor thus weigh in favor of adjusting the lodestar.

**b. The Novelty and Difficulty of the Questions**

From the Court's previous discussion of the case, there is no doubt this case is both novel and difficult. *Garza v. Sporting Goods Properties, Inc.,* No. CIV. A. SA–93–CA–108, 1996 WL 56247, at *30 (W.D.Tex. Feb.6, 1996) (considering novelty and difficulty of questions involved in class action litigation). The novelty is found in the fact that relief is based on Allstate's use of allegedly discriminatory credit scoring in the pricing of homeowners' and automobile insurance. The difficulty in plaintiffs' case was in the remedy they sought-algorithm, education, marketing, and appeals process changes-by the second largest insurer in the United States. As stated by class counsel at the fairness hearing:

Today we are seeking final approval of a class wide settlement resolving allegations against Allstate that their use of credit scoring in pricing of homeowners' and automobile insurance is racially discriminatory under the civil rights laws and the Fair Housing Act.

Both of those acts enacted by Congress under the authority of the Thirteenth Amendment were designed to redress generations of invidious discrimination,

The Court has recognized in the San Antonio Hispanic Police Officers' case [referring to *San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio,* 188 F.R.D. 433, 442 (W.D.Tex.1999) ] that, in present times, the vestiges of that kind of discrimination persist in economic disadvantages and disparities experienced by minority communities resulting from these generations of deeply imbedded racial discrimination. Class counsel believes and the work of our experts supports our conclusion that credit scoring algorithms can pick-up on these economic disparities and penalize minorities for them in ways that are subtle and not readily detectable. The Fair Housing Act in particular is constructed to apply to subtle and evolving economic practices such as credit scoring that were not even contemplated when the Fair Housing Act was drafted. Remarkably, we think it's remarkable, our system allows individuals as private litigants to challenge and ultimately change corporate practices they regard as discriminatory and as a result to bring about important social change. That's what this case is about and ultimately the proposed settlement has done. . . . The settlement is significant and ground-breaking. It's significant because for a nationwide class of individuals we're providing settlement benefits that are tailored to address the allegations that were raised in our case against Allstate. These benefits surpass what is merely fair and reasonable under the standards established by rule 23.

(Fairness hearing, testimony of Christa Collins, pp. 10–11).

**c. The Skill Requisite to Perform the Legal Services Properly**

Clearly, the members of class counsel assembled to represent the class are exceptional. *Garza v. Sporting Goods Properties. Inc.,* No. Civ. A. SA–03–CA–108, 1996 WL 56247, at *31 (W.D.Tex. Feb.6, 1996) (recognizing exceptional skills requisite to perform legal services properly in complex class action). Each member brought a special expertise to the litigation. For example, Andrew Friedman, and the law firm of which he is a named partner, brought their class ac-

tion expertise; John J. Stoia, Jr., and the law firm of which he is a named partner, brought their years of prior knowledge of insurance products and their expertise in discriminatory practices; and Christa Collins, and the law firm of James, Hoyer, Newcomer & Smiljanich, P.A., brought their negotiation expertise and organizational skills to the table. On the other side, Allstate was represented by equally talented and experienced lawyers. Despite formidable opposition, plaintiffs were able to work together as a team and overcome many obstacles and financial burdens in reaching a settlement. In addition, because of counsel's efforts, expensive and prolonged discovery was avoided in favor of an amicable resolution.

**d. The Preclusion of Other Employment by the Attorneys due to the Acceptance of the Case**

The law firms which make up class counsel are small to medium law firms and class counsel are associates and partners of their respective firms. Counsel have indicated, either at the fairness hearing or in conferences, that their involvement in this case has substantially diminished, and perhaps in some cases foreclosed, the acceptance of other employment or possible business opportunities. *Garza,* 1996 WL 56247, at *31 (considering preclusion of other employment by attorneys due to acceptance of case). Based on the number of hours expended by counsel, their support staffs, and the experts, no doubt remains that cases were not accepted because of this ongoing litigation, especially cases which demanded immediate attention. In addition, the matter has been a financial burden on class counsel who have advanced over half a million dollars in necessary costs and expenses with no guarantee those funds would ever be reimbursed.

**e. The Customary Fee**

The customary fee in civil rights and other socially valuable cases is often higher than in other cases. *See Fleet Inv. Co. v. Rogers,* 620 F.2d 792, 793–94 (10th Cir.1980) (noting "[t]he value of an attorney's services is not only measured by the amount of the recovery to plaintiff, but also the non-mone-

tary benefit accruing to others, in this case the public at large from his successful vindication of a national policy to protect consumers from fraud in the used car business"); *In re Rio Hair Naturalizer Prod. Liab. Litig.*, No. MDL 1055, 1996 WL 780512, at *17 (E.D.Mich. Dec.20, 1996) (concluding "benefit to society" had been satisfied because "without compensation to those who are willing to undertake the inherent complexities and unknowns of consumer class action litigation, enforcement of the federal and state consumer protection laws would be jeopardized"). While many categories of lawsuits are valued by our society, actions resulting in the erosion of discrimination and the preservation of civil rights are especially significant. As the Court explained in *Bowe v. Colgate–Palmolive Co.*, 443 F.Supp. 696, 720 (D.C.Ind.1977), attorneys successfully challenging civil rights violations should be rewarded an enhanced customary fee. The Court found:

> The efforts of all of plaintiffs' counsel in this case resulted in the plaintiff class being extended and insured various ... rights under ... the Civil Rights Act of 1964 which they did not enjoy before. The injunctive relief issued ... is perhaps the most significant event in the history of this litigation ... [and] the Court believes that the efforts of [plaintiffs' counsel] are entitled to special commendation in this respect.

*Id.* Moreover, at least one important legal treatise has reached a similar conclusion. As set forth in Wright & Miller, *Federal Practice & Procedure*, § 1803.1:

> One of the most significant considerations taken into account in setting the ultimate fee is the benefit conferred by the litigation. Benefit in this context is not necessarily limited to monetary relief or the value of the property right protected. A number of courts have indicated the importance of encouraging private litigants to vindicate public wrongs by suggesting that the fees awarded would be particularly generous in those situations. This consideration seems warranted. [Because] the objective of the award is to create a financial incentive to initiate socially desirable litigation and thereby enhance access to the adjudicative process, taking into ac-

count the amount of benefit actually produced and allowing fees to be enhanced accordingly seems particularly appropriate.

Finally, case law supports the proposition that the customary fee in civil rights cases should be enhanced. *See United Slate, Tile & Composition Roofers, Damp and Waterproof Workers Ass'n, Local 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 503 (6th Cir.1984) (recognizing courts should not focus on financial gain when awarding attorneys' fees where results are achieved in form of vindication of civil rights); *Donaldson v. O'Connor*, 454 F.Supp. 311, 315 (D.C.Fla. 1978) (noting that United States Court of Appeals for the Fifth Circuit has determined that "[i]f the decision corrects across-the-board discrimination affecting a large class ... the attorneys' fees awarded should reflect the relief granted") (quoting *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 718 (5th Cir.1974)).

**f. Whether the Fee is Fixed or Contingent**

This case was taken on a purely contingency fee basis and, as indicated in the report of Professor Silver, some of the attorneys involved usually base their fees on a contingency fee basis rather than an hourly rate. (Report of Charles Silver, pp. 8–9, attached to plaintiffs' Notice of Filing Supplement to plaintiffs' Application for Attorneys' Fees and Costs, docket no. 119). The contingency fee system "permits a greater recovery for successful cases, thereby rewarding their investment in successes, and offsetting the losses from unsuccessful cases." *In re Shell Oil Refinery*, 155 F.R.D. 552, 571 (E.D.La.1993). Adjustment of the lodestar to reflect the contingent nature of the suit was recognized by the United States Court of Appeals for the Fifth Circuit in *Graves v. Barnes*, 700 F.2d 220, 222–23 (5th Cir.1983). However, since this decision, the United States Supreme Court determined that enhancement of the lodestar based on the contingent nature of the fee is not permitted when fees are awarded to plaintiffs under traditional fee-shifting provisions of relevant statutes. *City of Burlington v. Da-*

*gue*, 505 U.S. 557, 567, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Nonetheless, courts of appeal deciding the issue have indicated *Dague* may not apply to class action settlement cases. *See Florin v. Nationsbank, N.A.*, 34 F.3d 560, 564–65 (7th Cir.1994) (concluding *Dague* does not apply to common or class action settlement fund cases); *Rawlings v. Prudential–Bache Props. Inc.*, 9 F.3d 513, 516–17 (6th Cir.1993) (applying lodestar adjustment to attorneys' fees request in class action settlement); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1273 (determining *Dague* is not applicable to class action settlement fund); *see also Rutherford v. Harris County*, 197 F.3d 173, 193 (5th Cir.1999) (determining court abused its discretion under *Dague* when using contingency factor in case which had proceeded to jury trial). Although the Fifth Circuit Court of Appeals did not address *Dague* in class action settlement decisions rendered after the Supreme Court's decision, the Fifth Circuit did reiterate that adjustment of the lodestar includes the twelve *Johnson* factors. *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 800 & n. 18 (5th Cir.2006); *Longden v. Sunderman*, 979 F.2d 1095, 1099 n. 10 (5th Cir.1992). Moreover, at least one District Court post-*Dague* has recognized the risk of receiving little or no recovery is a factor in considering an award of attorneys' fees in a class action case which has settled. In *In re Prudential–Bache Energy Income P'ships Sec. Litig.*, No. 888, 1994 WL 202394, at *6 (E.D.La. May 18, 1994), the Court noted:

> Although today it might appear that risk was not great based on Prudential Securities' global settlement with the Securities and Exchange Commission, such was not the case when the action was commenced and throughout most of the litigation. Counsel's contingent fee risk is an important factor in determining the fee award. Success is never guaranteed and counsel faced serious risks since both trial and judicial review are unpredictable. Counsel advanced all of the costs of litigation, a not insubstantial amount, and bore the additional risk of unsuccessful prosecution.

Therefore, this Court will consider the contingency factor. *Garza v. Sporting Goods Properties, Inc.*, No. Civ. A. SA–03–CA–108, 1996 WL 56247, at *31–32 (W.D.Tex. Feb.6, 1996) (considering contingency factor in common fund case).

As recognized by the United States Court of Appeals for the Seventh Circuit:

> [W]hen attorneys' receipt of payment is contingent on the success of the litigation, reasonable compensation may demand more than the hourly rate multiplied by the hours worked, for that is exactly what the attorneys would have earned from clients who agreed to pay for services regardless of success. Thus to account for the contingent nature of the compensation, a court should assess the riskiness of litigation.

*Skelton v. General Motors Corp.*, 860 F.2d 250, 258 (7th Cir.1988); *see also Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D.Fla.1988) (recognizing that if lodestar " 'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing"), *aff'd without opinion*, 899 F.2d 21 (11th Cir. 1990). From its inception, class counsel took substantial risk in pursuing this litigation because of the novelty of seeking relief for a class of minority policyholders who challenged Allstate's use of credit scoring as discriminatory. Not only did counsel seek monetary compensation, they also undertook the challenge of persuading Allstate to change its practice of credit scoring, marketing, education and an appeals process which had been in effect for several years. As in all contingency fee cases, counsel for the past five years have received no funds from the class to pay for work performed or expenses incurred. Given the complex legal and factual issues confronting counsel, as discussed throughout this opinion, class counsel undertook a considerable risk with no guarantee any fees or expenses would be recovered. Under this analysis, the multiplier requested is applicable.

**g. The Amount Involved and the Results Obtained**

The settlement involves not only monetary relief, but, most importantly, a change in the

credit scoring formula, an educational outreach program, multi-cultural marketing, an improved appeals process. *See Garza,* 1996 WL 56247, at *332 (considering amount involved and results obtained when considering request for attorneys' fees in class action settlement). It is the extraordinary results obtained by settlements in civil rights cases such as this which stand out the most in the minds of courts. *See D.J. Miller & Assocs. v. Ohio Dept. of Admin. Servs.,* 115 F.Supp.2d 872, 884 (S.D.Ohio 2000) (concluding "[t]he right to be free from discrimination is such a core value of our society that [any inconvenience to the defendant] pales by comparison to the harm that discrimination occasions"); *Walker v. Carnival Cruise Lines,* 107 F.Supp.2d 1135, 1145 (N.D.Cal. 2000) (emphasizing "[t]he value society places upon eradicating discrimination and ensuring civil rights plaintiffs bringing good faith suits have their day in Court" and that "society [has a] strong interest in rooting out discrimination and ensuring that the disabled members of our society equally partake in social intercourse, because to [not] do so would erode a clearly enunciated federal policy of the highest order"). Also, courts have recognized that "[t]oo great an emphasis on the amount realized from the judgment would detrimentally encourage attorneys to concentrate on increasing the damage award, perhaps with harm to the merits of the case." *United Slate, Tile & Composition Roofers, Damp and Waterproof Workers' Ass'n, Local 307 v. G & M Roofing & Sheet Metal Co.,* 732 F.2d 495, 503 (6th Cir.1984). Courts should not focus on financial gain, where great results are achieved in the form of the vindication of civil rights. *Id.* For example, in *Geier v. Sundquist,* 372 F.3d 784, 786–88 (6th Cir. 2004), the United States Court of Appeals for the Sixth Circuit vacated a District Court's award of attorneys' fees and remanded the case for calculation of the lodestar figure and determination of an upward adjustment. The Court found the results obtained by plaintiffs in that case were exceptional and therefore warranted an upward adjustment because they had secured injunctive relief toward the "removal[ ] of all vestiges of state-imposed segregation in institutions of public higher education." *Id.* at 787–88, 796;

*see also Ramos v. Lamm,* 539 F.Supp. 730, 739 (D.C.Colo.1982) (recognizing "the trial court must consider both the monetary and the non-monetary relief obtained in determining the total value of the relief [because] [i]n many cases, particularly civil rights cases, the value of the injunctive or declaratory relief will greatly exceed the damage award, making proper an attorney fee award greatly in excess of the damage award").

The United States Court of Appeals for the Fifth Circuit has determined the Court should consider:

> The result obtained by verdict or settlement, evaluated in terms of (a) the potential money damages available to the class member, i.e. a comparison of the extent of possible recovery with the amount of actual verdict or settlement; [and] (b) the benefit-monetary or non-monetary-conferred on the class, i.e. permitting the court to recognize and reward achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum of time invested.

*Graves v. Barnes,* 700 F.2d 220, 223 (5th Cir.1983). The key to this class action settlement are the results obtained. *See Garza v. Sporting Goods Properties, Inc.,* No. Civ. A. SA–03–CA–108, 1996 WL 56247, at *32 (W.D.Tex. Feb.6, 1996) (noting key to class action settlement was results obtained). These results-the change in the credit scoring formula, an educational outreach program, multi-cultural marketing, an improved appeals process-taken together with the economic value of the settlement show just how substantial and beneficial is the recovery.

**h. The Experience, Reputation, and Ability of the Attorneys**

The experience, excellent reputation and abilities of class counsel are without question. Moreover, as noted, class counsel were opposed by a formidable defense team. *See Garza,* 1996 WL 56247, at *33 (discussing experience, reputation and abilities of attorneys when calculating lodestar adjustment). The skill of each team was observed and complimented by this Court. In particular, the Court recognizes the exceptional and invaluable experience brought to class counsel

by Christa Collins, lead counsel for plaintiffs in this action. As set forth in part in her declaration, this case required extraordinary measures. She stated:

Before commencing this action, as well as during litigation and settlement negotiations, I, along with my co-counsel (collectively "Plaintiffs' Counsel"), conducted a thorough and extensive evaluation of the relevant law and facts to assess the merits of the potential claims against Allstate and to determine how best to serve the interests of the Plaintiffs and other similarly situated individuals.

Our work included, *inter alia*, meeting and communicating with Plaintiffs; conducting a pre-filing investigation and analysis; identifying and interviewing witnesses; retaining and working extensively with experts and consultants; conducting extensive informal discovery with Allstate; reviewing and analyzing voluminous amounts of documents, data and other information produced by Allstate; researching issues raised in Allstate's motion to dismiss and its appeal of this Court's denial of its motion to dismiss; conducting complicated statistical analysis and analyzing complex insurance underwriting and pricing algorithms for their discriminatory impact on minorities; and negotiating a settlement and presenting it to the Court and Class for approval.

In addition, my law firm intervened as a party in two regulatory cases filed against Allstate by the State of California Department of Insurance regarding Allstate's use of credit scoring in the underwriting of auto and homeowners' policies in that state. This litigation resulted in Allstate agreeing to withdraw its use of credit scoring in the underwriting of both auto and homeowners in the state of California prior to having to produce its algorithms to the Department of Insurance and my firm. Allstate had vigorously opposed producing the algorithms in both cases....

The settlement in this case was reached only after extensive, complex and arm's length negotiations that lasted nearly two years. Allstate initiated settlement discussions in June 2004 and intense settlement negotiations on the many components of this settlement continued steadily until the parties executed the final Settlement Agreement May 19, 2006. To reach this agreement, class counsel and defendants held over 50 negotiating sessions, both in person and via telephone conference, to discuss a possible agreed-upon resolution of the case. Counsel for all parties worked with their respective clients and expert consultants between those ongoing meetings. Class counsel and their experts reviewed a substantial volume of electronic information containing millions of observations that Allstate provided as part of the parties' settlement efforts. As a result of those efforts, counsel for the parties developed and exchanged numerous proposals encompassing potential settlement frameworks and general settlement terms, which, eventually resulted in the final agreement provided to this Court.

(Declaration of Christa Collins, docket no. 149, pp. 1–3). Ms. Collins and her class counsel team bring to the case experience, reputation, and ability in excess of the usual hourly rate.

### i. The "Undesirability" of the Case

Courts have recognized the undesirability of a case is another important factor in determining a fair fee award. *See Alberti v. Klevenhagen*, 903 F.2d 352, 352 (5th Cir.1990) (affirming district court's undesirability enhancement, reasoning an enhancement for undesirability of case is required to attract competent counsel to accept certain cases); *Forrest v. Dynamic Sec., Inc.*, No. CIV.A. 00–3423, 2002 WL 31256202, at *2 (E.D.La. Oct.4, 2002) (listing undesirability of case as one of permissible factors to consider in adjusting lodestar amount). Thus, factors already discussed such as the financial burden on counsel and the demands of handling a class action of the size and complexity of this case, may cause a case to be considered "undesirable." *Garza v. Sporting Goods Properties, Inc.*, No. Civ. A. SA–03–CA–108, 1996 WL 56247, at *33 (W.D.Tex. Feb.6, 1996) (citing *In re Shell Oil Refinery*, 155 F.R.D. 552, 572 (E.D.La.1993)). However, "taking on this type of litigation against major corporations where the prospective relief

involves decisions by corporate management at a high level is as intimidating a legal task as someone can take." *Id.* In view of the task undertaken, one expert has deemed a class action settlement negotiated with a major corporation which results in substantial policy changes to be a "remarkable" achievement. *Id.* Moreover, the United States Court of Appeals for the Fifth Circuit recognized more than thirty years ago, civil rights cases, like the instance case, are often undesirable:

> Civil rights attorneys face hardships in their communities because of their desire to help the civil rights litigant. *See NAACP v. Button,* 371 U.S. 415, 443, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Oftentimes his decision to help eradicate discrimination is not pleasantly received by the community or his contemporaries. This can have an economic impact on his practice which can be considered by the Court.

*Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 719 (5th Cir.1974). Furthermore, as discussed, by any reasonable view, this case was undesirable because substantial risks and uncertainties were present from the outset of this case that made it far from certain that any relief for the settlement class would be obtained. The issues were complex; the legal hurdles were many and substantial; the opponents were powerful, well-funded and ably defended; and the time and expense demands were substantial. Although class counsel were confident they would develop a convincing case, they were also aware that, historically, disparate impact racial discrimination cases are not easily won. (Fairness hearing, testimony of Christa Collins, pp. 10–11).

Additionally, Allstate raised serious issues with respect to preemption issues which, as this Court acknowledged, could have been resolved in several manners. *See DeHoyos v. Allstate Corp.,* No. SA–01–CA–1010 (W.D. Tex. Order filed May 16, 2002) (noting this case "involves controlling questions of law as to which there are substantial grounds for

difference of opinion"). Allstate's motion to dismiss, if granted, posed the risk of destroying the plaintiffs' case and the ability of the class to obtain relief. Moreover, Allstate did not waiver in its belief the McCarran–Ferguson Act preempted plaintiffs' claim and took its argument to the United States Supreme Court. In its effort, Allstate was supported by the insurance and business industry, which included the filing of *amici curiae* briefs by the Chamber of Commerce of the United States, Alliance of American Insurers, American Insurance Association, National Association of Independent Insurers, National Association of Mutual Insurance Companies and Reinsurance Association of America. Nonetheless, class counsel persevered and broke ground by negotiating what would be one of the first cases, if not the first, case to successfully challenge allegedly racially discriminatory credit scoring.

**j. Awards in Similar Cases**

Courts often look at fees awarded in comparable cases to determine if the fee requested is reasonable. *Johnson,* 488 F.2d at 719 & n. 5 (citing similar cases reviewed when determining whether to adjust lodestar). The average range of multipliers applied to other class actions has been from 1.0 to 4.5. *Garza,* 1996 WL 56247, at *33. The range of multipliers on large and complicated class actions have ranged from at least 2.26 to 4.5. *Id.* (citing *Retiree Med. Benefits ERISA Litig.,* 886 F.Supp. 445, 481–82 (E.D.Pa.1995)). Moreover, as discussed above, civil rights and discrimination cases generally call for increases in attorneys' fees awards. Here, a $11,720,000 fee award, representing a multiplier of less than 1.7, is equal to or less than the average fee awarded in similar complex class action litigation.[10] Specifically, the fee requested here compares favorably to awards in other complex, civil rights and/or class actions:

> 1. *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 123 (2d Cir.) (noting lodestar of 3.5 in antitrust class action "has been deemed reasonable under

---

**10.** Because costs are not included in calculating the lodestar multiplier, the portion of the requested award compensating for attorneys' fees

equals $11,137,514.60, representing a 1.68 multiplier on the $6,605,505.50 unenhanced lodestar.

analogous circumstances"), *cert. denied*, 544 U.S. 1044, 125 S.Ct. 2277, 161 L.Ed.2d 1080 (2005);

2. *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 98 Fed.Appx. 581, 583, 2004 WL 829383, at *2 (9th Cir. Aug.14, 2004) (reversing and remanding District Court's denial of risk multiplier and instructing Court to apply multiplier of 2 to class counsel's lodestar);

3. *Bernardi v. Yeutter*, 951 F.2d 971, 975 (9th Cir.1991) (determining that District Court should have applied multiplier of 2 to lodestar figure of class counsel in civil rights case to account for risk of contingent fee and to ensure attorneys will accept civil rights cases);

4. *Local 56, United Food & Commercial Workers Union v. Campbell Soup Co.*, 954 F.Supp. 1000, 1005 (D.N.J.1997) (refusing to reduce agreed-upon class counsel's fees which equated a 2.39 multiplier on the lodestar cross-check because such an award was fair and reasonable under circumstances of case);

5. *J/H Real Estate Inc. v. Abramson*, Nos. 95–4176, 95–7180, 1996 WL 750053, at *3 (E.D.Pa. Dec.30, 1996) (concluding fee award of more than 2.5 times lodestar is "generous but fair premium");

6. *Garza v. Sporting Goods Properties, Inc.*, No. Civ. A. SA–03–CA–108, 1996 WL 56247, at *33 (W.D.Tex. Feb.6, 1996) (finding fees requested which represented multiplier of 3.5 and 4 were appropriate);

7. *Pooshs v. Fluoroware, Inc.*, No. C–93–1137 MHP, 1994 WL 374540, at *5 (N.D.Cal. July 11, 1994) (awarding multiplier of 2 in civil rights case);

8. *In re Fernald Litig.*, No. C–1–85–149, 1989 WL 267038, at *5 (S.D.Ohio Sept.29, 1989) (awarding class counsel equivalent of multiplier of 5);

9. *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D.Fla.1988) (finding that "application of a multiple of 3.0 here compares favorably with the mul-

tiples used in these other complex cases"), *aff'd without opinion*, 899 F.2d 21 (11th Cir.1990); and

10. *Pollar v. Judson Steel Corp.*, No. C–82–6833–MHP, 1985 WL 312, at *5–6 (N.D.Cal. May 21, 1985) (multiplying lodestar by 1.25 in civil rights case which easily resulted in favorable class action settlement).

Based on awards in similar cases and upon the factors set forth above, this Court concludes the fee requested here, which represents a multiplier of 1.68, is appropriate for this case.

## B. Expenses

The appropriate analysis to apply in determining which expenses are compensable in a class action case is whether such costs are of the variety typically billed by attorneys to clients. *Abrams v. Lightolier*, 50 F.3d 1204, 1225 (3d Cir.1995) (determining expenses are recoverable if it is customary to bill clients for these expenses); *Harris v. Marhoefer*, 24 F.3d 16, 19–20 (9th Cir.1994) (stating "Harris may recover as part of the award of attorney's fees those out-of-pocket expenses that would normally be charged to a fee paying client") (internal quotation and citations omitted); *Dowdell v. City of Apopka*, 698 F.2d 1181, 1192 (11th Cir.1983) (concluding "all reasonable expenses incurred in case preparation, during the course of litigation, or as an aspect of settlement of a case" may be recovered as costs in civil rights case); *Miltland Raleigh–Durham v. Myers*, 840 F.Supp. 235, 239 (S.D.N.Y.1993) (noting "[a]ttorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were incidental and necessary to representation of those clients") (internal quotation and citations omitted); *see also Texas State Teachers Ass'n v. San Antonio Indep. Sch. Dist.*, 584 F.Supp. 61, 66 (W.D.Tex.1983) (awarding "all reasonable expenses incurred in case preparation [and] during the course of litigation") (quoting *Dowdell*, 698 F.2d at 1192).

In this case, class counsel have incurred expenses in excess of $582,485.40. These expenses include costs for filing fees, expert

witnesses and consultants, photocopies, mailing and travel. It also includes costs for computerized factual and legal research (i.e., Pacer and Westlaw). *See In re Media Vision Tech. Sec. Litig.*, 913 F.Supp. 1362, 1371 (N.D.Cal.1996) (agreeing computerized legal research increases efficacy of legal research); *Gottlieb v. Wiles*, 150 F.R.D. 174, 186 (D.Colo.1993) (explaining "[t]he reason for allowing such [Westlaw and Lexis research] expenses is twofold: one, without computer research, attorneys' own billing rates would be higher; and two, the fee paying market reimburses computer research and by disallowing expenses in fee awards the incentive is for lawyers to substitute their own time for the computer"), *rev'd on other grounds sub nom. Gottlieb v. Barry*, 43 F.3d 474 (10th Cir.1994). Based on the application for expenses and supporting documentation, the Court finds these costs to be reasonable. Moreover, reimbursing class counsel for these costs will not whatsoever affect the relief given to the settlement class. Therefore, the Court finds class counsel should be reimbursed for these litigation related expenses from the $11,720,000 lump sum amount.

## C. Objections to the Requested Attorneys' Fees and Expenses

Several objectors have challenged class counsel's request for attorneys' fees. Some demand that class counsel submit their detailed time records for either the Court or the class members to review. Several argue the amount requested for fees and expenses is too high given their assertion that class counsel is not responsible for obtaining the relief achieved through the settlement or that the relief obtained carries no value. Some suggest the fees not be awarded until all of the claims are distributed to class members. A few suggest class counsel acted improperly and traded the class members' claims for their attorneys' fees and expenses. And, some make faulty assumptions about or apparently failed to consider counsel's fee applications.

As to this last group of objectors, they state that class counsel has not yet filed their attorneys' fee request or stated the basis for

their request. They further contend that class counsel will be seeking a "percentage of the value theory." However, class counsel filed plaintiffs' fee application on June 30, 2006, and supplemented this filing on October 27, 2007–both before these objections were filed. As to the percentage of the value theory, plaintiffs did not request fees under this theory, which is not the applicable method in this case or in this Circuit. *See Longden v. Sunderman*, 979 F.2d 1095, 1099 (5th Cir.1992) (determining lodestar method is proper method to calculate attorneys' fees in this Circuit). These objections are overruled.

### 1. Information to Support the Fee Applications

Although each of the law firms representing plaintiffs has submitted affidavits, tables and charts summarizing over five years of time records, several objectors request that the Court order class counsel to submit their itemized time records for those five years for the Court to review. The Court declines this invitation. In addition to providing the information in a digestible form for the Court and class members, plaintiffs also, as previously discussed, submitted an expert report by Professor Charles Silver of the University of Texas, a well respected authority on attorneys' fees. (Report of Charles Silver, attached to plaintiffs' Notice of Filing Supplement to plaintiffs' Application for Attorneys' Fees and Costs, docket no. 119). Professor Silver opined that class counsels' fee request was reasonable in its entirety. *Id.* at 1–6. He also testified that hourly rates charged and the amount of time class counsel spent in prosecuting this action were reasonable and justified. *Id.* at 7–23. Having reviewed the plaintiffs' fee applications, supporting materials and the report, the Court finds the evidence sufficient to support the fee request. *See In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572, 573 (7th Cir.1992) (finding District Court's review of and modifications to class counsel's time records and billing rates to be "ultimately futile expenditure of judicial time," suggesting instead that "it might be quicker and easier to generate [expert testimony or statistics regarding comparable cases] than it would be to hassle over every

item or category of hours and expenses and what multiple to fix and so forth").

Similarly, at least one objector requests that the Court order that class counsel turn over their detailed time sheets, not for the Court's review, but so the objectors and other class members themselves can determine if the time expended by class counsel was "realistic and fair." The Court also declines this invitation. Even presuming the class members could fully comprehend the detailed time records, this objection fails to explain how these individuals are qualified to pass judgment on the daily time records of attorneys in a complex, national class action. *See Wolf v. Frank*, 555 F.2d 1213, 1214 (5th Cir.1977) (recognizing that determination of amount of attorneys' fees is entrusted to sound discretion of trial court). Moreover, without more, the class members' review is unnecessary given Professor Silver's undisputed opinion that the attorneys' fees requested are reasonable. Finally, "these records contain privileged and non-discoverable information, including descriptions of attorney-client communications, joint prosecution information shared among counsel for plaintiffs, attorney work product reflecting the mental impressions of counsel and/or information from which the tactics and strategies employed by plaintiffs in this litigation could be inferred." (Plaintiffs' Memorandum in Response to Objections, docket no. 151, p. 29). The objectors have not shown how turning over these documents would not be detrimental to plaintiffs' interests. Moreover, although it may be possible to redact the privileged information from these records, which are voluminous, the redacted record would not provide full information to review. This objection is overruled.

### 2. The Amount of Fees in Relation to the Relief Obtained

Some objectors contend class counsel do not deserve their requested fees by challenging the value of the settlement. Others contend the Court should not award fees until the exact value of the settlement can be determined. As discussed throughout this opinion, this Court has found the settlement confers substantial value upon and relief to the class members. In any event, the objectors appear to fall into one of two categories: they either (1) only recognize the injunctive relief and assert it does not have value because it does not convey actual money to class members or (2) only recognize the monetary relief and attempt to limit class counsel's fees in relation to the amount of monetary relief distributed to the class. As noted, the monetary relief is merely incidental to the injunctive relief. Moreover, neither view is appropriate in this case because class counsel has negotiated both injunctive and restitutionary relief for the class members.

While class members may be entitled to awards ranging from $50 to $150 each, as discussed throughout this opinion, ending alleged racial discrimination is invaluable to victims and society as a whole. The Supreme Court has explained, when a plaintiff brings a civil rights action and "obtains an injunction, he does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority." *Newman v. Piggie Park Enter., Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); *see also Setser v. Novack Inv. Co.*, 657 F.2d 962, 966 (8th Cir.) (concluding that "underlying Civil Rights legislation of 1860s and 1960s is the judgment that a just and harmonious society requires the eradication of racial discrimination"), *cert. denied*, 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981); *Scott v. City of Anniston*, 597 F.2d 897, 900 (5th Cir.1979) (noting there is an "important national purpose" of "ending discrimination"), *cert. denied*, 446 U.S. 917, 100 S.Ct. 1850, 64 L.Ed.2d 271 (1980). Furthermore, if such relief were valueless, attorneys would rarely accept civil rights or other socially valuable cases not involving monetary damages. *See Evans v. Jeff D.*, 475 U.S. 717, 745–52, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986) (Brennan, J., dissenting) (discussing at length importance of awarding attorneys' fees in civil rights actions to attract competent counsel and explaining "devastating" impact that withholding awards of attorneys' fees had on civil rights litigation in past history); *Newman*, 390 U.S. at 402, 88 S.Ct. 964 (explaining those who are successful at obtaining an injunction against civil rights violations are

entitled to an award of attorneys' fees); *Fleet Inv. Co., v. Rogers,* 620 F.2d 792, 794 (10th Cir.1980) (discussing how "[t]he value of an attorney's services is not only measured by the amount of the recovery to plaintiff, but also the non-monetary benefit accruing to others, in this case, the public at large from his successful vindication of a national policy to protect consumers"); *In re Rio Hair Naturalizer Prod. Liab. Litig.,* No. MDL 1055, 1996 WL 780512, at *18 (E.D.Mich. Dec.20, 1996) (recognizing "benefit to society" factor in rewarding attorneys' fees in class action litigation and that such compensation is necessary to attract counsel to accept such cases and enforce federal and state laws). This is not how the justice system operates. Instead, recognizing it is difficult to value injunctive and declaratory relief, courts use the lodestar method, which compensates attorneys based on ·their reasonable time and rates. *See Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1029 (9th Cir.1998) (noting that "courts often use a lodestar calculation because there is no way to gauge net value of settlement or any percentage thereof" in civil rights and other injunctive relief class actions). Here, as recognized by Professor Silver, the precise dollar value of the relief to be afforded the class is difficult to ascertain, especially given that much of the injunctive relief is "forward looking." (Report of Charles Silver, p. 31, attached to plaintiffs' Notice of Filing Supplement to plaintiffs' Application for Attorneys' Fees and Costs, docket no. 119). For this reason, class counsel chose not to attempt to justify their fee based upon "nebulous and entirely speculative assertions" regarding the dollar value of the relief provided by the settlement. (Memorandum in Response to Objections, docket no. 151, p. 31). Instead, class counsel properly filed and has predicated their fee application using the lodestar method, coupled with a reasonable 1.68 enhancement. The objections to the requested attorneys' fees based on these arguments are overruled.

### 3. The Melder Objectors' Request for Attorneys' Fees

The Melder objectors seek attorneys' fees in this DeHoyos action for their efforts in prosecuting the Louisiana claims raised in the Eastern District of Louisiana. Specifically, counsel for the Melder objectors contend they are entitled to an award of $2,493,327.20 for work they did, and therefore, plaintiffs' award of $11,720,000 in this case should be reduced to $9,226.672.80. Before objectors will be entitled to attorneys' fees, they must show they improved the settlement, assisted the Court, or enhanced the recovery for the class. *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1052 (9th Cir.) (noting that court will not treat objectors' fee request like that of class counsel and in absence of showing objectors substantially enhanced benefits to class, objectors are not entitled to award of fees), *cert. denied,* 537 U.S. 1018, 123 S.Ct. 536, 154 L.Ed.2d 425 (2002); *In re Prudential Ins. Co. Am. Sales Practice Litig.,* 148 F.3d 283, 330 n. 100 (3d Cir.1998) (noting District Court denied request for attorneys' fees because objector neither improved the settlement, assisted the Court, nor enhanced the settlement recovery), *cert. denied,* 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999).

■ Here, there has been a some suggestion the Melder attorneys are entitled to a fee because they were a "catalyst" for the settlement. (Fairness hearing, testimony of Richard C. Godfrey, p. 48). However, the Melder attorneys have presented no specific proof as to what were their efforts, how they created a benefit, and why this benefit would not have been created for the DeHoyos class absent their efforts. *See In re Cendant Corp. Sec. Litig.,* 404 F.3d 173, 200 (3d Cir. 2005) (explaining objectors' counsel seeking fees must show through specific proof that their efforts conferred benefits on class). Moreover, Christa Collins, lead counsel for the DeHoyos plaintiffs, declared under penalty of perjury that "[t]he lawyers for the Melder group of objectors played no role whatsoever in this litigation or in the settlement negotiations between Class Counsel and Allstate." (Declaration of Christa Collins, docket no. 149, p. 3). She states that "[c]ounsel for the Melder group contacted me in late January, 2006 to obtain information on the status of our negotiations with Allstate in preparation for a status conference in their case pending in Louisiana." *Id.* "By this

time," she continues, "Allstate and Plaintiffs' Counsel had reached agreement in principle on the settlement terms and the settlement papers were being drafted and exchanged between the parties." *Id.* Moreover, she concludes, "[w]e had no further contact from the Melder group until [they] filed their petition with the Multi–District Litigation panel in [July] 2006." *Id.*

There has also been some suggestion the *Melder* case and the *DeHoyos* case proceeded on "parallel" litigation tracks. However, when "both lead counsel and the fee-requesting non-lead counsel performed work in parallel," non-lead counsel will not be able to carry their burden unless they demonstrate "their work alone was responsible for some demonstrably improved probability of victory, or some identifiable portion of the class's recovery." *In re Cendant Corp. Sec. Litig.*, 404 F.3d at 200–01. Because Melder counsel have not shown they increased the fund or otherwise substantially benefitted the DeHoyos class members, they are not entitled to fees.

The Melder group argues the cases are "parallel" in the sense that they "have been essentially trying to reach the same objective." (Fairness hearing, testimony of Tom Thornhill, p. 88). The record however does not support this argument.

TIME LINE

| | |
|---|---|
| November 2, 2001: | The *DeHoyos v. Allstate* action consisting of a nationwide class is filed in federal court alleging anti-discrimination claims under federal law. |
| February 1, 2002: | Allstate files its motion to dismiss in the *DeHoyos v. Allstate* case. |
| March 6, 2002: | The *DeHoyos* group responds to Allstate's motion to dismiss. |
| April 5, 2002: | This Court denies the motion to dismiss filed in *DeHoyos v. Allstate*. |
| June, 2002: | The Melder group's counsel becomes aware of the *DeHoyos v. Allstate* case. |
| July 1, 2003: | The *Melder v. Allstate* case is filed as a state-wide class action in Louisiana state court alleging state law causes of action. |
| September 3, 2003: | The Fifth Circuit affirms this Court's Order denying Allstate's motion to dismiss in the *DeHoyos v. Allstate* case. |
| September 3, 2003: | Allstate removes the *Melder v. Allstate* case to federal court based on diversity jurisdiction. |
| October 2, 2003: | The Melder group files its motion to remand in the *Melder v. Allstate* case. |
| December 2, 2003: | The Louisiana Federal Court denies the motion to remand filed by the Melder group in the *Melder v. Allstate* case. |
| April 26, 2004: | The United States Supreme Court denies Allstate's petition for writ of certiorari in the *DeHoyos v. Allstate* case. |
| June, 2004: | Settlement negotiations begin in the *DeHoyos v. Allstate* case. |
| March 16, 2005: | The Fifth Circuit Court of Appeals affirms the Louisiana Federal Court's Order denying the Melder group's motion to remand in the *Melder v. Allstate* case. |
| April 27, 2005: | The Melder group amends its complaint to include federal anti-discrimination claims in the *Melder v. Allstate* case. |
| May 19, 2006: | A final settlement is executed in the *DeHoyos v. Allstate* case. |
| June 6, 2006: | This Court enters an Order Preliminarily Approving Settlement in the *DeHoyos v. Allstate* case. |
| July 5, 2006: | The Melder group moves the multi-district litigation panel to consolidate the *DeHoyos v. Allstate* action with the *Melder v. Allstate* action and to transfer the Louisiana action to the Western District of Texas. |
| July 10, 2006: | The District Clerk's Office receives a copy of the Melder group's motion to transfer filed with the multi-district litigation panel for the *DeHoyos v. Allstate* file. |
| October 16, 2006: | The multi-district litigation panel denies the Melder group's motion to consolidate and transfer. |
| November 6, 2006: | The Melder group files objections to the proposed Settlement Agreement in the *DeHoyos v. Allstate* action. |
| December 18, 2006: | This Court held the fairness hearing in the *DeHoyos v. Allstate* case. |

The timeline reveals that these cases have seemingly different objectives. The Melder action has been litigated since 2003, while the *DeHoyos* action has been on file since 2001. The Melder plaintiffs are a state only class of Louisiana claimants, while the DeHoyos plaintiffs are a nationwide group of claimants. The Melder group initially filed suit in state court alleging only state law claims for money damages, while the DeHoyos group filed suit in federal court seeking mainly equitable relief. Notably, the Melder group proceeded before a regulatory agency and did not add their federal anti-discrimination claims to their complaint until after the United States Court of Appeals for the Fifth Circuit had affirmed the District Court's decision denying their motion to remand. Further, the Melder plaintiffs challenged removal, a battle they lost in both the federal

District Court and the Fifth Circuit Court of Appeals. The DeHoyos plaintiffs were challenged by Allstate's motion to dismiss, a battle they won in this Court, in the Fifth Circuit Court of Appeals and the United States Supreme Court. Importantly, by the time the Melder plaintiffs achieved a result on the removal question, the DeHoyos case had been returned from the United States Supreme Court and settlement negotiations had begun.

A lack of a common objective can also be seen by the fact that counsel for the Melder plaintiffs acknowledged their group knew in 2002 the DeHoyos class action was pending and they made an informed, conscious decision not to intervene and to pursue their claims on a separate litigation track in Louisiana. (Fairness hearing, testimony of Tom Thornhill, p. 89). Specifically, the following exchange took place between the Court and counsel for the Melder plaintiffs:

> The Court: [Y]ou, all your group, at least knew about this [the DeHoyos] litigation here back in 2002, and you said you decided to and had talked about it and decided to pursue parallel remedies and actions and so forth.

> Counsel: We did:

> The Court: And whether the current plaintiffs' counsel group had agreed or not, you could have intervened at this time, could you not?

> Counsel: We could have attempted to do [so], Your Honor, we chose not to do [so]. So we respected their pursuing their case there and they respected our pursing our case in Louisiana in the federal courts there.

*Id.*

Counsel for the Melder plaintiffs suggest that not knowing about the preliminary approval date of the settlement in the DeHoyos case worked some prejudice against their clients. (Fairness hearing, pp. 89–90). However, these objectors cite the Court to no rights they could have asserted at the preliminary approval stage that they have not asserted in their objections or at the fairness hearing. Moreover, the Melder plaintiffs

knew the DeHoyos case was close to settling in January of 2006, and they did nothing until July 5, 2006, when they filed their petition before the multi-district litigation panel. (Fairness hearing, testimony of Christa Collins, p. 111) (Melder Objections, docket no. 129, p. 9). Finally, the Judicial Panel on Multidistrict Litigation in a published opinion found that "centralization [of the *Melder* cause of action and the *DeHoyos* cause of action] would neither serve the convenience of the parties and witnesses nor further the just and efficient conduct of this litigation." *In re Ins. Indus. Discriminatory Sales Practices Litig.*, 460 F.Supp.2d 1376, 1376 (2006); *see also* (docket no. 118 in this case). This is because, the panel concluded, the Melder group had failed to persuade it "that any common questions of fact and law are sufficiently complex, unresolved and/or numerous to justify … transfer in this docket in which the Texas action has been pending for almost five years and is the subject of a pending class action settlement." *Id.* This is further evidence that any prejudice to the Melder plaintiffs was caused by their decision to pursue a separate litigation from the beginning of the case. The request for attorneys' fees made by the Melder group's counsel is denied.

### COMPENSATION FOR THE NAMED PLAINTIFFS

■ The six named plaintiffs who have made court appearances and performed other services for the class have made a request for $5,000 each in compensation for time spent. Allstate does not oppose these awards and will pay them, if approved, as provided by the Settlement Agreement. Benefits to the class will not be reduced.

"Federal courts consistently approve incentive awards in class action lawsuits to compensate named plaintiffs for the services they provide and burdens they shoulder during litigation." *Camp v. Progressive Corp.*, No. Civ. A. 01–2680, Civ. A. 03–2507, 2004 WL 2149079, at *8 (E.D.La. Sept.23, 2004) (internal quotation omitted); *see also Carrabba v. Randalls Food Mkts., Inc.*, 191 F.Supp.2d 815, 835 (N.D.Tex.2002) (recognizing practice of compensating named repre-

sentatives in class action suits). The $30,000 amount requested here is consistent with or below awards made in similar suits. *See Camp,* 2004 WL 2149079, at *7 (awarding up to $10,000 to each named plaintiff as compensation for total payment of $102,000); *Purdie v. Ace Cash Express, Inc.,* No. Civ. A. 301CV1754L, 2003 WL 22976611, at *7 (N.D.Tex. Dec.11, 2003) (awarding three named plaintiffs combined incentive award of $16,665); *In re Lease Oil Antitrust Litigation (No. II),* 186 F.R.D. 403, 449 (S.D.Tex. 1999) (awarding named plaintiffs up to $10,000 each for participating in lawsuit); *In re Catfish Antitrust Litig.,* 939 F.Supp. 493, 504 (N.D.Miss.1996) (awarding each of four named plaintiffs $10,000 in compensation); *In re Granada P'ship Sec. Litigs.,* 803 F.Supp. 1236, 1247 (S.D.Tex.1992) (granting request for compensation of $5,000 to representative class action plaintiffs). Having reviewed the record, the Court finds the compensation is justified in light of the named plaintiffs' willingness to devote their time and energy to this civil rights representative action and reasonable in consideration of the overall benefit conferred on the settlement class.

### CONCLUSION

Based on the foregoing discussion and the Court's findings of fact and conclusions of law herein, the settlement as evidenced by the parties' agreement is hereby determined to be fair, reasonable and adequate. The $11,720,000 in attorneys' fees and expenses requested by class counsel are further found to be reasonable, as is the award of $5,000 in compensation for each of the six named class representatives.

The Motion for Final Approval of Proposed Settlement, Final Certification of the Class and Entry of Final Judgment ("Motion for Final Approval") came for hearing (the "Fairness Hearing") on December 18, 2006, as previously scheduled before the Court. All parties appeared through counsel, as stated on the record. The Court, having considered the Motion for Final Approval, having considered all of the submissions and arguments with respect to the Motion, having provisionally certified by Order dated June 2, 2006 a settlement Class pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, and good cause appearing, the Court finds, Orders and Adjudges as follows:

1. On June 2, 2006, the Court entered an Order Preliminarily Approving Settlement in this cause based upon a Settlement Agreement entered into by the Parties. The Settlement Agreement was arrived at as a result of arm's-length negotiations conducted in good faith by counsel for the parties and is supported by the vast majority of the members of the Class.

2. The Court hereby adopts all of the findings contained in its Order Preliminarily Approving Settlement and incorporates those findings by reference as if fully set forth herein. In addition, this Final Order and Judgment Approving Class Action Settlement incorporates by reference the definitions contained in the Settlement Agreement, and all capitalized terms used in this Final Order and Judgment Approving Class Action Settlement will have the same meanings as set forth in the Settlement Agreement, unless otherwise defined in this Final Order and Judgment Approving Class Action Settlement.

3. This matter satisfies the prerequisites for certification of a settlement class under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. The members of the Class are so numerous that joinder of all members is not practicable, there are questions of law and fact common to the Class, the claims of the Plaintiffs are typical of the Class, and the Plaintiffs will fairly and adequately protect the interests of the Class. Based on the allegations of plaintiffs, Defendants in this cause have acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole.

4. The Settlement Agreement primarily provides injunctive and equitable relief, which requires Allstate to give Class Members the opportunity to ob-

tain an Allstate insurance policy that is priced using the Settlement Algorithm, implement an appeals process for those whose credit information has been adversely affected by an extraordinary event, provide a credit education program and increase its national media spending for multicultural marketing. Equitable restitution also is provided in the form of a monetary payment, based on a simple objective calculation and not dependent on class members' intangible, subjective differences. This equitable restitution is merely incidental to the injunctive and equitable relief being provided in the Settlement Agreement for Class Members.

5. The Court thus finds that the Class satisfies Rule 23(b)(2) of the Federal Rules of Civil Procedure in that it appears Allstate in this cause has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the class as a whole.

6. Given that the present action falls within the classic Rule 23(b)(2) paradigm, no opt-out procedure is necessary to protect the interests of the Class. The interests of the Class Members in this Settlement are cohesive and homogeneous, Plaintiffs seek to redress an alleged common injury properly through class-wide equitable relief. The relief offered in the Settlement is not dependent on adjudication of facts particular to any subset of the class nor does it require a remedy that differs materially among Class members. As a result, an opt-out procedure is not required and all Class Members may properly be bound by the release and final judgment to be entered pursuant to the Settlement.

7. Notice to the Settlement Class has been provided in accordance and compliance with this Court's Preliminary Order Approving Settlement Agreement dated June 2, 2006, and notice has been given in an adequate and sufficient manner; constitutes the best notice practicable under the circumstances; and satisfies the requirements of due process. In addition, the Notice was supplemented by the placing of settlement documents on the website established for administration of the class. The Notice apprised the members of the Class of the pendency of the litigation; of all material elements of the proposed Settlement, including but not limited to the relief available under the Settlement Agreement and steps necessary to obtain the relief; of the *res judicata* and/or collateral estoppel effect on members of the Class and of their opportunity to object to or comment on the settlement; of the identity of Class Counsel and of information necessary to contact Class Counsel; of Class Counsel's filing of a motion for attorney's fees; of the right to object to the proposed Settlement; and of the right to appear at the Fairness Hearing. Full opportunity has been afforded to members of the Class to participate in this Fairness Hearing. Accordingly, the Court determines that all members of the Class are bound by this Order and Final Judgment Approving Class Action Settlement.

8. The parties and each Class Member have irrevocably submitted to the jurisdiction of this Court for any suit, action, proceeding or dispute arising out of the Settlement. In addition, the Court has subject matter jurisdiction over the claims of the Plaintiffs and of all Class Members.

9. It is in the best interests of the parties and the Class and consistent with principles of judicial economy that any dispute between any Class Member (including any dispute as to whether any person is a Class Member) and any Released Party which in any way relates to the applicability or scope of the Settlement Agreement or this Final Order Approving Class Action Settlement should be presented exclusively to this Court for resolution.

It is therefore ORDERED, ADJUDGED and DECREED that:

1. Plaintiffs' Motion for Final Approval of Class Action Settlement and Entry of Final Judgment (docket no. 147) is GRANTED.

2. For purposes of settlement only, pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the following Settlement Class is certified: all individuals who are (1) Black/African–American or of Hispanic or Latino origin who either (a) were charged a premium for a policy that was anything but the lowest available premium based in whole or in part on credit information; or (b) did not qualify for a policy issued by one Allstate insurer based solely on credit information, but who was issued a policy by another Allstate insurer; and (c) who received notice from Allstate, included in a new business or renewal mailing package, indicating that he or she did not qualify for lower rates or that he or she did not qualify for a policy based in whole or in part on credit information and advised him or her of certain rights under the Fair Credit Reporting Act.

3. The Settlement Agreement submitted by the parties is finally approved as fair, reasonable and adequate and in the best interests of the Class, and the parties are directed to consummate and to implement the Settlement Agreement in accordance with its terms. The provision of equitable relief shall take place in accordance with the Settlement Agreement.

4. The law firms of James, Hoyer, Newcomer & Smiljanich, P.A., Bonnett, Fairbourn, Friedman & Balint, P.C, and Lerach Coughlin Stoia Geller Rudman & Robbins LLP are appointed Class Counsel for the settlement Class and shall act on behalf of the Class Representative and all members of the settlement Class. The law firm of James, Hoyer, Newcomer & Smiljanich is appointed as Lead Counsel.

5. Plaintiffs Jose C. DeHoyos, Eva Perez–DeHoyos, Georgia Harrison, Charles White, Sheryl H. Franks, and Martel Shaw are hereby certified as the Class representatives of the Class defined above, for settlement purposes only.

6. This certification of the Class, Class Counsel and the Class representatives is solely for purposes of effectuating the Settlement Agreement. If the Settlement Agreement is terminated or is not consummated for any reason, the foregoing certification of the Class and appointment of Class representatives shall be null and void and of no further effect with respect to any party to this action, and the Parties to the settlement shall be returned to the status each occupied before entry of this Final Order And Judgment Approving Class Action Settlement without prejudice to any legal argument that any of the Parties to the Settlement Agreement might have asserted but for the Settlement Agreement. Neither the Settlement Agreement nor the Court's orders issued in connection with consideration of the settlement, including this Final Order and Judgment Approving Class Action Settlement, shall be used or referred to in any litigation for any purpose whatsoever, except as required to enforce those provisions of the Settlement Agreement which survive a failure of the settlement to be consummated or the Effective Date of the settlement to occur.

7. Class Counsel has applied for an award of attorneys' fees and expenses to be paid pursuant to the terms of the Settlement. This Court awards Plaintiffs' Counsel attorneys' fees and expenses of Eleven Million Seven Hundred and Twenty Thousand Dollars ($11,720,000). Said fees and expenses are determined by the Court to be fair, reasonable and appropriate. No other fees, costs or expenses may be awarded to Plaintiffs' Counsel, Class Counsel or any other attorney representing a Class Member in connection with this action, in any related action, or in any action arising from the facts and circumstances alleged in this action.

8. Plaintiffs have applied for incentive awards to be paid to the representative Plaintiffs. Recognizing these representative Plaintiffs' efforts on behalf of the Class, this Court finds these awards fair, reasonable and appropriate, and approves incentive awards in the amount of $5,000 to each of the named Plaintiffs in this cause to be paid in accordance with the Settlement Agreement. No other payments, costs or expenses may be awarded to Plaintiffs in connection with this action, in any related action, or in any action

arising from the facts and circumstances alleged in this action.

9. Plaintiffs and all Class Members covenant and agree that, subject to Section 7.E. of the Settlement Agreement, they shall, upon the Effective Date and by operation of the Final Order and Judgment Approving Class Action Settlement, release and forever discharge Allstate and each of their present and former officers, directors, partners, shareholders, agents, independent contractors, employees, predecessors, successors, assigns, parents, insurers and attorneys, and the agents and employees of them ("Released Parties") from liability for the Litigation in any state or federal court, in or before any regulatory body or administrative agency, or in any other proceeding regarding the Released Parties' use of credit reports, credit information, and/or insurance scores in any form and in any manner whatsoever to underwrite, price or rate insurance policies, including but not limited to any claims arising under 42 U.S.C. § 1981, 42 U.S.C. § 1982, and 42 U.S.C. § 3604, and any tort claims, contract claims, statutory claims, controversies, claims for disgorgement, claims for restitution, actions, causes of action, declaratory judgment actions, cross-claims, counterclaims, demands, debts, claims for damages, liquidated damages, punitive damages or exemplary damages, equitable relief, injunctive relief, costs, expenses and/or attorneys fees, or liabilities (collectively "Claims") of any nature in both law or in equity, past and present, and whether known or unknown, suspected or claimed, regardless of whether each such Plaintiff or Class Members timely makes a claim for Benefits under this Class Settlement Agreement. This is a general release of the Litigation as described herein as to Allstate, individually and collectively, and the parties intend and agree that it shall be interpreted, construed and enforced as such. However, nothing herein is intended to or shall be construed as a release of any Claims arising after the Effective Date.

10. Upon the Effective Date of Settlement, for the consideration provided for herein and by operation of the Final Order and Judgment Approving Class Action Settlement, Plaintiffs and all Class Members and the Class shall be deemed to have covenanted and agreed that they shall not, at any time, institute, cause to be instituted, assist in instituting or permit to be instituted on their behalf any proceeding in any state or federal court, in or before any regulatory body or administrative agency, or any other proceeding or otherwise allege or assert any of the Claims released against the Released Parties or any claims based on Allstate's use hereafter of the Settlement Algorithm or of any algorithm comprised of substantially the same variables and associated weights, to underwrite, price or rate insurance policies.

11. "Unknown Claims" means all claims arising out of facts relating in any way to any matter covered by the Released Claims which all persons or entities providing releases, including all Class Members, do not know or suspect to exist in their favor and which, if known by them, might have affected their decision to settle. All persons or entities providing releases under the Settlement Agreement may hereafter discover facts other than or different from those which such persons now know or believe to be true with respect to the Actions or matters covered by the Released Claims. Plaintiffs and Class Counsel explicitly took this into account in entering into the Settlement Agreement. Upon the Effective Date, each person or entity providing releases under the Stipulation of Settlement, including but not limited to all Class Members who are or were residents of the State of California during the time periods identified above in the definition of "Class" in Section 7.A of the Settlement Agreement, expressly waives and releases, and shall be deemed to have waived and released, any and all rights that he, she, it or they may have under any statute, regulation, administrative adjudication or common law principle that would otherwise limit the effect of the foregoing releases to those claims actually known or suspected to exist at the time of execution of the Settlement Agreement, including, but not limited to, the provisions of Section 1542 of the California Civil Code, to the extent deemed applicable, which provides as follows:

General Release–Claims Extinguished. A general release does not extend to claims

which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

12. Nothing in this Release shall be deemed to release, extinguish or otherwise compromise in any way: (in) any Class Member's claims or remedies for any violation of the Fair Credit Reporting Act; (ii) or any Class Member's right to participate in any relief obtained or made available by any administrative or regulatory body through a public action or proceeding to which no Class Member is a party and that has not been in any way initiated by any Class Member, regarding Allstate's use of credit reports, credit information, and/or insurance scores to underwrite, price or rate insurance policies.

13. Without affecting the finality of this Final Order and Judgment Approving Class Action Settlement, and pursuant to Section 10.M of the Settlement Agreement, the Court retains exclusive jurisdiction to resolve any disputes relating to or arising out of the administration enforcement, implementation, consummation or interpretation of the Settlement Agreement. In addition, without affecting the finality of this judgment, the parties, including each member of the Settlement Class as defined in this Order, are hereby deemed to have submitted irrevocably to the exclusive jurisdiction of this Court for any suit, action, proceeding or dispute arising out of or relating to this Order or the Settlement Agreement.

14. Any person wishing to appeal this Final Order and Judgment Approving Class Action Settlement shall post a bond with this Court to cover the costs of appeal as a condition of prosecuting the appeal. The amount of the appeal bond will be set if, as, and when a notice of appeal is filed. The Court will consider whether any further bond should be required at a later point.

15. If the Effective Date, as defined in the Settlement Agreement, does not occur for any reason whatsoever, this Final Order and Judgment Approving Class Action Settlement and the Order Preliminary Approving Settlement shall be deemed vacated and shall have no force and effect whatsoever.

16. Nothing in this Final Order and Judgment Approving Class Action Settlement shall be construed or used as an admission, concession, or declaration by or against Allstate for any fault, wrongdoing, breach or liability. Nor shall this Order be construed as a finding or conclusion of the Court with respect to the merit or lack of merit of any claim asserted in the action or the defense to any claim asserted in this action.

17. The Plaintiffs, the Class Members, and Allstate having so agreed, good cause appearing, and there being no just reason for delay, it is expressly directed that this Final Order and Judgment Approving Class Action Settlement, is hereby entered as a final and appealable order.

18. The Litigation is dismissed with prejudice and without further costs, including but not limited to claims for interest, penalties, costs and attorneys' fees, that Plaintiffs and any Class Members have alleged or may have alleged in connection with this Litigation or that are covered by the Release in Section 7 of the Settlement Agreement.

It is so ORDERED.